# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 17-60907-CIV-MORENO

FEDERAL TRADE COMMISSION, *et al.*,

      Plaintiffs,

v.

JEREMY LEE MARCUS, *et al.*,

      Defendants.

_____/

## RECEIVER'S MOTION TO COMPEL PNC BANK, N.A. TO COMPLY WITH SUBPOENAS, FOR SANCTIONS, AND FOR RELATED RELIEF

Jonathan E. Perlman, the Court-appointed Receiver ("Receiver") of the Receivership Entities,[1] moves under Fed. R. Civ. P. 45(g), 37(a), 30(b)(6), S.D. Fla. L.R. 26.1(g), and the Court's inherent authority to compel PNC Bank, N.A. ("PNC Bank" or "PNC") to comply with subpoenas issued by the Receiver, to impose appropriate sanctions against PNC, and for related relief.

---

[1] Receivership Entities are Financial Freedom National, Inc. f/k/a Institute for Financial Freedom, Inc. and Marine Career Institute Sea Frontiers, Inc. d/b/a 321 Loans, Instahelp America, Inc., Helping America Group, United Financial Support, Breeze Financial Solutions, 321Financial Education, Credit Health Plan, Credit Specialists of America, American Advocacy Alliance, and Associated Administrative Services, 321Loans, Inc., f/k/a 321 Loans, Inc. d/b/a 321Financial, Inc., Instahelp America, Inc. f/k/a Helping America Team, Inc. d/b/a Helping America Group, Breeze Financial Solutions, Inc. d/b/a Credit Health Plan and Credit Maximizing Program, US Legal Club, LLC, Active Debt Solutions, LLC f/k/a Active Debt Solutions, Inc. d/b/a Guardian Legal Center, Guardian LG, LLC d/b/a Guardian Legal Group, American Credit Security, LLC f/k/a America Credit Shield, LLC, Paralegal Support Group LLC f/k/a Paralegal Support LLC, Associated Administrative Services, LLC d/b/a Jobfax, Cockburn & Associate LLC, JLMJP Pompano, LLC, Halfpay International, LLC, Halfpay NV, LLC, HP Properties Group, Inc., HP Media, Inc., Omni Management Partners, LLC, Nantucket Cove of Illinois, LLC, Discount Marketing USA, S.A., Viking Management Services, LLC, White Light Media LLC, Blue42, LLC, National Arms, LLC, and 110 Glouchester St., LLC, and their divisions, subsidiaries, affiliates, predecessors, successors, and assigns.

## PRELIMINARY STATEMENT

1.   This Motion presents a veritable textbook case of the things a corporate entity should <u>not do</u> in response to a federal court subpoena. The Receiver issued a subpoena *duces tecum* to PNC seeking documents relevant to the Receiver's investigation into potential assets of the receivership estate. PNC responded without objection by producing a limited category of documents together with a letter stating that "<u>all documents requested</u>" had been produced. Given the dearth of responsive documents PNC produced, the Receiver sought to confirm whether PNC had additional responsive documents; but the Receiver was stonewalled. PNC's outside counsel advised that PNC would belatedly object to producing certain documents if they existed, but PNC would not actually say whether any more documents existed, had been searched for, or had been withheld. In response to PNC's astonishing position, the Receiver served a Rule 30(b)(6) subpoena on PNC requiring PNC to designate a witness to testify as to its efforts to comply with the initial subpoena for documents. PNC then responded by taking more than month to locate an employee who would be the bank's designee. Then, after that stall tactic, PNC sent the Receiver's counsel on a wild goose chase to depose a designee that knew <u>next to nothing</u> about PNC's efforts to comply with the subpoena; in truth, the only useful information PNC's designee provided was confirmation that PNC had utterly failed to prepare her as its Rule 30(b)(6) witness, and that another employee in a different city, already identified by PNC, is actually the person with the information the Receiver seeks. Thus, PNC spent weeks surveying its employees for potential witnesses and designated the person with the <u>least</u> useful information possible, intentionally designating a witness with no knowledge of the designated topics.

2.   To paraphrase a famous Miamian, Dave Barry: the Receiver is not making this up! There is no conceivable good cause or excuse for PNC's complete failure to comply with its most basic

obligations under the federal rules. As set forth in detail below, the Court should compel PNC to comply with the subpoenas without further delay, and impose appropriate sanctions, as requested below, for its egregious conduct.

## BACKGROUND

3. Mr. Perlman is the Permanent Receiver over the Receivership Entities and "their affiliates, subsidiaries, divisions, or sales or customer service operations, wherever located, with the full power of an equity receiver." [ECF No. 21]. The Court's Order appointing the Receiver "directed and authorized" the Receiver, *inter alia*, to "Issue subpoenas to obtain documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate." *Id.* p.20. Further, the Court's Order requires any "Person served with a copy of this Order"—specifically including "banks"—to "fully cooperate with and assist the Receiver," including by "providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order." *Id.* p.21. The Receiver served a certified copy of the Court's Order containing the foregoing directives to PNC shortly after the Receiver's appointment in this case.

### A.       The Receiver's Subpoena *Duces Tecum* to PNC.

4. On May 1, 2018, the Receiver, through counsel, issued a subpoena *duces tecum* to PNC to obtain documents pertaining to the receivership and potential assets (namely, potential causes of action) of the receivership. A correct copy of the subpoena *duces tecum* is Exhibit 1 to this Motion.

5. The subpoena seeks 36 categories of documents related to Receivership Entities and the individuals that controlled them (defined in the subpoena as "Relevant Parties"):

(1)    All documents and communications relating to account opening documents referencing any of the Relevant Parties.

(2)   All documents and Computer Generated Reports relating to any of the Relevant Parties.[2]

(3)   All communications between you and any third party concerning any of the Relevant Parties.

(4)   All communications between you and any of the Relevant Parties.

(5)   All documents and correspondence relating to any due diligence relating to any of the Relevant Parties.

(6)   All documents and communications relating to any account of any of the Relevant Parties.

(7)   Documents identifying the name of each automated account monitoring system, such as Carreker Fraud Link or SAS, and documents identifying the name of each manual account monitoring systems, such as uncollected funds reports or large account balance change reports.

(8)   Any and all fraud alerts, ALM alerts, or Bank Secrecy Act alerts from any automated or manual account monitoring system for accounts titled in the name of or held by any of the Relevant Parties.

(9)   Any and all documents regarding each of your automated or manual account monitoring systems for the years 2013 through 2017.

(10)  Any user manuals and policies and procedures for each of your automated or manual account monitoring systems for the years 2013 through 2017.

(11)  All reports and other documents generated from your Large Cash Reporting System concerning any of the Relevant Parties.

(12)  All Currency Transaction Reports concerning any of the Relevant Parties.

(13)  All reports and other documents reflecting customer contact history and/or account contact history concerning any of the Relevant Parties.

(14)  All reports and other documents concerning any of the Relevant Parties generated from your Customer Relationship Inquiry Service System.

(15)  All reports and other documents generated from BlueZone concerning any of the Relevant Parties.

(16)  All reports and other documents generated from Genesis concerning any of the Relevant Parties.

---

[2] "Computer Generated Reports" is a defined term in the subpoena.

(17) Manuals and any other documents identifying your policies and procedures concerning identification and/or reporting of unusual, suspicious, improper or illegal activity in accounts during the relevant time period.

(18) Manuals and any other documents identifying your account opening policies and procedures in effect during the relevant time period.

(19) Any and all reports, excluding SARs, relating to your automated and manual account monitoring systems referencing any of the Relevant Parties.

(20) Any and all documents reflecting your review of any transactions in any accounts of any of the Relevant Parties.

(21) Your entire investigative file excluding any SARs, concerning any of the Relevant Parties or any accounts of the Relevant Parties.

(22) Any and all documents relating to the disposition or resolution of alerts generated by your automated or manual account monitoring systems relating to any of the Relevant Parties.

(23) All correspondence, memoranda, facsimiles, emails, text messages, or any other form of written communication between any of the relevant parties and any officer, director, employee, agent or account officer of yours with respect to the banking relationship maintained by you for any of the Relevant Parties.

(24) All documents relating to original account files maintained internally by employees and/or account officers of you with respect to any and all accounts held by or on behalf of any of the Relevant Parties.

(25) All correspondence between you and any other financial institution relating to any of the Relevant Parties.

(26) All communications between any branch employee and your investigative, compliance, or comparable departments concerning any of the Relevant Parties.

(27) Correspondence and communications between you and any law enforcement or regulatory agency relating to any of the Relevant Parties, excluding SARs.

(28) All internal emails and text messages relating to any of the Relevant Parties.

(29) All documents reflecting the codes where their corresponding definitions that are reflected in the Computer Generated Reports.

(30) All documents setting forth the parameters (i.e., dollar amount, activity level, type of activity) which would cause a customer to appear on

Computer Generated Reports during the time period 2013 through 2017.

(31) All documents relating to notification by you to another financial institution reporting returned items for, among other reasons, uncollected/insufficient funds as relates to any of the Relevant Parties.

(32) All documents relating to notification by another financial institution to your reporting returned items for, among other reasons, uncollected/insufficient funds as relates to any of the Relevant Parties.

(33) All correspondence between you and any other financial institution concerning any of the Relevant Parties.

(34) All hardcopies, originals and computer data documents and records maintained by you relating to the above requests.

(35) All hardcopies, originals and computer data documents and records maintained by third parties relating to the above requests.

(36) All documents, including data, information, files, records, files, manuals, supplies, computer data, information, materials and other materials that have been created, used or obtained by you regarding, relating to or for the benefit of the relevant parties, including all financial statements, customer sales and marketing information, customer account records, proprietary interests, copyrights, patents, trademarks and other intellectual property rights (including website rights), training and operations materials and memoranda, personal records, pricing information, and financial information and trade secrets concerning or relating to the financial condition, business, accounts, customers, employees and affairs of any of the relevant parties (or any related entity or affiliate thereof) not already requested herein.

6. On May 15, 2018, PNC responded to the subpoena. <u>PNC did not object to any of the document requests or any other aspect of the subpoena</u>, and instead produced various signature cards and account statements, along with a letter from a PNC Records Custodian, Cheryl Basko, which stated: "To the best of the knowledge, information and belief of PNC Bank, **Enclosed are all documents requested**." (emphasis added). Nothing in PNC's correspondence or production referenced any of the categories of documents reproduced above.

**B.     The Receiver's Subpoena for Deposition under Fed. R. Civ. P. 30(b)(6)**

7. Because PNC produced so few responsive documents, the Receiver was convinced that

PNC had not fully complied with the subpoena. To address that concern, the Receiver first attempted to confer informally with PNC and then served, on November 8, 2018, a Rule 30(b)(6) subpoena for deposition of the PNC representative(s) concerning (a) PNC's efforts to comply with the document subpoena and (b) the documents that PNC produced. After serving the subpoena for deposition on PNC, the Receiver was contacted by PNC's in-house Senior Counsel, Joel B. Gold, who advised that PNC would investigate whether it had additional responsive documents. Mr. Gold also advised that two searches were ongoing with respect to the subpoena and that a deposition might involve two witnesses. This email chain is attached as <u>Exhibit 2</u> to this Motion.

8.   On November 28, 2018 (the day before the deposition was scheduled to occur), PNC (through Mr. Gold) provided by email "information meant to augment the bank's response" to the original subpoena *duces tecum* served in May 2018. The new information consisted of a list of entities named in the subpoena *duces tecum* and a statement as to whether they had been PNC accountholders. PNC continued to ignore the specific categories of documents sought in the subpoena reproduced above. The Receiver responded that the deposition would go forward, but offered to reschedule the deposition if necessary to accommodate the "appropriate PNC representative." *Id.* PNC, through Mr. Gold, requested additional time and also additional information to identify the correct PNC witness; the Receiver agreed to reschedule the deposition and supplied the requested additional information. PNC, again through Mr. Gold, responded on November 30, 2018 by advising that "if it comes to a deposition, the employees are located in Pittsburgh and Cleveland." *Id.* Mr. Gold also advised that PNC would be engaging outside counsel: this was nearly seven months after the documents subpoena was served on PNC.

9.   On December 5, 2018, Receiver's counsel spoke by phone with PNC's outside counsel,

Jason Bowyer, Esq. of McGuire Woods LLP. Attorney Bowyer advised that he would consult with PNC to determine whether it had additional documents to produce. After two more weeks, however, PNC had provided no new information to the Receiver despite multiple follow-up emails. So, on December 19, 2018, the Receiver's counsel notified PNC that the deposition would be re-noticed for early January in Pittsburgh, *i.e.*, one of the two places where PNC said a knowledgeable PNC employee was located. PNC's outside counsel responded that he was still trying to "determine who, if anyone, is the most appropriate person to depose and where that would take place." Upon hearing that PNC still did not know "who, if anyone" was the appropriate witness, the Receiver advised that the deposition would be set for January 15, 2019—more than two months after the deposition subpoena was served—in South Florida, the location of the PNC branch that maintained the Receivership Entities' accounts. This email chain is attached as Exhibit 3 to this Motion.

10. On January 11, 2019 (four days before the deposition the Receiver had set more than three weeks earlier), PNC's counsel contacted Receiver's counsel to try and resolve the subpoena *duces tecum* without a deposition. Essentially, PNC's counsel advised that PNC had conducted an investigation of the Receivership Entities' accounts and that PNC was concerned that its production of any documents related to this investigation would violate the Bank Secrecy Act; yet the bank's attorney could not say in January 2019 whether any such documents actually existed or had been held back from PNC's document production. The Receiver responded that the deposition would proceed. A correct copy of this email chain is attached as Exhibit 4.

11. On January 14, 2019 (the day before the deposition which had been set a month earlier), PNC's counsel advised that the bank's designee was "located either in Pittsburgh or Cleveland"—thus, PNC delayed nearly a month while it looked for the appropriate witness, but

then apparently settled on the same two witnesses PNC's in-house counsel had already identified in late-November 2018—more than a six weeks earlier. PNC also requested that the Receiver again reschedule the deposition so that the PNC witness would not have to travel to the deposition location (*i.e.*, to South Florida in mid-January from Pittsburgh or Cleveland, which were in the midst of a Polar Vortex at the time). As a courtesy and to accommodate PNC's employee, the Receiver agreed. *Id.*

12. Upon the Receiver agreeing to reschedule the deposition to February 1, 2019, PNC advised that its designated witness would be produced in Cleveland. PNC's attorney accepted service of a subpoena under Rule 30(b)(6) (identical to the Receiver's prior deposition subpoena to PNC except for the date and location) designating the following topics: (a) the efforts that PNC undertook to comply with the subpoena *duces tecum* previously served to PNC; and (b) the documents of PNC that are responsive to the subpoena. A correct copy of the operative subpoena for deposition is attached as Exhibit 5 to this Motion.

### C.     The PNC Corporate Representative Deposition

13. On January 31, 2019—the same day that the Receiver's counsel was scheduled to travel from Florida to Cleveland to conduct the deposition the following morning, on February 1—the Receiver was contacted by another PNC attorney, Branden Moore, Esq. of McGuire Woods, who advised that PNC's designated witness would have limited information about the designated topics, and requested that the Receiver not "beat up" the witness in response to her lack of knowledge. At the February 1 deposition, PNC produced Ms. Basko, the same PNC Records Custodian that had sent PNC's production to the Receiver. Excerpts from the transcript of Ms. Basko's deposition are attached as Exhibit 6.

14. At the deposition, it quickly became clear that  Ms. Basko knew next to nothing about the

topics for which PNC had designated her to testify—"the efforts that PNC undertook to comply with the subpoena *duces tecum* previously served to PNC" and "the documents of PNC that are responsive to the subpoena." Instead, Ms. Basko explained that, as a Records Custodian, she only has access to limited categories of documents: (i) bank statements, (ii) checks, (iii) deposits, (iv) signature cards, (v) loan documents, and (vi) credit card statements. "[A]nything else we [PNC Records Custodians] have to order from the appropriate department. We don't have access to all bank documents."[3] Ms. Basko's deposition testimony confirms that she lacked access to the vast majority of documents sought in the Receiver's subpoena *duces tecum*, could not say what department within PNC had access to these documents, did not know where or how the documents might be stored, and did not know what types of documents might exist with respect to most of the categories of documents requested. In other words, despite taking over two months to designate its Rule 30(b)(6) designee, PNC produced a witness that affirmatively lacked the knowledge required of the designated witness.

15. Ms. Basko further testified that she made no attempt to search for responsive documents that she, as a Records Custodian, could not access. Instead, because the subpoena mostly sought documents that she could not access, Ms. Basko referred the entire subpoena to PNC's "legal department"—which is located in Pittsburgh, not Cleveland.[4] The following excerpts summarize Ms. Basko's testimony on this point:[5]

> A. I contacted the legal department because of, I don't know what some of this stuff is, and I asked them to respond.
> Q. Respond to you?
> A. No.
> Q. Respond –

---

[3] Basko Tr. p.19:20-23.

[4] *Id.* pp.34-35.

[5] *Id.* pp.66:23 to 110:9.

A. They don't respond to us.

Q. Okay. You asked the legal department to respond to the subpoena?

A. Um-hmm.

\*\*\*

Q. Is it fair to -- is it fair to characterize the communication [to the legal department] as -- and again, I'm just trying to understand the purpose of the communication -- as; I have received this subpoena. You guys need to handle it? Was that the essence of the communication?

A. Yes.

\*\*\*

Q. Was your expectation that the legal department -- how did you expect the legal department to respond, if at all, to your --

A. If there were any relevant documents, they would have provided them. I wouldn't know what they provide, they don't tell us.

Q. And that was the purpose of the communication, for them to provide relevant documents that you didn't have access to?

A. Yes.

\*\*\*

Q. And again, I'm gathering that the tenor of the conversation with the legal department was; You guys need to find out whether there are documents responsive to this that I don't have access to. Is that accurate?

A. Yes.

\*\*\*

Q: … This is [document request number] 19. "Any and all reports, excluding SARs, relating to your automated and manual account monitoring systems referencing any of the Relevant Parties." Is it your testimony that you referred this to legal with the expectation that if there were responsive documents they would deal with it?

A. That is correct.

\*\*\*

Q. And then, number 21 asks for your entire investigative files, excluding any SARs, concerning any of the Relevant Parties or any accounts of the Relevant Parties. Did you do anything to search for those documents?

A. I did not.

Q. Did you reach out to anyone within the bank to ask them to search for those documents?

A. Legal department.

\*\*\*

Q. Under what circumstances do you normally reach out to the legal department for help in responding to a subpoena? There are usual circumstances where this happens a lot that you might refer to the legal department.

A. If there are documents or requests that we do not have access to, we refer it to the legal department.

Q. As a matter of course, any time you don't have access to documents you would refer that to the legal department?

A. Um-hmm.

Q. Any other departments? I think you mentioned other departments you might --

A. Yeah. I would do it if I do not know where those documents would be or how to get them.

Q. You would go to legal?

A. I would.

***

Q. Let's look at number 22. "Any and all documents relating to the disposition or resolution of alerts generated by your automated or manual account monitoring systems relating to any of the Relevant Parties." What, if anything, did you do to search for those documents?

A. Referred it to our legal department.

Q. With the expectation that they would undertake that search?

A. That is correct.

Q. And you've testified a number of times that you referred requests to the legal department, correct?

A. Um-hmm.

Q. And in each instance, it was with the expectation that the legal department would undertake to search for those documents that you did not have access to?

A. That's correct.

***

Q. And as your lawyer said, each time you referred -- is it fair for me to assume that each time you referred something to the legal department, it was with the understanding, purpose, expectation that they were going to search for those documents?

A. Yes, that's correct.

***

Q. Okay. Did you ask the legal department anything other than to search for these documents?

[Bank's counsel]: Objection. Don't answer that.

THE WITNESS: Okay.

Q. Did you ask for any legal advice from the legal department, in your view?

A. No.

16. To summarize: the Receiver issued a subpoena *duces tecum* in May 2018 seeking

numerous categories of documents (beyond account statements and signature cards). PNC did

12

not object in any way, and instead produced only account statements and signature cards, together with a letter stating that "all documents requested" had been produced. When the Receiver sought to confirm whether PNC had additional responsive documents, PNC's outside counsel then responded that PNC would object to producing certain documents if they existed, but PNC would not confirm whether such documents did exist, had been searched for, or had been withheld. When the Receiver sought to depose PNC's Rule 30(b)(6) designee regarding PNC's efforts to comply with the subpoena, PNC took over a month to investigate "who, if anyone," would be the appropriate witness before designating a witness who knew next to nothing about PNC's efforts to comply with the subpoena, except that the entire subpoena had been referred to Pittsburgh. Thus, PNC apparently surveyed its employees for potential designees and selected an employee with the least information about the designated topics, intentionally choosing not to designate a witness with the knowledge sought, who apparently is located in Pittsburgh.

## RELIEF REQUESTED AND MEMORANDUM OF LAW

**A. The Court should sanction PNC for failing to produce an appropriate, prepared Rule 30(b)(6) representative, and should compel PNC to produce a properly-prepared witness at a location in South Florida convenient to the Receiver.**

A corporation served with a Rule 30(b)(6) subpoena "must produce one or more witnesses who can testify about the corporation's knowledge of the noticed topics." *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 688 (S.D. Fla. 2012). The "corporation must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed as to the relevant subject matters." *In re Brican Am. LLC Equip. Lease Litig.*,

No. 10-MD-02183, 2013 WL 5519969, at *3 (S.D. Fla. Oct. 1, 2013), *aff'd sub nom.*, *In re: Brican Am. LLC*, No. 10-MD-02183-PAS, 2013 WL 12092311 (S.D. Fla. Nov. 15, 2013).

A fundamental purpose of Rule 30(b)(6) is "to avoid the bandying by corporations where individual officers or employees disclaim knowledge of facts clearly known to the corporation," and "curb any temptation by the corporation to shunt a discovering party from 'pillar to post' by presenting deponents who each disclaim knowledge of facts known to someone in the corporation." *QBE*, 277 F.R.D. at 688. Thus, a corporation's "duty to prepare a Rule 30(b)(6) witness goes beyond matters personally known to the designee or to matters in which the designated witness was personally involved" and "extends to matters reasonably known to the responding party." *Id.* "In other words, a corporation is expected to <u>create</u> an appropriate witness or witnesses from information reasonably available to it if necessary," and therefore "it must perform a reasonable inquiry for information that is reasonably available to it." *Id.*

Rule 30(b)(6) "provides for a variety of sanctions for a party's failure to comply with its Rule 30(b)(6) obligations, ranging from the imposition of costs to preclusion of testimony and even entry of default." *Id.; Brican Am.*, 2013 WL 5519969, at *5 ("A district court has broad discretion to impose sanctions" under Rule 37 and inherent powers to remedy violations of Rule 30(b)(6). The corporation's failure to produce an appropriate witness "can be deemed a nonappearance justifying the imposition of sanctions," because a witness that is unable to give useful information "is 'no more present for the deposition than would be a deponent who physically appears for the deposition but sleeps through it.'" *QBE*, 277 F.R.D. at 690 (citing *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.,* 228 F.3d 275, 305 (3d Cir. 2000)).

In this case, PNC has flouted its obligations under Rule 30(b)(6). Producing Ms. Basko to testify that the subpoena *duces tecum* was handled by some other, unknown PNC employee is

exactly what Rule 30(b)(6) forbids; the rule's fundamental purpose is prevent a corporation from producing a witness who "disclaim[s] knowledge of facts clearly known to the corporation." *QBE*, 277 F.R.D. at 688. PNC's decision to produce Ms. Basko merely to testify that she referred the Receiver's subpoena to Pittsburgh violated PNC's duty to "create an appropriate witness or witnesses from information reasonably available to" it. *QBE*, 277 F.R.D. at 689; *Brican*, 2013 WL 12092311 ("a corporation with no current knowledgeable employees must prepare its designees by having them review available materials, such as fact witness deposition testimony, exhibits to depositions, documents produced in discovery, materials in former employees' files and, if necessary, interviews of former employees or others with knowledge."). Indeed, instead of producing an appropriately-educated witness, PNC apparently selected among its potential witnesses the employee that knows the least about PNC's efforts to comply with the subpoena.

Based on the foregoing, the Receiver requests the Court order PNC to produce a new Rule 30(b)(6) witness to testify with respect to the topics designated in the subpoena. *QBE*, 277 F.R.D. at 688–91 ("If it becomes apparent during the deposition that the designee is unable to adequately respond to relevant questions on listed subjects, then the responding corporation has a duty to timely designate additional, supplemental witnesses as substitute deponents."). Further, as a sanction, the Court should order PNC to pay the fees and costs that the receivership estate incurred on PNC's wild goose chase to Cleveland, and order PNC to pay the additional fees and costs that the receivership estate will incur taking the second deposition necessitated solely by PNC's failure to comply with its obligations under the rules. The Court should also order PNC to produce its new witness at a location of the Receiver's choosing in South Florida, where the Receiver and his counsel are located, where the PNC branch bank that maintained the Receiver Entities' and Jeremy Marcus' accounts is located, and where PNC routinely conducts substantial

business and maintains its regional headquarters. *See Brican Am. LLC*, No. 10-MD-02183, 2013 WL 5519969, at *12 (discussing that district court has "broad discretion" to remedy discovery violations).

> **B. The Court should order PNC to produce all documents responsive to the subpoena *duces tecum* without further delay, order that all of PNC's belated, "boilerplate" objections to the subpoena *duces tecum* are waived, and order that the attorney-client privilege is not a basis to withhold the information sought merely because the subpoena was referred to PNC's "legal department."**

In addition, the Court should order PNC to produce all documents responsive to the subpoena *duces tecum* in advance of the second Rule 30(b)(6) deposition. In connection with this order, the Court should rule that PNC has waived all of its untimely, boilerplate-type objections to the subpoena *duces tecum* (*e.g.*, "overly broad and unduly burdensome"), which were made for the very first time during Ms. Basko's deposition.[6]

Rule 45(d)(2)(B) requires a party served with a subpoena to make any objections in writing within 14 days of service:

> **(B)** *Objections*. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises--or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served.

"The failure to serve written objections to a subpoena within the time specified by Rule 45(d)(2)(B) typically constitutes a waiver of such objections, as does failing to file a timely motion to quash." *Noel-Wagstaffe v. Metro. Cas. Ins. Co.*, No. 17-CIV-61039, 2017 WL 6047679, at *1 (S.D. Fla. Dec. 7, 2017); *Stringer v. Ryan*, No. 08-21877-CIV-COOKE, 2009 WL 3644360, at *1 (S.D. Fla. Oct. 30, 2009) ("A non-party waives any objections if she does

---

[6] *See* Ex. 6 at pages 58:17 to 59:1 and pages 79:14 to 80:5.

not timely object to the subpoena."). Here, PNC not only failed to timely assert <u>any</u> objections to the subpoena *duces tecum*, but also made the affirmative representation to the Receiver that "all documents requested" in the subpoena *duces tecum* had been produced. A finding that PNC's untimely objections have been waived is warranted.

Additionally, the Court should make clear in its order that the attorney-client privilege is not a basis for PNC to withhold any documents or information merely because Ms. Basko referred the subpoena to PNC's "legal department" to search for and produce responsive documents.[7] During the deposition in Cleveland, PNC's outside counsel twice improperly instructed Ms. Basko not to discuss her conversations with the legal department concerning the subpoena. But Ms. Basko testified that the sole purpose of these communications was to prompt the legal department to search for and produce responsive documents: "the purpose of the communication [was] for them to provide relevant documents that [Ms. Basko] didn't have access to" and that as "a matter of course, any time [Ms. Basko does not] have access to documents [she] would refer that to the legal department." Indeed, when asked whether her communications with the legal department sought any legal advice, Ms. Basko responded: "No."

The attorney-client privilege does not protect these types of communications:

> … the mere fact that an attorney is present at a meeting or is copied on a document does not in and of itself afford privilege protection to such a meeting or document. The mere fact that one is an attorney does not render everything he does for or with the client privileged. **The attorney-client privilege protects only communications between attorney and client where legal advice is sought.**

---

[7] Again, PNC raised this objection for the very first time at deposition, and thus any privilege objection is waived. *See MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 583 (S.D. Fla. 2013) (citing *Rynd v. Nationwide Mut. Fire Ins. Co.*, 2010 WL 5161838, (M.D. Fla. Dec. 14, 2010)) ("the failure to assert the privilege in a timely manner [may constitute] waiver of the privilege").

*In re Seroquel Prod. Liab. Litig.*, No. 606MD1769-ORL-22DAB, 2008 WL 1995058, at *2 (M.D. Fla. May 7, 2008) (citing *Gutter v. E.I. Dupont de Nemours & Co.*, No. 95-CV-2152, 1998 WL 2017926, *1, *6-7 (S.D. Fla. May 18, 1998) *opinion clarified*, No. 95-2152-CIV, 1998 WL 35333391 (S.D. Fla. June 23, 1998) (emphasis added). Corporations cannot "immunize internal business communications from discovery by placing legal counsel in strategic corporate positions and funneling documents through counsel … the protection of the privilege applies only if the primary or predominate purpose of the attorney-client consultations is to seek legal advice or assistance." *Id.* at *4 (citations and alterations omitted). As explained by the district court in *Poertner v. Gillette Co.*:

> Corporate house counsel are often called upon to perform tasks that go beyond the traditional tasks performed by lawyers. Each document must be perused to see whether the attorney was involved in rendering legal advice; **if the attorney was performing other tasks, then the communications receive no protection from discovery.** There is general agreement that the protection of the privilege applies only if the primary or predominant purpose of the attorney-client consultations is to seek legal advice or assistance.

No. 612CV803ORL31DAB, 2013 WL 12149369, at *2 (M.D. Fla. Mar. 12, 2013) (citations omitted, emphasis added).

Here, Ms. Basko specifically testified that the purpose of her communication with her colleagues in Pittsburgh was <u>not</u> to obtain legal advice, but instead to obtain assistance in producing documents that she could not access herself. Plainly, the "primary or predominant" purpose of PNC's legal department's involvement with the subpoena was <u>not</u> to render legal advice, but to search for responsive documents. PNC cannot "immunize" these documents or related communications by tasking its "legal department" with the responsibility to search for and produce them. *Seroquel* 2008 WL 1995058, at *4. The Court should make clear that PNC

cannot (belatedly) assert the attorney-client privilege in this context to hide non-privileged documents and communications responsive to the subpoena.

### CONCLUSION

PNC's obstructionist conduct is egregious and sanctionable—particularly considering that PNC was already served with this Court's Order expressly requiring PNC to "fully cooperate with and assist the Receiver" by "providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under" the Court's Order. PNC's actions have impeded the Receiver's investigation and administration of the receivership, and caused the receivership estate to incur unnecessary attorney's fees and costs at the expense of the estate's claimants. The Court should order PNC to produce an appropriate Rule 30(b)(6) witness and all documents responsive to the subpoena *duces tecum* without further delay, and impose sanctions.

**WHEREFORE**, the Receiver respectfully requests that the Court (i) grant this Motion; (ii) compel PNC to fully comply with the Receiver's subpoenas; (iii) order PNC to produce all documents responsive to the subpoena *duces tecum* and order that all of PNC's objections to that subpoena are waived; (iv) order PNC to produce a new, appropriately-educated Rule 30(b)(6) witness at a mutually-convenient location in South Florida to testify about the designated topics; (v) order PNC to pay the Receiver's reasonable fees and costs incurred taking the wasteful deposition of Ms. Basko in Cleveland, in bringing and litigating this Motion, and in conducting the additional Rule 30(b)(6) deposition necessitated by PNC's conduct; and (vi) grant such other and further relief as the Court deems appropriate.

## LOCAL RULE 7.1(a)(2) CERTIFICATION

Undersigned counsel certifies that Receiver's counsel has made reasonable efforts to confer with all parties or non-parties who may be affected by the relief sought in the motion, specifically: (i) undersigned attempted to confer by telephone with Jason Bowyer, counsel for PNC bank, on March 14, 2019, and left a detailed voicemail when Mr. Bowyer did not answer; (ii) sent an email to Mr. Bowyer on March 14, 2019, which requested a conference regarding the subpoenas at issue in this Motion; (iii) placed another telephone call to Mr. Bowyer on March 15, 2019, and left him another voicemail; (iv) sent Mr. Bowyer another email on March 15, 2019, again requesting to discuss this matter; and (v) left Mr. Bowyer another voicemail on March 18, 2019, again requesting to discuss this matter. As of the date of this filing, undersigned counsel's telephone calls and emails have not been responded to in any way. The Receiver's counsel will continue to attempt to confer with Mr. Bower; but the Receiver must not be delayed further by PNC unresponsiveness in pursuing the information to which he is entitled from PNC.

Additionally, the Receiver's counsel has conferred with counsel for the FTC, which does not object to the filing of this Motion and takes no position with respect to the relief sought.

Dated: April 2, 2019.

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
*Attorneys for the Receiver*
100 Southeast 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:    (305) 349-2300
Facsimile:    (305) 349-2310

By:    /s/ Michael Friedman
       Gregory M. Garno, Esq., FBN 87505
       ggarno@gjb-law.com
       Michael A. Friedman, Esq., FBN 71828
       mfriedman@gjb-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 2, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record and entities identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   ___/s/ Michael Friedman_____
Michael A. Friedman, Esq., FBN 71828

## <u>SERVICE LIST</u>
**Federal Trade Commission v. Jeremy Lee Marcus, et al.**
**USDC, SD Fla., Case No. 17-60907-CIV-MORENO/SELTZER**

PNC Bank, N.A.
c/o Jason R. Bowyer, Esq.
jbowyer@mcguirewoods.com
McGuire Woods, LLP
Bank of America Tower
50 North Laura Street
Suite 3300
Jacksonville, FL 32202-3661

Keith Feldman
kfeld@bellsouth.net
80 Nottingham Place
Boynton Beach, FL 33426
Pro Se via U.S. Mail and Electronic Mail

Ryann Flack, Esq.
Ryann.Flack@myfloridalegal.com
Ronnie Adili, Esq.
Ronnie.Adili@myfloridalegal.com
Office of the Attorney General
Consumer Protection Division
SunTrust International Center

1 S.E. 3rd Ave, Suite 900
Miami, FL 33131
Telephone:  (786) 792-6249
*Attorneys for State of Florida, Office of Attorney General*

Valerie M. Verduce, Esq.
vverduce@ftc.gov
Angeleque P. Linville, Esq.
alinville@ftc.gov
Federal Trade Commission
225 Peachtree Street, Suite 1500
Atlanta, GA 30303
Telephone:  (404) 656-1355
Facsimile:  (404) 656-1379
*Attorneys for Federal Trade Commission*

Jonathan E. Perlman, Esq.
jperlman@gjb-law.com
Gregory M. Garno, Esq.
ggarno@gjb-law.com
Allison Day, Esq.
aday@gjb-law.com
Theresa M.B. Van Vliet, Esq.
tvanvliet@gjb-law.com
Genovese Joblove & Battista, P.A.
100 Southeast 2nd Street
Suite 4400
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310
*Receiver and his Counsel*

Rachel Hirsch, Esq.
rhirsch@ifrahlaw.com
A. Jeff Ifrah, Esq.
jeff@ifrahlaw.com
1717 Pennsylvania Avenue, NW
Suite 650
Washington, DC 20006

Maurice B. VerStandig, Esq.
mac@mbvesq.com
The VerStandig Law Firm, LLC
12505 Park Potomac Avenue
Sixth Floor
Potomac, Maryland 20854

*Counsel for Defendant Jeremy Lee Marcus and*
*Relief Defendants Halfpay International, LLC; Halfpay NV LLC;*
*JLMJP Pompano, LLC; and Nantucket Cove of Illinois, LLC*

Craig David Smith
13586 Harwell Path
Apple Valley, MN 55124

Yisbet Segrea
5020 Canal Drive
Lake Worth, FL 33463

**<u>Relief Defendants</u>**

Jack Marcus
jackmarcus@bellsouth.net
6436 Grand Cypress Cir.
Lake Worth, FL  33463
Relief Defendant via Electronic Mail

Teresa Duda
110 Glouchester Street
Boca Raton, FL  33487
Pro Se via U.S. Mail

# EXHIBIT 1

$7056

Received

MAY 07 2019

Record Services
Cleveland

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

5/4/18

MCN No. 111

is a certified process server in the Circuit and County Courts and for the Second Judicial Circuit

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, et. al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 17-60907-CIV-Moreno |
| JEREMY LEE MARCUS, et. al. | ) | |
| *Defendant* | ) | |

COPY

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        PNC Bank, N.A., c/o Corporation Service Company, Registered Agent
           1201 Hays Street, Tallahassee, FL 32301-2525

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

            See Attached Exhibit "A"

| Place: Genovese Joblove & Battista, P.A., 200 E. Broward Blvd., Suite 1110, Ft. Lauderdale, FL 33301 | Date and Time: 05/18/2018 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    05/01/2018

            CLERK OF COURT

                                                                OR

_____                    _____
   *Signature of Clerk or Deputy Clerk*                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Jonathan Perlman
Court Appointed Receiver                                      , who issues or requests this subpoena, are:

Gregory M. Garno, Esq., Genovese Joblove & Battista, P.A., 100 SE 2nd Street, Suite 4400, Miami, FL 33131

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## EXHIBIT A

### DEFINITIONS & INSTRUCTIONS

I.   **DEFINITIONS**

1.   The term "Case" shall mean the above-captioned case in the matter styled *Federal Trade Commission, et al. v. Jeremy Lee Marcus, et al., Case No. 17-60907-CIV-Moreno*, pending in the United States District Court for the Southern District of Florida (the "Court").

2.   The term "Receiver" shall mean Jonathan E. Perlman, as permanent receiver over the receivership defendants in the Case, and any agent, attorney, employee, and all other persons acting or purporting to act on the Receiver's behalf, or under the Receiver's authority or control.

3.   The term Relevant Parties shall collectively mean:

   a.   Jeremy Lee Marcus (SSN: ▮▮▮-8380)

   b.   Craig Smith (SSN: ▮▮▮-6923)

   c.   Yisbet Segrea (SSN: ▮▮▮-1184)

   d.   321Loans, Inc. d/b/a 321Financial, Inc. (FEIN: 47-2302663)

   e.   Instahelp America, Inc. f/k/a Helping America Team, Inc. also d/b/a Helping America Group (FEIN: 47-3752203)

   f.   Financial Freedom National, Inc. (FEIN: 59-3316743)

   g.   Breeze Financial Solutions, Inc. (FEIN: 47-2591201)

   h.   Associated Administrative Services, LLC (FEIN: 47-3759372)

   i.   Active Debt Solutions, LLC f/k/a Active Debt Solutions, Inc. (FEIN: 47-4026321)

   j.   US Legal Club, LLC (FEIN: 47-1115648)

   k.   Guardian LG, LLC, also d/b/a Guardian Legal Group (FEIN: 47-1076116)

   l.   Paralegal Support Group, LLC (FEIN: 27-4286400)

   m.   HP Media, Inc. (FEIN: 81-4082950)

   n.   HP Properties Group, Inc. (FEIN: 81-4102535)

   o.   American Credit Security, LLC (FEIN: 81-4898654)

CASE NO. 17-60907-CIV-MORENO

    p.  White Light Media, LLC (FEIN: 81-4197270)

    q.  Halfpay International, LLC (FEIN: 47-1037023)

    r.  Halfpay NV, LLC  (FEIN: 47-1037023)

    s.  Viking Management Services, LLC (FEIN: 81-5245896)

    t.  Cockburn & Associate LLC (FEIN: 81-1236040)

    u.  Omni Management Partners LLC (FEIN: 27-1313420)

    v.  JLMJP Pompano, LLC (FEIN: 47-2566544)

    w.  Nantucket Cove of Illinois, LLC (FEIN: 47-5133390)

    x.  Blue42, LLC (FEIN: 47-2505857)

    y.  Discount Marketing USA, S.A. (Panamanian company)

4.    The terms "you" and "your" shall mean and refer to the party receiving this subpoena and any employee, agent, attorney, and all other persons acting for, or on behalf of, or under the authority or control of such party, or others who are in possession of or who may have obtained information for or on behalf of such party.

5.    The term "Computer Generated Reports" shall mean ACH transaction activity reports, balance fluctuation reports, overdrawn balance reports, active loan reports, past due reports, past due notices by officer, past due management reports, past due board reports, new reports, renewal reports, advance reports, notes in stop accrual reports, activity on past due reports, officer loan portfolio reports, past due by officer reports, customer file maintenance journal reports, drawing on today's deposit reports, EFA suspected activity reports, drawing against bank unavailability/holds reports, significant balance change reports, large items reports, overdraft activity report, check kiting reports, money laundering reports, overdraft reports, posting reject journal reports, NSF/insufficient funds reports, daily trial balance reports, daily transaction journal reports, stop/hold reports, master F/M exception list reports, file maintenance journal reports, stop pay and hold journal reports, stop pay and hold maintenance reports, stop payment reports, exception account charges summary reports, vector return reports, exception audit detail reports, exceptions pay/return high dollar reports, balance fluctuation reports, overall wire activity detail reports, change of internet address reports, internet protocol (IP) address reports, and any and all other reports maintained or updated at the branch, regional and main office levels and that are otherwise generated on a daily, weekly, monthly or any other period basis.

6.    The terms "person" or "persons" includes, without limitation, any natural person,

CASE NO. 17-60907-CIV-MORENO

proprietorship, corporation, partnership, limited partnership, limited liability corporation, limited liability partnership, joint venture, trust, association, organization, business entity or governmental agency or unit.

7.     The term "document" or "documents" shall mean any document as defined in Rule 1001 of the Federal Rules of Evidence, thing, or physical or electronic embodiment of information, data, or ideas (including the original, copy, or drafts); and shall include, but not be limited to, all paper materials of any kind, whether written, typed, printed, punched, filmed or marked in any way; records or data stored, maintained, or accessed by computers, recordings tapes or wires; film; photographs; movies or any graphic matter however produced or reproduced; and all mechanical or electronic sound recordings or transcripts thereof that are in Defendant's possession, custody or control.

8.     The term "possession, custody, or control" shall have the same meaning as under Rule 34(a) of the Federal Rules of Civil Procedure.

9.     The term "ESI" shall mean any and all electronically stored information, including e-mails, texts, writings, drawings, graphs, charts, photographs, documents, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form as set forth in Rules 26 and 34 of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence.

10.    The term "any and all documents" shall mean every document or group of documents or communications as herein defined known to you, and every such document or communication which can be located or discovered by reasonably diligent effort.

11.    The terms "communication" or "communications" shall mean any verbal, written and electronic means of conversation or other statement from one person to another, including, but not limited to, any interview, conference, meeting or telephone conversation. Further, such term means any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation, written contact by such means as letters, memoranda, facsimile transmissions, e-mail, texts, or other electronic transmissions of information or communications, telegrams, telexes, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone or electronically transmitted conversations.

12.    The term "Correspondence" means any letter, note, memorandum, report, notice, facsimile transmission, e-mail transmission, and any communication (as defined above) that were sent or received from one or more persons to one or more persons, regardless of authorship or origin, including that which was directed as a copy, blind copy, forwarded copy, or sent or received mistakenly.

3

13.     The terms "support," "supports," "evidence," "evidences" "evidencing," "relate to," "relates to," "related to," "relating to," "refers," "refer to," "referred to," "referring to," "concern," "concerns," "concerning," "pertains to," "pertaining to," "involves," "involving," and "regarding" shall mean anything which directly, or indirectly, concerns, consists of, pertains to, reflects, evidences, describes, sets forth, constitutes, contains, shows, underlies, supports, refers to in any manner, is or was used in the preparation of, appended to, legally, logically or factually connected with, proves, disproves, or tends to prove or disprove.

14.     The terms "include," "includes," and "including" are used in the sense of specification, and are not to be construed as words of limitation.

15.     The terms "identify" or "identifying" shall mean to state, as to each document, the following information, irrespective of whether the document is deemed privileged or subject to any claim of privilege or immunity from discovery.

     a.   The title and other means of identification;

     b.   The date;

     c.   The author;

     d.   The recipient or recipients;

     e.   The present location of the original and of any and all copies;

     f.   The names and current addresses of any and all persons who have custody of or control over the documents and any copies.

16.     The conjunctions "and" and "or" shall be interpreted in each instance as meaning "and" so as to encompass the broader of the two possible constructions, and shall not be interpreted disjunctively so as to exclude any information or documents otherwise within the scope of any request herein.

17.     As used herein, the singular and masculine form of nouns and pronouns shall embrace, and be read and applied as, the plural or feminine or non-gender specific, as circumstances may make appropriate.

## II.     INSTRUCTIONS

1.      Unless otherwise stated in a particular request, the relevant time period of this Request is **January 1, 2013** through the date of service of this Subpoena (the "Discovery Period"), and shall include all documents which relate or refer to the Discovery Period despite being prepared or created before or subsequent to such period.

2.      All documents shall be produced as they are kept in the ordinary course of business, or shall be organized and labeled in a manner clearly identifying and

CASE NO. 17-60907-CIV-MORENO

indicating the documents or tangible things that are being produced in response to each particular request.

3.     For each and every request herein, you shall produce documents in your possession, custody, or control, which shall include but not be limited to, documents, objects, or articles described that are in your possession or of which you have the right to secure the original or a copy from another person or entity. The fact that your investigation is continuing or discovery is incomplete is not an excuse for your failure to respond to each request as fully and completely as possible. Your responses should consist of information known to you through yourself, your agents, your attorneys, your employees, or your representatives.

4.     This Request is continuing in nature. If, after producing documents, you later discover additional responsive documents or things, you are obligated to supplement your responses pursuant to Rule 26(e).

5.     In producing documents, you shall produce documents in full, without abridgement, abbreviation or editing of any sort, including all "metadata" relating to such documents. For purposes of this Instruction, the term "Metadata" shall mean the data about the data otherwise referred to as the fingerprint of the document. All available fields of metadata should be included.

6.     To the extent that this Request seeks production of ESI residing elsewhere other than, or in addition to, on back-up copies, such information should be produced in its Native Format on hard drive or other digital storage media that does not otherwise detract from the original format of the files, or that by default may exclude or somehow alter any metadata associated with said files. The information produced should include any original or existing full file path, file or folder structure, or other source referencing data, and be fully inclusive of all supporting and underlying data, the absence of which would render the information incomplete or unusable. For purposes of this Instruction, the term "Native Format" shall mean the format that the data was originally created in. This should include, but not limited to, information about the software that the data was created in, stored in, or was used, or is used to read, write, alter, modify, or in any way change or manipulate the data.

7.     All archived data being produced in response to this Request should be provided with the means to view and export such data. Paper documents that are not otherwise contained, stored, or recoverable by electronic means should be provided either in paper format, or via a scanned image in a .TIFF format. Colored pages, photographs or other documents among such paper documents that would otherwise loose the color format should be scanned in .JPEG or other standard color format.

8.     Copies of documents which are identical duplicates of other documents which have already been produced for inspection and copying in this action need not be produced again, except that the duplicates shall be produced if handwritten or any

CASE NO. 17-60907-CIV-MORENO

and the document objected to by furnishing, at the least, its date, authors, addressees, date, a general description of the subject matter of the document, the type of document, number of pages, number and kind of attachments or appendices, indicated or blind copies, all persons to whom shown or explained, date of destruction or other disposition, reason for destruction, person authorizing destruction or other disposition, person destroying or otherwise disposing of document, and if not destroyed, person in possession of documents otherwise disposed of, and the reason why the document is protected. This shall not constitute a waiver of the obligation, or the Receiver's right, to demand a timely and legally sufficient privilege log, or the remedies for non-production of such privilege log. Notwithstanding such objection, you must disclose any objected to evidence containing non-objectionable matter which is relevant and material to this Request, but you may withhold the portion for which you assert the objection, subject to further request or motion, provided that you furnish the above-requested identification.

12. In the event any of the documents cannot be provided in full, you must produce all documents to the fullest extent possible and specify the reasons for your inability to produce the remainder.

## III. **DOCUMENTS TO BE PRODUCED**

1. All documents and communications relating to account opening documents referencing any of the Relevant Parties.

2. All documents and Computer Generated Reports relating to any of the Relevant Parties.

3. All communications between you and any third party concerning any of the Relevant Parties.

4. All communications between you and any of the Relevant Parties.

5. All documents and correspondence relating to any due diligence relating to any of the Relevant Parties.

6. All documents and communications relating to any account of any of the Relevant Parties.

7. Documents identifying the name of each automated account monitoring system, such as Carreker Fraud Link or SAS, and documents identifying the name of each manual account monitoring systems, such as uncollected funds reports or large account balance change reports.

8. Any and all fraud alerts, ALM Alerts or Bank Secrecy Act alerts from any automated or manual account monitoring system for accounts titled in the name of or held by any of the Relevant Parties.

7

CASE NO. 17-60907-CIV-MORENO

9.     Any and all documents regarding each of your automated or manual account monitoring systems for the years 2013 through 2017.

10.    Any user manuals and policies and procedures for each of your automated or manual account monitoring systems for the years 2013 through 2017.

11.    All reports and other documents generated from your Large Cash Reporting System concerning any of the Relevant Parties.

12.    All Currency Transaction Reports concerning any of the Relevant Parties.

13.    All reports and other documents reflecting customer contact history and/or account contact history concerning any of the Relevant Parties.

14.    All reports and other documents concerning any of the Relevant Parties generated from your Customer Relationship Inquiry Service System.

15.    All reports and other documents generated from BlueZone concerning any of the Relevant Parties.

16.    All reports and other documents generated from Genesis concerning any of the Relevant Parties.

17.    Manuals and any other documents identifying your policies and procedures concerning identification and/or reporting of unusual, suspicious, improper or illegal activity in accounts during the relevant time period.

18.    Manuals and any other documents identifying your account opening policies and procedures in effect during the relevant time period.

19.    Any and all reports, excluding SARs, relating to your automated and manual account monitoring systems referencing any of the Relevant Parties.

20.    Any and all documents reflecting your review of any transactions in any accounts of any of the Relevant Parties.

21.    Your entire investigative file(s), excluding any SARs, concerning any of the Relevant Parties or any accounts of the Relevant Parties.

22.    Any and all documents relating to the disposition or resolution of alerts generated by your automated or manual account monitoring systems relating to any of the Relevant Parties.

23.    All correspondence, memoranda, facsimiles, e-mails, text messages, or any other form of written communication between any of the Relevant Parties and any

8

officer, director, employee, agent or account officer of yours with respect to the banking relationship maintained by you for any of the Relevant Parties.

24. All documents relating to original account files maintained internally by employees and/or account officers of you with respect to any and all accounts held by or on behalf of any of the Relevant Parties.

25. All correspondence between you and any other financial institution relating to any of the Relevant Parties.

26. All communications between any branch employee and your investigative, compliance, or comparable departments concerning any of the Relevant Parties.

27. All correspondence and communications between you and any law enforcement or regulatory agency relating to any of the Relevant Parties, excluding SARs.

28. All internal emails and text messages relating to any of the Relevant Parties.

29. All documents reflecting the codes or their corresponding definition that are reflected in the Computer Generated Reports.

30. All documents setting forth the parameters (i.e., dollar amount, activity level, type of activity) which would cause a customer to appear on Computer Generated Reports during the time period 2013 through 2017.

31. All documents relating to notification by you to another financial institution reporting returned items for, among other reasons, uncollected/insufficient funds as relates to any of the Relevant Parties.

32. All documents relating to notification by another financial institution to your reporting returned items for, among other reasons, uncollected/insufficient funds as relates to any of the Relevant Parties.

33. All correspondence between you and any other financial institution concerning any of the Relevant Parties.

34. All hard copies, originals and computer data documents and records maintained by you relating to the above requests.

35. All hard copies, originals and computer data documents and records maintained by third parties relating to the above requests.

36. All documents, including data, information, files, records, files, manuals, supplies, computer data, information, materials and other materials that have been created, used or obtained by you regarding, relating to or for the benefit of the Relevant Parties, including all financial statements, customer sales and marketing

information, customer account records, proprietary interests, copyrights, patents, trademarks and other intellectual property rights (including website rights), training and operations material and memoranda, personnel records, pricing information, and financial information and trade secrets concerning or relating to the financial condition, business, accounts, customers, employees and affairs of any of the Relevant Parties (or any related entity or affiliate thereof) not already requested herein.

# CERTIFICATION

I, Cheryl Basko, hereby certify that to the best of my knowledge, information, and belief:

1.  I am a Record Custodian for PNC Bank, National Association, a national banking association.

2.  As a Record Custodian, my responsibilities include identifying and authenticating records of PNC Bank, NA.

3.  Attached to this certification is a record(s) (hereafter, "Records") of PNC Bank, NA, further identified in the inventory of documents that is also attached to this certification.

4.  The record(s) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters (subject to any redactions I have made relating to certain Personally Identifiable Information); was kept in the course of the regularly conducted activity; and was made by the regularly conducted activity as a regular practice of PNC Bank, NA.

5.  I declare under penalty of perjury that the forgoing is true and correct.

Date: _5/15/2018_

By: _Cheryl Basko_
A Record Custodian

# EXHIBIT 2

**Friedman, Michael**

| | |
|---|---|
| **From:** | Gold, Joel B <joel.gold@pnc.com> |
| **Sent:** | Friday, November 30, 2018 3:25 PM |
| **To:** | Friedman, Michael |
| **Subject:** | RE: Subpoena to PNC FTC v. Jeremy Lee Marcus |

I am checking on two things.  First, whether the number of accounts identified in my email match the number of accounts that were produced in response to the May 2018 Subpoena.  Second apart from the ordinary accounts records, whether was any activity on any account render other items listed in the subpoena as pertinent. In each instance the bank's first choice is to produce additional records in lieu of a deposition.  The fact that there are two searches going on is also part of the explanation that it is possible there is not one but two witnesses involved.  If it comes to a deposition the employees are located in Pittsburgh and Cleveland.

In addiotn the bank has retained counsel at McGuire Woods to assist it on this item.  I expect you will hear from them as shortly.

Thank you.

Joel B. Gold
Senior Counsel (admitted only in Pennsylvania)

PNC Bank
PT-PTWR-18-1
300 Fifth Avenue, 18th Floor
Pittsburgh, PA 15222
(p) 412 762 2801  | (f) 412 762 6763
Joel.Gold@pnc.com

IMPORTANT NOTICE.  This e-mail communication, together with any attachments, is intended for the use of the individual or entity to which it is addressed and may contain confidential information that is privileged and/or confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you received this communication in error.  Any review, dissemination, distribution or copying of this communication is strictly prohibited.  If you receive this communication in error please call the telephone number listed above, or send a return e-mail, and then delete this message, together with any attachments.

-----Original Message-----
From: Friedman, Michael [mailto:mfriedman@gjb-law.com]
Sent: Thursday, November 29, 2018 8:46 PM
To: Gold, Joel B <joel.gold@pnc.com>
Subject: EXTERNAL: Re: Subpoena to PNC FTC v. Jeremy Lee Marcus

We are seeking confirmation that PNC looked for and provided the documents requested.

We'll reschedule the deposition for a date convenient for the employee. Please propose some specific dates.

1

Thank you,

Michael Friedman
Genovese Joblove & Battista, P.A.

On Nov 29, 2018, at 2:27 PM, Gold, Joel B <joel.gold@pnc.com<mailto:joel.gold@pnc.com>> wrote:

[this may be a duplicate email, I drafted a similar one this morning but having just checked cannot see that an email was sent or saved]

The date of the deposition needs to be rescheduled.  The bank is unable to identify a witness based on the description provided in the Subpoena and asks that you provide further information.  As you may recall from an earlier conversation we had, one reading may be that you are asking for something similar to a FRE 902(11) records testimony but emphasizing the search as opposed to the records obtained; that is, you wish a record that a bank employee researched the names and tax identification numbers provided and then located and delivered what is believed to be responsive records.  The employee for that testimony is located in either Pittsburgh or Cleveland.  The bank also has to consider use of local counsel; for the PNC nonparty subpoena matters, your request , if not unique, is out of the ordinary.

Joel B. Gold
Senior Counsel (admitted only in Pennsylvania)

PNC Bank
PT-PTWR-18-1
300 Fifth Avenue, 18th Floor
Pittsburgh, PA 15222
(p) 412 762 2801  | (f) 412 762 6763
Joel.Gold@pnc.com<mailto:Joel.Gold@pnc.com>

IMPORTANT NOTICE.  This e-mail communication, together with any attachments, is intended for the use of the individual or entity to which it is addressed and may contain confidential information that is privileged and/or confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you received this communication in error.  Any review, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error please call the telephone number listed above, or send a return e-mail, and then delete this message, together with any attachments.

From: Friedman, Michael [mailto:mfriedman@gjb-law.com]
Sent: Wednesday, November 28, 2018 5:32 PM
To: Gold, Joel B <joel.gold@pnc.com<mailto:joel.gold@pnc.com>>
Subject: EXTERNAL: RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mr. Gold:

Thank you for this additional information. Based on what you've provided, and assuming no additional information or documents are forthcoming, we need to go forward with the deposition of PNC's representative as noticed in the Subpoena.

As you know, the deposition is currently scheduled for this Friday, November 30, 2018. Please confirm as soon as possible whether that date needs to be rescheduled to accommodate the appropriate PNC representative; and if so, please propose new dates. Otherwise, we will go forward with the deposition on November 30 as noticed.

Regards,

<image001.jpg>

Michael Friedman
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Main 305.349.2300
Direct 305.372.2495
Fax 305.428.8878
mfriedman@gjb-law.com<mailto:mfriedman@gjb-law.com>|www.gjb-law.com

Miami | Fort Lauderdale


From: Gold, Joel B [mailto:joel.gold@pnc.com]
Sent: Wednesday, November 28, 2018 4:43 PM
To: Friedman, Michael
Subject: Subpoena to PNC FTC v. Jeremy Lee Marcus

Counsel,  The following is information meant to augment the bank's response to the Subpoena to PNC dated May 1, 2018.  What is provided is information on accounts where account records matching the time frame, January 1, 2013 through roughly, May 1, 2018 .  Note: In the list below "DDA" can be read as 'deposit account' frequently a checking account.


Jeremy Lee Marcus had a car loan  x2589

Craig Smith DDA's x8865 & x9315

Yisbet Segrea no records

321 Loans Inc DDA x8785  closed 2015  CD x1432 closed 2016

Insthelp America Inc.  DDA x8806 closed 2015

Financial Freedom National, Inc*

Breeze Financial Solutions Inc. DDA x8753 closed 2015

Associated Administrative Services LLC  no records

Active Debt Solutions LLC no records

US Legal Club LLC  SVG x0279 closed 2015, DDA x0391 closed 2015

Guardian LG LLC    DDA x9315  closed 2016

Paralegal Support Group LLC  no records

HP Media Inc no records

HP Properties Group Inc. No records

American Credit Security LLC no records

White Light Media LLC no records

Halfpay International LLC DDA  x8769   closed 2015

Halfpay NV LLC DDA x8769 closed 2015

Viking Management Services LLC no records

Cockburn & Associates LLC no records

Omni Management Partners LLC no records

JLMJP Pompano LLC no records

Nantucket Cove Illinois LLC no records

Blue42 LLC no records

Discount Marketing USA S. A. no records

*the bank found no accounts on a name search.  The EIN provided in the subpoena brought up four three account of differently  named entities.

Joel B. Gold
Senior Counsel (admitted only in Pennsylvania)

PNC Bank
PT-PTWR-18-1
300 Fifth Avenue, 18th Floor
Pittsburgh, PA 15222
(p) 412 762 2801  | (f) 412 762 6763
Joel.Gold@pnc.com<mailto:Joel.Gold@pnc.com>

IMPORTANT NOTICE.  This e-mail communication, together with any attachments, is intended for the use of the individual or entity to which it is addressed and may contain confidential information that is privileged and/or confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that you received this communication in error.  Any review, dissemination, distribution or copying of this communication is strictly prohibited. If you receive this communication in error please call the telephone number listed above, or send a return e-mail, and then delete this message, together with any attachments.

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may be considered a commercial electronic message under Canadian law or this message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US law. You may unsubscribe at any time from receiving commercial electronic messages from PNC at
http://pages.e.pnc.com/globalunsub/
PNC, 249 Fifth Avenue, Pittsburgh, PA 15222; pnc.com<http://pnc.com>


The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may be considered a commercial electronic message under Canadian law or this message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US law. You may unsubscribe at any time from receiving commercial electronic messages from PNC at
http://pages.e.pnc.com/globalunsub/
PNC, 249 Fifth Avenue, Pittsburgh, PA 15222; pnc.com<http://pnc.com>



The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may be considered a commercial electronic message under Canadian law or this message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US law. You may unsubscribe at any time from receiving commercial electronic messages from PNC at
http://pages.e.pnc.com/globalunsub/
PNC, 249 Fifth Avenue, Pittsburgh, PA 15222; pnc.com

# EXHIBIT 3

## Friedman, Michael

| | |
|---|---|
| **From:** | Bowyer, Jason R. <JBowyer@mcguirewoods.com> |
| **Sent:** | Friday, December 21, 2018 3:43 PM |
| **To:** | Friedman, Michael |
| **Subject:** | RE: Subpoena to PNC FTC v. Jeremy Lee Marcus |

Mike:

As I mentioned in my email below, I have a new client contact who is reviewing this matter and preparing a response on PNC's behalf. I will accept service of the subpoena on PNC's behalf, but reserve the right to discuss relocating or rescheduling the deposition to accommodate my client.  I will be back in touch to discuss this issue more in depth after the holidays.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Thursday, December 20, 2018 4:20 PM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

I previously agreed to postpone the deposition set for November 29, 2018 to accommodate specific designees that PNC claimed to have identified for deposition. But now, three weeks later, I'm learning that PNC has not actually identified anyone and does not know who, if anyone, is the most appropriate person to depose.

Attached is a new subpoena setting this deposition for January 15, 2019, in South Florida, where the PNC branch that maintained the accounts at issue is located. I'm setting the deposition in South Florida instead of Pittsburgh based on the acknowledgement that PNC doesn't know who it will designate and therefore can't possibly know where that unknown person is located. We can discuss rescheduling or relocating the deposition before January 15 if and when you determine who PNC's designee will be.

Please advise whether you will accept service of the subpoena on PNC's behalf. Thank you.

Regards,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Thursday, December 20, 2018 8:29 AM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mike:

I have a new contact at PNC and I am working with him to sort out this situation and determine who, if anyone, is the most appropriate person to depose and where that would take place. I am still working on this issue and would appreciate you holding off before issuing the subpoena until I can determine the proper person and a convenient date. If you would like to discuss further, please let me know.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Wednesday, December 19, 2018 11:42 AM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

Again following up on this. We agreed to move the November 29, 2018 deposition because your client claimed they needed a new date to accommodate specific witnesses, but it's been nearly a month and your client hasn't provided new dates for those witnesses despite repeated requests. On December 5, you were going to discuss dates with your client and revert to me back. That was two weeks ago and we've heard nothing despite multiple follow ups.

I'm going to issue a new subpoena setting the deposition on a date in the range previously proposed -- during the week of January 7 or January 14. Your client previously advised that one of the witnesses was located in Pittsburgh, which I understand to be the location of PNC's corporate headquarters. We'll set the deposition for that location.

If you would like to propose a different date and location that is more convenient for your client, please advise. Otherwise, please confirm that you will accept service of the new subpoena. Thanks.

Regards,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Thursday, December 13, 2018 3:33 PM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mike:

I have reached out to my client and I am awaiting a response. I will follow up and let you know.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Wednesday, December 12, 2018 1:32 PM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason,

I did not receive a response from you on this -- Please advise.

Thanks,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

---

**From:** Friedman, Michael
**Sent:** Friday, December 07, 2018 2:25 PM
**To:** 'Bowyer, Jason R.'
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Hello Jason,

Following up on the below email. Please let me know if you have spoken to your client and the results of the conversation.

Thanks,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

---

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Wednesday, December 05, 2018 3:37 PM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

It was nice speaking with you yesterday as well.  I will talk to my client about dates and document production and get back to you once I have had that conversation.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

---

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Wednesday, December 05, 2018 11:34 AM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

Good speaking with you yesterday afternoon. I understand you are going to confer with your client to determine whether there are additional documents to produce.

In the meantime, as we discussed on the phone, please let me know whether there is a date convenient for an appropriate representative of the bank to be deposed during the week December 17, January 7, or January 14, so that we have a date held in the even the bank's additional production (if any) does not resolve the subpoena.

Thank you,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Tuesday, December 04, 2018 7:45 AM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Yes, that works just fine.  I will give you a call this afternoon.  Thank you.

**Jason R. Bowyer**

T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Monday, December 03, 2018 8:08 PM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Hello Jason,

I'm in court tomorrow morning, but will be available for a call tomorrow afternoon. Does that work?

Thanks,

Mike Friedman

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Monday, December 03, 2018 1:26 PM
**To:** Friedman, Michael
**Subject:** Subpoena to PNC FTC v. Jeremy Lee Marcus

Mr. Friedman:

As you may know, PNC has retained our firm to assist with the subpoena you served on PNC for certain account records.  Do you have time to discuss this matter this afternoon or possibly tomorrow morning?

Thank you,

**Jason R. Bowyer**
Counsel
McGuireWoods LLP
Bank of America Tower
50 North Laura Street
Suite 3300
Jacksonville, FL 32202-3661
T:  +1 904 798 3230
M: +1 904 635 7552
F:  +1 904 360 6303
jbowyer@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT 4

**Friedman, Michael**

| | |
|---|---|
| **From:** | Bowyer, Jason R. <JBowyer@mcguirewoods.com> |
| **Sent:** | Monday, January 14, 2019 8:22 AM |
| **To:** | Friedman, Michael |
| **Subject:** | RE: Subpoena to PNC FTC v. Jeremy Lee Marcus |

Mike:

Good morning and thank you for your response. I am concerned that there will be a travel issue involved with the deposition set in South Florida. The person my client will have sit for the deposition, as we discussed, will be located either in Pittsburgh or Cleveland and not South Florida. I certainly understand if you do not want to take the deposition by phone, but I also do not want to place the burden of traveling to South Florida on my client unnecessarily.

In your email below you stated that you would discuss rescheduling or relocating the deposition prior to January 15. Again, I believe the best option here is to reschedule the deposition to the end of January or early February as we discussed on Friday. Please let me know if your client is willing to do so and we can work out a date and location. I appreciate your professional courtesy in this regard.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Monday, January 14, 2019 8:00 AM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

Good morning. The re-noticed deposition is set in South Florida, as mentioned in my below email. Let me know if that resolves the travel issue. I do not want to take the deposition by phone.

Thanks,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Friday, January 11, 2019 4:52 PM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mike:

Thank you for your response. I will discuss this with my client. In the event we move forward and we do not file an objection, are you willing to accommodate my client appearing by phone rather than traveling to Tampa?

1

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Friday, January 11, 2019 4:41 PM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

Thank you for the call this afternoon. Having raised the issues you and I discussed with the Receiver, we believe the most appropriate way to proceed is to simply move forward with the deposition as currently noticed. If you would like to discuss further, feel free to contact me. Thanks.

Regards,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Friday, January 11, 2019 11:06 AM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mike:

I will give you call this afternoon.  Thank you.

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Friday, January 11, 2019 11:03 AM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

I'm available now until around noon, and then again from about 1pm for the rest of the afternoon. Let me know when you want to do the call.

Thanks,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Thursday, January 10, 2019 3:02 PM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mike:

I am following up on the subpoena issued in this matter. I have discussed this matter with my client in more detail and would like to set up a time to give you a call to talk about it. I am out of pocket most of the rest of the afternoon, but wide open tomorrow. What time would work for you?

Thank you,


**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Thursday, December 20, 2018 4:20 PM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

I previously agreed to postpone the deposition set for November 29, 2018 to accommodate specific designees that PNC claimed to have identified for deposition. But now, three weeks later, I'm learning that PNC has not actually identified anyone and does not know who, if anyone, is the most appropriate person to depose.

Attached is a new subpoena setting this deposition for January 15, 2019, in South Florida, where the PNC branch that maintained the accounts at issue is located. I'm setting the deposition in South Florida instead of Pittsburgh based on the acknowledgement that PNC doesn't know who it will designate and therefore can't possibly know where that unknown person is located. We can discuss rescheduling or relocating the deposition before January 15 if and when you determine who PNC's designee will be.

Please advise whether you will accept service of the subpoena on PNC's behalf. Thank you.

Regards,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Thursday, December 20, 2018 8:29 AM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mike:

I have a new contact at PNC and I am working with him to sort out this situation and determine who, if anyone, is the most appropriate person to depose and where that would take place. I am still working on this issue and would appreciate you holding off before issuing the subpoena until I can determine the proper person and a convenient date. If you would like to discuss further, please let me know.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Wednesday, December 19, 2018 11:42 AM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

Again following up on this. We agreed to move the November 29, 2018 deposition because your client claimed they needed a new date to accommodate specific witnesses, but it's been nearly a month and your client hasn't provided new dates for those witnesses despite repeated requests. On December 5, you were going to discuss dates with your client and revert to me back. That was two weeks ago and we've heard nothing despite multiple follow ups.

I'm going to issue a new subpoena setting the deposition on a date in the range previously proposed -- during the week of January 7 or January 14. Your client previously advised that one of the witnesses was located in Pittsburgh, which I understand to be the location of PNC's corporate headquarters. We'll set the deposition for that location.

If you would like to propose a different date and location that is more convenient for your client, please advise. Otherwise, please confirm that you will accept service of the new subpoena. Thanks.

Regards,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Thursday, December 13, 2018 3:33 PM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Mike:

I have reached out to my client and I am awaiting a response. I will follow up and let you know.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Wednesday, December 12, 2018 1:32 PM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason,

I did not receive a response from you on this -- Please advise.

Thanks,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

**From:** Friedman, Michael
**Sent:** Friday, December 07, 2018 2:25 PM

4

**To:** 'Bowyer, Jason R.'
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Hello Jason,

Following up on the below email. Please let me know if you have spoken to your client and the results of the conversation.

Thanks,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

---

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Wednesday, December 05, 2018 3:37 PM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

It was nice speaking with you yesterday as well.  I will talk to my client about dates and document production and get back to you once I have had that conversation.

Thank you,

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

---

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Wednesday, December 05, 2018 11:34 AM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Jason:

Good speaking with you yesterday afternoon. I understand you are going to confer with your client to determine whether there are additional documents to produce.

In the meantime, as we discussed on the phone, please let me know whether there is a date convenient for an appropriate representative of the bank to be deposed during the week December 17, January 7, or January 14, so that we have a date held in the even the bank's additional production (if any) does not resolve the subpoena.

Thank you,

Michael Friedman | Genovese Joblove & Battista, P.A. | Miami 305.372.2495 | Tampa 813.439.3120

---

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Tuesday, December 04, 2018 7:45 AM
**To:** Friedman, Michael
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Yes, that works just fine.  I will give you a call this afternoon.  Thank you.

**Jason R. Bowyer**
T: +1 904 798 3230 | M: +1 904 635 7552

**From:** Friedman, Michael <mfriedman@gjb-law.com>
**Sent:** Monday, December 03, 2018 8:08 PM
**To:** Bowyer, Jason R. <JBowyer@mcguirewoods.com>
**Subject:** RE: Subpoena to PNC FTC v. Jeremy Lee Marcus

Hello Jason,

I'm in court tomorrow morning, but will be available for a call tomorrow afternoon. Does that work?

Thanks,

Mike Friedman

---

**From:** Bowyer, Jason R. [mailto:JBowyer@mcguirewoods.com]
**Sent:** Monday, December 03, 2018 1:26 PM
**To:** Friedman, Michael
**Subject:** Subpoena to PNC FTC v. Jeremy Lee Marcus

Mr. Friedman:

As you may know, PNC has retained our firm to assist with the subpoena you served on PNC for certain account records. Do you have time to discuss this matter this afternoon or possibly tomorrow morning?

Thank you,

**Jason R. Bowyer**
Counsel
McGuireWoods LLP
Bank of America Tower
50 North Laura Street
Suite 3300
Jacksonville, FL 32202-3661
T: +1 904 798 3230
M: +1 904 635 7552
F: +1 904 360 6303
jbowyer@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com



---

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT 5

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Southern District of Florida

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, et. al. | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   17-60907-CIV-MORENO |
| | ) | |
| JEREMY LEE MARCUS, et. al. | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      PNC Bank, N.A., Rule 30(b)(6) Representative, c/o Corporation Service Company, Registered Agent
1201 Hays Street, Tallahassee, FL 32301-2525

_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See attached Exhibit A

| Place: PNC Bank, N.A.<br>4100 West 150th Street<br>Cleveland, OH 44135 | Date and Time:<br>02/01/2019 8:30 am |
|---|---|

The deposition will be recorded by this method:      Stenographically

☐ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      01/24/2019

| _CLERK OF COURT_ | OR | /s/ Michael A. Friedman |
|---|---|---|
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Jonathan Perlman Court Appointed Receiver
, who issues or requests this subpoena, are:

Michael A. Friedman, Esq., Genovese Joblove & Battista, P.A., 100 N. Tampa Street, Ste 1645, Tampa, FL 33602

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   17-60907-CIV-MORENO

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# __EXHIBIT A__

Corporate Representative designated under Fed. R. Civ. P. 30(b)(6) to testify on behalf of PNC Bank, N.A. ("PNC") as to (a) the efforts that PNC undertook to comply with the subpoena *duces tecum* previously served to PNC and attached as Exhibit 1 to this subpoena; and (b) the documents of PNC that are responsive to the subpoena attached as Exhibit 1 to this subpoena.

# EXHIBIT 1

*S7056*

*Cheryl*

Received

MAY 07 2019

Record Services
Cleveland

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

*S/4/18* — Time *9:35*

MCN. No. 111

is a certified process server in the
Circuit and County Courts
and for the Second Judicial Circuit

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et. al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 17-60907-CIV-Moreno |
| JEREMY LEE MARCUS, et. al. | ) |
| *Defendant* | ) |

COPY

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          PNC Bank, N.A., c/o Corporation Service Company, Registered Agent
          1201 Hays Street, Tallahassee, FL 32301-2525

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

          See Attached Exhibit "A"

| Place: Genovese Joblove & Battista, P.A., 200 E. Broward Blvd., Suite 1110, Ft. Lauderdale, FL 33301 | Date and Time: 05/18/2018 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    05/01/2018

|  |  |  |
|---|---|---|
| *CLERK OF COURT* | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Jonathan Perlman
Court Appointed Receiver          , who issues or requests this subpoena, are:

Gregory M. Garno, Esq., Genovese Joblove & Battista, P.A., 100 SE 2nd Street, Suite 4400, Miami, FL 33131

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT A**

**DEFINITIONS & INSTRUCTIONS**

I.    **DEFINITIONS**

1.    The term "Case" shall mean the above-captioned case in the matter styled *Federal Trade Commission, et al. v. Jeremy Lee Marcus, et al., Case No. 17-60907-CIV-Moreno*, pending in the United States District Court for the Southern District of Florida (the "Court").

2.    The term "Receiver" shall mean Jonathan E. Perlman, as permanent receiver over the receivership defendants in the Case, and any agent, attorney, employee, and all other persons acting or purporting to act on the Receiver's behalf, or under the Receiver's authority or control.

3.    The term Relevant Parties shall collectively mean:

    a.   Jeremy Lee Marcus (SSN: ████-8380)

    b.   Craig Smith (SSN: ████-6923)

    c.   Yisbet Segrea (SSN: ████-1184)

    d.   321Loans, Inc. d/b/a 321Financial, Inc. (FEIN: 47-2302663)

    e.   Instahelp America, Inc. f/k/a Helping America Team, Inc. also d/b/a Helping America Group (FEIN: 47-3752203)

    f.   Financial Freedom National, Inc. (FEIN: 59-3316743)

    g.   Breeze Financial Solutions, Inc. (FEIN: 47-2591201)

    h.   Associated Administrative Services, LLC (FEIN: 47-3759372)

    i.   Active Debt Solutions, LLC f/k/a Active Debt Solutions, Inc. (FEIN: 47-4026321)

    j.   US Legal Club, LLC (FEIN: 47-1115648)

    k.   Guardian LG, LLC, also d/b/a Guardian Legal Group (FEIN: 47-1076116)

    l.   Paralegal Support Group, LLC (FEIN: 27-4286400)

    m.   HP Media, Inc. (FEIN: 81-4082950)

    n.   HP Properties Group, Inc. (FEIN: 81-4102535)

    o.   American Credit Security, LLC (FEIN: 81-4898654)

CASE NO. 17-60907-CIV-MORENO

    p.  White Light Media, LLC (FEIN: 81-4197270)

    q.  Halfpay International, LLC (FEIN: 47-1037023)

    r.  Halfpay NV, LLC  (FEIN: 47-1037023)

    s.  Viking Management Services, LLC (FEIN: 81-5245896)

    t.  Cockburn & Associate LLC (FEIN: 81-1236040)

    u.  Omni Management Partners LLC (FEIN: 27-1313420)

    v.  JLMJP Pompano, LLC (FEIN: 47-2566544)

    w.  Nantucket Cove of Illinois, LLC (FEIN: 47-5133390)

    x.  Blue42, LLC (FEIN: 47-2505857)

    y.  Discount Marketing USA, S.A. (Panamanian company)

4.    The terms "you" and "your" shall mean and refer to the party receiving this subpoena and any employee, agent, attorney, and all other persons acting for, or on behalf of, or under the authority or control of such party, or others who are in possession of or who may have obtained information for or on behalf of such party.

5.    The term "Computer Generated Reports" shall mean ACH transaction activity reports, balance fluctuation reports, overdrawn balance reports, active loan reports, past due reports, past due notices by officer, past due management reports, past due board reports, new reports, renewal reports, advance reports, notes in stop accrual reports, activity on past due reports, officer loan portfolio reports, past due by officer reports, customer file maintenance journal reports, drawing on today's deposit reports, EFA suspected activity reports, drawing against bank unavailability/holds reports, significant balance change reports, large items reports, overdraft activity report, check kiting reports, money laundering reports, overdraft reports, posting reject journal reports, NSF/insufficient funds reports, daily trial balance reports, daily transaction journal reports, stop/hold reports, master F/M exception list reports, file maintenance journal reports, stop pay and hold journal reports, stop pay and hold maintenance reports, stop payment reports, exception account charges summary reports, vector return reports, exception audit detail reports, exceptions pay/return high dollar reports, balance fluctuation reports, overall wire activity detail reports, change of internet address reports, internet protocol (IP) address reports, and any and all other reports maintained or updated at the branch, regional and main office levels and that are otherwise generated on a daily, weekly, monthly or any other period basis.

6.    The terms "person" or "persons" includes, without limitation, any natural person,

2

proprietorship, corporation, partnership, limited partnership, limited liability corporation, limited liability partnership, joint venture, trust, association, organization, business entity or governmental agency or unit.

7.    The term "document" or "documents" shall mean any document as defined in Rule 1001 of the Federal Rules of Evidence, thing, or physical or electronic embodiment of information, data, or ideas (including the original, copy, or drafts); and shall include, but not be limited to, all paper materials of any kind, whether written, typed, printed, punched, filmed or marked in any way; records or data stored, maintained, or accessed by computers, recordings tapes or wires; film; photographs; movies or any graphic matter however produced or reproduced; and all mechanical or electronic sound recordings or transcripts thereof that are in Defendant's possession, custody or control.

8.    The term "possession, custody, or control" shall have the same meaning as under Rule 34(a) of the Federal Rules of Civil Procedure.

9.    The term "ESI" shall mean any and all electronically stored information, including e-mails, texts, writings, drawings, graphs, charts, photographs, documents, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form as set forth in Rules 26 and 34 of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence.

10.   The term "any and all documents" shall mean every document or group of documents or communications as herein defined known to you, and every such document or communication which can be located or discovered by reasonably diligent effort.

11.   The terms "communication" or "communications" shall mean any verbal, written and electronic means of conversation or other statement from one person to another, including, but not limited to, any interview, conference, meeting or telephone conversation. Further, such term means any contact or act by which any information is transmitted or conveyed between two or more persons, and shall include, without limitation, written contact by such means as letters, memoranda, facsimile transmissions, e-mail, texts, or other electronic transmissions of information or communications, telegrams, telexes, or by any document, and any oral contact by such means as face-to-face meetings or conversations and telephone or electronically transmitted conversations.

12.   The term "Correspondence" means any letter, note, memorandum, report, notice, facsimile transmission, e-mail transmission, and any communication (as defined above) that were sent or received from one or more persons to one or more persons, regardless of authorship or origin, including that which was directed as a copy, blind copy, forwarded copy, or sent or received mistakenly.

CASE NO. 17-60907-CIV-MORENO

13.   The terms "support," "supports," "evidence," "evidences" "evidencing," "relate to," "relates to," "related to," "relating to," "refers," "refer to," "referred to," "referring to," "concern," "concerns," "concerning," "pertains to," "pertaining to," "involves," "involving," and "regarding" shall mean anything which directly, or indirectly, concerns, consists of, pertains to, reflects, evidences, describes, sets forth, constitutes, contains, shows, underlies, supports, refers to in any manner, is or was used in the preparation of, appended to, legally, logically or factually connected with, proves, disproves, or tends to prove or disprove.

14.   The terms "include," "includes," and "including" are used in the sense of specification, and are not to be construed as words of limitation.

15.   The terms "identify" or "identifying" shall mean to state, as to each document, the following information, irrespective of whether the document is deemed privileged or subject to any claim of privilege or immunity from discovery.

    a.   The title and other means of identification;

    b.   The date;

    c.   The author;

    d.   The recipient or recipients;

    e.   The present location of the original and of any and all copies;

    f.   The names and current addresses of any and all persons who have custody of or control over the documents and any copies.

16.   The conjunctions "and" and "or" shall be interpreted in each instance as meaning "and" so as to encompass the broader of the two possible constructions, and shall not be interpreted disjunctively so as to exclude any information or documents otherwise within the scope of any request herein.

17.   As used herein, the singular and masculine form of nouns and pronouns shall embrace, and be read and applied as, the plural or feminine or non-gender specific, as circumstances may make appropriate.

## II.   INSTRUCTIONS

1.   Unless otherwise stated in a particular request, the relevant time period of this Request is **January 1, 2013** through the date of service of this Subpoena (the "Discovery Period"), and shall include all documents which relate or refer to the Discovery Period despite being prepared or created before or subsequent to such period.

2.   All documents shall be produced as they are kept in the ordinary course of business, or shall be organized and labeled in a manner clearly identifying and

CASE NO. 17-60907-CIV-MORENO

indicating the documents or tangible things that are being produced in response to each particular request.

3.    For each and every request herein, you shall produce documents in your possession, custody, or control, which shall include but not be limited to, documents, objects, or articles described that are in your possession or of which you have the right to secure the original or a copy from another person or entity. The fact that your investigation is continuing or discovery is incomplete is not an excuse for your failure to respond to each request as fully and completely as possible. Your responses should consist of information known to you through yourself, your agents, your attorneys, your employees, or your representatives.

4.    This Request is continuing in nature. If, after producing documents, you later discover additional responsive documents or things, you are obligated to supplement your responses pursuant to Rule 26(e).

5.    In producing documents, you shall produce documents in full, without abridgement, abbreviation or editing of any sort, including all "metadata" relating to such documents. For purposes of this Instruction, the term "Metadata" shall mean the data about the data otherwise referred to as the fingerprint of the document. All available fields of metadata should be included.

6.    To the extent that this Request seeks production of ESI residing elsewhere other than, or in addition to, on back-up copies, such information should be produced in its Native Format on hard drive or other digital storage media that does not otherwise detract from the original format of the files, or that by default may exclude or somehow alter any metadata associated with said files. The information produced should include any original or existing full file path, file or folder structure, or other source referencing data, and be fully inclusive of all supporting and underlying data, the absence of which would render the information incomplete or unusable. For purposes of this Instruction, the term "Native Format" shall mean the format that the data was originally created in. This should include, but not limited to, information about the software that the data was created in, stored in, or was used, or is used to read, write, alter, modify, or in any way change or manipulate the data.

7.    All archived data being produced in response to this Request should be provided with the means to view and export such data. Paper documents that are not otherwise contained, stored, or recoverable by electronic means should be provided either in paper format, or via a scanned image in a .TIFF format. Colored pages, photographs or other documents among such paper documents that would otherwise loose the color format should be scanned in .JPEG or other standard color format.

8.    Copies of documents which are identical duplicates of other documents which have already been produced for inspection and copying in this action need not be produced again, except that the duplicates shall be produced if handwritten or any

5

CASE NO. 17-60907-CIV-MORENO

and the document objected to by furnishing, at the least, its date, authors, addressees, date, a general description of the subject matter of the document, the type of document, number of pages, number and kind of attachments or appendices, indicated or blind copies, all persons to whom shown or explained, date of destruction or other disposition, reason for destruction, person authorizing destruction or other disposition, person destroying or otherwise disposing of document, and if not destroyed, person in possession of documents otherwise disposed of, and the reason why the document is protected. 'This shall not constitute a waiver of the obligation, or the Receiver's right, to demand a timely and legally sufficient privilege log, or the remedies for non-production of such privilege log. Notwithstanding such objection, you must disclose any objected to evidence containing non-objectionable matter which is relevant and material to this Request, but you may withhold the portion for which you assert the objection, subject to further request or motion, provided that you furnish the above-requested identification.

12.     In the event any of the documents cannot be provided in full, you must produce all documents to the fullest extent possible and specify the reasons for your inability to produce the remainder.

## III.   **DOCUMENTS TO BE PRODUCED**

1.      All documents and communications relating to account opening documents referencing any of the Relevant Parties.

2.      All documents and Computer Generated Reports relating to any of the Relevant Parties.

3.      All communications between you and any third party concerning any of the Relevant Parties.

4.      All communications between you and any of the Relevant Parties.

5.      All documents and correspondence relating to any due diligence relating to any of the Relevant Parties.

6.      All documents and communications relating to any account of any of the Relevant Parties.

7.      Documents identifying the name of each automated account monitoring system, such as Carreker Fraud Link or SAS, and documents identifying the name of each manual account monitoring systems, such as uncollected funds reports or large account balance change reports.

8.      Any and all fraud alerts, ALM Alerts or Bank Secrecy Act alerts from any automated or manual account monitoring system for accounts titled in the name of or held by any of the Relevant Parties.

CASE NO. 17-60907-CIV-MORENO

9.      Any and all documents regarding each of your automated or manual account monitoring systems for the years 2013 through 2017.

10.     Any user manuals and policies and procedures for each of your automated or manual account monitoring systems for the years 2013 through 2017.

11.     All reports and other documents generated from your Large Cash Reporting System concerning any of the Relevant Parties.

12.     All Currency Transaction Reports concerning any of the Relevant Parties.

13.     All reports and other documents reflecting customer contact history and/or account contact history concerning any of the Relevant Parties.

14.     All reports and other documents concerning any of the Relevant Parties generated from your Customer Relationship Inquiry Service System.

15.     All reports and other documents generated from BlueZone concerning any of the Relevant Parties.

16.     All reports and other documents generated from Genesis concerning any of the Relevant Parties.

17.     Manuals and any other documents identifying your policies and procedures concerning identification and/or reporting of unusual, suspicious, improper or illegal activity in accounts during the relevant time period.

18.     Manuals and any other documents identifying your account opening policies and procedures in effect during the relevant time period.

19.     Any and all reports, excluding SARs, relating to your automated and manual account monitoring systems referencing any of the Relevant Parties.

20.     Any and all documents reflecting your review of any transactions in any accounts of any of the Relevant Parties.

21.     Your entire investigative file(s), excluding any SARs, concerning any of the Relevant Parties or any accounts of the Relevant Parties.

22.     Any and all documents relating to the disposition or resolution of alerts generated by your automated or manual account monitoring systems relating to any of the Relevant Parties.

23.     All correspondence, memoranda, facsimiles, e-mails, text messages, or any other form of written communication between any of the Relevant Parties and any

officer, director, employee, agent or account officer of yours with respect to the banking relationship maintained by you for any of the Relevant Parties.

24.　All documents relating to original account files maintained internally by employees and/or account officers of you with respect to any and all accounts held by or on behalf of any of the Relevant Parties.

25.　All correspondence between you and any other financial institution relating to any of the Relevant Parties.

26.　All communications between any branch employee and your investigative, compliance, or comparable departments concerning any of the Relevant Parties.

27.　All correspondence and communications between you and any law enforcement or regulatory agency relating to any of the Relevant Parties, excluding SARs.

28.　All internal emails and text messages relating to any of the Relevant Parties.

29.　All documents reflecting the codes or their corresponding definition that are reflected in the Computer Generated Reports.

30.　All documents setting forth the parameters (i.e., dollar amount, activity level, type of activity) which would cause a customer to appear on Computer Generated Reports during the time period 2013 through 2017.

31.　All documents relating to notification by you to another financial institution reporting returned items for, among other reasons, uncollected/insufficient funds as relates to any of the Relevant Parties.

32.　All documents relating to notification by another financial institution to your reporting returned items for, among other reasons, uncollected/insufficient funds as relates to any of the Relevant Parties.

33.　All correspondence between you and any other financial institution concerning any of the Relevant Parties.

34.　All hard copies, originals and computer data documents and records maintained by you relating to the above requests.

35.　All hard copies, originals and computer data documents and records maintained by third parties relating to the above requests.

36.　All documents, including data, information, files, records, files, manuals, supplies, computer data, information, materials and other materials that have been created, used or obtained by you regarding, relating to or for the benefit of the Relevant Parties, including all financial statements, customer sales and marketing

CASE NO. 17-60907-CIV-MORENO

information, customer account records, proprietary interests, copyrights, patents, trademarks and other intellectual property rights (including website rights), training and operations material and memoranda, personnel records, pricing information, and financial information and trade secrets concerning or relating to the financial condition, business, accounts, customers, employees and affairs of any of the Relevant Parties (or any related entity or affiliate thereof) not already requested herein.

# EXHIBIT 6

1          Q.    Are you familiar with Titan Funding and

2    their business?

3          A.    Yeah.

4          Q.    What kind of business is Titan Funding?

5          A.    They're supposed to be a mortgage broker and

6    lender.

7          Q.    Now, you said they're supposed to be?

8          A.    Well, because it's either a broker or

9    lender, I'm not sure which one it is, but ---

10         Q.    Are you -- have you ever done any business

11   with Titan Funding?

12         A.    I referred Titan Funding loans that PNC

13   could not do, but let me rephrase it.  They have closed

14   loans for Jeremy.  Yeah, I've been to the offices in Boca.

15         Q.    So just so I have this correct, and correct

16   me if I'm wrong, so at certain points in time you would

17   refer to Titan Funding loans that PNC wouldn't -- wouldn't

18   close on?

19         A.    Can't close on.  It's just clients that are

20   not bankable, and they claim to be able to have a source

21   of funding to do those things.

22         Q.    And what would make a potential borrower not

23   bankable?

24         A.    Credit was one, cash flow is two.  Not

25   bankable is the wrong word to use, not lendable.

1   high.

2              And he said he had a bank in Kentucky that

3   handled all their transactions or whatever it is.  They

4   had another bank that did that stuff for them, and that

5   that was not true or if it was true, it did not stop --

6   stop coming to PNC Bank.  So we decided that we're going

7   to exit our relationship.

8              That's what I was told why because PNC

9   doesn't always tell you this.  Basically when corporate

10  office decides that there's a risk, shut it down.

11       Q.    Okay.  But in this circumstance they did

12  indicate to you why the accounts were closed?

13       A.    They didn't tell me why.  They don't tell me

14  that.  They close all the accounts -- they close all the

15  accounts and tell me to tell him we're closing all the

16  accounts.

17       Q.    Got it.

18       A.    Give him like 30 days or how many days to

19  shut everything down.

20       Q.    But it was your belief because -- it was

21  your belief that the accounts were closed in return -- in

22  part because of the high number of returns?

23       A.    High number of returns, yes.

24       Q.    Well, certainly you experienced while you

25  were at PNC in phrase two that what Mr. Smith had

Page 35

1    represented about the account activity wasn't, in fact,

2    what was happening in the accounts?

3            A.    Yeah.  I mean, I don't -- the service he

4    had, the returns don't show up on the branch.  It shows up

5    more of a corporate system, that makes sense?  So I don't

6    really see it.  They showed up somewhere else, so that's

7    why.

8                 And then another reason why it was closed

9    was he would move money from one company to the other.  So

10   from -- $40,000 from one company to the other, I mean, a

11   big, big amount.

12                And I said to him, Jeremy, you can't move

13   money like this from company to company.  The different

14   companies -- you know, this company is 123 Loans, whatever

15   it is, you can't move money from that to a nonprofit and

16   back.

17           Q.    Oh, so there were large cash transfers

18   between the for profit and the not for profit entities?

19           A.    Yeah, yeah.

20           Q.    Okay.

21           A.    And he said -- he said, look, I didn't know.

22   He said -- he said why.  I said to him because it's -- you

23   mixing stuff together, it doesn't make any sense.  Are you

24   doing a loan from one to the other?  Are you talking to

25   your accountant, and he -- you know.

Page 58

1    fund an existing venture or business?

2           A.    Never, never, never told me where he get

3    money -- was getting money from.  I've asked him.  I said

4    do you have partners, investors?

5           Q.    Did he answer your questions?

6           A.    No.

7           Q.    No.  The conversation you just described

8    about looking to get into new investments happened in the

9    last few months?

10          A.    Uh-huh, yes.

11          Q.    All right.

12          A.    Happened before we met in Miami and after.

13          Q.    That was February when we met; correct?

14          A.    Is it February?

15          Q.    So we met on February 21st.

16          A.    Yes, I met with him before and after.  He

17   had asked other people that I know, the attorney that I

18   use, he asked that attorney also for stuff on business.

19          Q.    Who is that, Mr. Carey?

20          A.    Carey, yeah, because Carey is the one who

21   asked to help me with the affidavit, and Jeremy had asked

22   him.  He said, yeah, Jeremy called me about some stuff,

23   and he's like so ---

24                MR. GARNO:  Okay.  Let's go ahead, you need

25   to make a call.

1            THE WITNESS:  I just want to return some of

2   these calls.

3            MR. GARNO:  Yeah, yeah.  Go ahead, take your

4   time.

5            (Thereupon, a brief recess was taken, after

6   which the following proceedings were had:)

7   BY MR. GARNO:

8        Q.    I want to kind of circle back and do a

9   couple of follow ups on something you've talked about this

10  morning, and it deals with the phase one of Jeremy's

11  relationship at PNC Bank.

12            It was your understanding that at that time

13  Jeremy's business was a Paralegal Staff Support --

14       A.    Yeah.

15       Q.    -- business?

16       A.    Yeah, he did -- yeah, he did Paralegal

17  Express or Paralegal something, and what he did was

18  lawyers would outsource their business, their legal stuff

19  to him.  He had paralegals all over the country and

20  attorneys all over the country.

21       Q.    Okay.  Now, you had mentioned, and correct

22  me if I'm wrong, that one of the things that plagued these

23  accounts in phase one was that there were excessive wires

24  and overdrafts?

25       A.    The account that Doug had access to -- so he

```
 1    we were trying to launch off the ground.

 2           Q.    Go Fetch?

 3           A.    Go Fetch RX --

 4           Q.    Go Fetch RX.

 5           A.    -- on Page 3.

 6           Q.    Okay.

 7           A.    And said to him, look, you know, you have

 8    the resources, the call center, whatever it is.  It's an

 9    idea, what do you think?  And then when I bought the lot,

10    he -- I put the lot in the name of Oxbridge also.  I think

11    it was under Oxbridge.  I think the lot on Embassy Drive

12    was in Oxbridge.

13           Q.    What kind of business was Go Fetch RX in?

14           A.    It never took off, which my wife wanted to

15    do -- she's the one in the medical side, this is all stuff

16    that she would be running anyway, her stuff.

17                 Go Fetch was going to be a system where if

18    you need to pick up your prescription, it will be

19    delivered to your home or office, that was the gist of it.

20           Q.    Did Mr. Marcus invest in either of those

21    businesses?

22           A.    No.  It was too slow.  It was too slow for

23    him.

24           Q.    And these were businesses and business

25    opportunities that you were presenting to him while he was
```

1    a customer at PNC?

2           A.    Yeah.  Well, Craig was a customer at PNC,

3    but, yeah.

4           Q.    And was it unusual for PNC people to have

5    these types of out of banking relationships with

6    customers?

7           A.    If it didn't conflict with PNC -- didn't

8    compete with PNC, I didn't -- I didn't see why -- I didn't

9    talk with PNC about it at all, but it was more or less my

10   wife.  She's the one who was more in the healthcare thing

11   and -- sorry.

12          Q.    Do you want some water?

13          A.    Jeremy invest in a lot of companies.  I told

14   my wife about Jeremy, and I think -- I'm not sure if she

15   met him or not after that.

16                I didn't talk to PNC about it and, yeah, I

17   just didn't talk to PNC about it, but Craig was the one

18   who I dealt with -- Craig was the one whose name was on

19   the corporations.  Jeremy was technically not a client.

20   Sorry.

21          Q.    That's okay.

22                Let me show you what we're going to mark as

23   Exhibit 2.

24                (Thereupon, Exhibit Number 2 was marked for

25   Identification.)

Page 68

```
1   BY MR. GARNO:
2         Q.    I'm showing the witness what we've marked as
3   Exhibit 2.
4         A.    Okay.  This is the lot.
5         Q.    Exhibit 2 is a HUD statement dated --
6   settlement statement dated August 10, 2015?
7         A.    Uh-huh.
8         Q.    Turn your attention to Page 2.  Is that your
9   signature that appears there on behalf of Oxbridge
10  Medical, Inc.?
11        A.    Yes.
12        Q.    And under this HUD, the name of the borrower
13  is Oxbridge Medical, Inc.; correct?
14        A.    Yes.
15        Q.    And the name of the lender is Halfpay
16  International, LLC?
17        A.    Yes.
18        Q.    And it has a 1410 Southwest 3rd Street,
19  Pompano Beach, Florida address?
20        A.    Yes.
21        Q.    Do you see that?
22              And that was Jeremy's warehouse facility?
23        A.    That's his -- that's his -- yeah.
24        Q.    And it deals with a property located at
25  3716 Embassy Drive, West Palm Beach, Florida; correct?
```

Page 69

1          A.     Yes.

2          Q.     And it appears from this that the purchase

3     price for this property at Embassy Drive was $140,000?

4          A.     Yes.

5          Q.     And the amount of money lent by Halfpay was

6     $185,000?

7          A.     Uh-huh.

8          Q.     Why was ---

9          A.     The difference between the two.

10         Q.     Yeah, what's the difference?  Why the

11    $45,000 extra of money loaned?

12         A.     Okay.  There -- there are two reasons, the

13    first one was that Jeremy and I had talked about we're

14    going to buy some lots in Port St. Lucie, and basically he

15    will -- it will be a joint venture, buy lots in

16    Port St. Lucie that's worth 20,000 each, plus closing

17    costs.  We were going to build houses for about one --

18    I'll build the houses for about one something, and sell

19    them for about 260, and we'll split it, and that was part

20    of the -- that was a part of it, but then later on it

21    didn't work out.

22         Q.     Okay.  So ---

23         A.     And then there were other -- there were

24    other stuff for the money with the lot that we were trying

25    to circumvent.

```
 1          Q.    What do you mean by that?

 2          A.    It was -- it was the other stuff that we had

 3    to pay off with respect to the lot.

 4          Q.    What else did you have to pay off on the lot

 5    for $45,000?

 6          A.    It was -- I'd rather not say, a lot of

 7    stuff.  It wasn't nothing to do with Jeremy, it was having

 8    to do with the lot and the deal we had with the guy.

 9          Q.    And how did it come about that -- it was

10    your understanding that Jeremy Marcus -- Halfpay

11    International was Jeremy Marcus' company?

12          A.    Oh, yeah, yeah.  Well, yeah, Jeremy funds

13    it.

14          Q.    And at that time, Halfpay International was

15    a customer of PNC in 2015?

16          A.    Yes.

17          Q.    How did it come about that Jeremy, through

18    Halfpay, lent you -- lent Oxbridge Medical $185,000 in

19    August of 2015?

20          A.    I think -- well, it came up originally, I

21    was speaking to Eddie, said I'm trying to buy this lot in

22    West Palm Beach, but it's hard to get a lot loan.

23          Q.    Mr. Piazza?

24          A.    Piazza, yeah.

25          Q.    Okay.
```

1          A.    Hard to get a lot loan.  He said call

2    Jeremy.  Okay.  So I called Jeremy.  Jeremy, I'm trying to

3    get this lot loan.  He's like, okay.  How much is it?  He

4    said, okay, we can do that.  He asked me for the lot

5    address, what the comps were at the time.

6          Q.    And what do you think the lot is worth today

7    if you had to guess?

8          A.    I don't know.  I don't know because there's

9    a -- I'm -- I get e-mails from the HOA still.  There are a

10   couple of break-ins, like three more break-ins a couple

11   weeks ago, but they're building new houses up there.  So

12   it's -- it could be 140 to 250, I will say, anywhere

13   between there.

14              There is another one up the street that's on

15   the water, that's nice, that's about 250.  This is not on

16   the water.

17        Q.    Is this property vacant?

18        A.    It's dry land.

19        Q.    Dry land.

20        A.    It's land.  It varies.  The HOA changed to

21   being really, really bad.  I mean, really, really

22   restrictive.  There are couple of sales going up now

23   because people there for like 20 years are moving out.  So

24   I don't know, I'd say between 150 and 250.

25        Q.    Okay.  I want to go back to the funding.  So

1    the extra $45,000 that was funded to your company from

2    Jeremy Marcus beyond the purchase price, how much of that

3    money went to buy lots in Port St. Lucie?

4         A.    We were supposed to buy the lots.  We didn't

5    buy the lots.

6         Q.    Okay.  So no money went to that?

7         A.    No.

8         Q.    The $45,000 of extra funding --

9         A.    No.

10        Q.    -- didn't go to that?

11        A.    Well, it's not -- yeah, go ahead, yeah.

12        Q.    And how much of the $45,000 of funding in

13   the transaction went to deal with issues on the lot?

14        A.    I don't remember.  I mean, it's -- I don't

15   remember.  I had to pay some people on it and some of

16   people who were involved.

17        Q.    Okay.

18        A.    I can -- I can check.

19        Q.    Sure.  Who did you have to pay?

20        A.    I don't want to tell you.  The owner, who I

21   bought the lot from his sister.  His sister bought both

22   lots, so it's ---

23        Q.    Mr. Gregory?

24        A.    Yeah.  He was living in Europe at the time,

25   his sister -- we bought it from his sister.  There was

1   some other stuff I had to do to pay her and some other

2   stuff.  It's -- I'm not getting -- I'm not getting him

3   involved.  I just want to keep it ---

4           Q.    No, no, and just candidly, I'm not looking

5   to get them involved.

6           A.    Okay.

7           Q.    I'm just trying to understand where the

8   $45,000 went.

9           A.    So basically I had to pay other people to

10  get the lot, and he had other money he owed somebody else,

11  I had to pay them, and it was just all this other stuff.

12          Q.    And how much of the $45,000 went to making

13  those payments?

14          A.    Most of it.

15          Q.    Most of it?

16          A.    And then there's closing costs.  I'm trying

17  to see where the closing costs is, I can't find it.

18  There's closing costs.  I'm trying to see where the

19  closing costs, I can't see the closing costs.

20          Q.    Okay.  So most of the $45,000 went to make

21  payments to other people so that the deal could happen

22  that aren't reflected in the closing statement?

23          A.    Yeah, yes.

24          Q.    And why -- why was it decided that those

25  wouldn't be addressed in the closing statement?

Page 74

1            A.    Because they were not party to the

2      transaction, directly to the transaction.

3            Q.    Was Jeremy aware that those -- that that

4      money was going to be ---

5            A.    At the time he was, later on he said he

6      wasn't, but at the time he was.  At the time he knew about

7      it.  I told him, I said, look, here's the deal.  That's

8      why he -- he went higher than the contract had it on it,

9      and then he -- then he said he didn't remember.  I said,

10     Jeremy, we talked about it.

11                 How much was the net?  I'm trying to see

12     where this thing is.

13           Q.    It looks like it's about $53,675.20 is the

14     net to borrower.  Do you see that?

15           A.    Yeah, it wasn't that much.  No, it wasn't

16     that much.  It wasn't close to that much.

17           Q.    All right.

18           A.    It wasn't close to that much.  It was a

19     lot -- it was a lot less.  It was a whole lot less.

20           Q.    Let me show you what we're going to mark as

21     Exhibit 3.

22           A.    It was a whole lot less.

23                 (Thereupon, Exhibit Number 3 was marked for

24     Identification.)

25     BY MR. GARNO:

Page 75

1          Q.    Exhibit 3 is a mortgage and security

2    agreement dated August 10, 2015.  The parties are

3    Oxbridge Medical and Halfpay International.

4          A.    Uh-huh.

5          Q.    Let me direct your attention to the page

6    that has Number 24 on it.  Is that your signature on

7    behalf of Oxbridge Medical?

8          A.    Yes, yes.

9          Q.    And this was the mortgage that Halfpay put

10   on the Embassy Drive property for $185,000?

11         A.    Yes, yes.

12         Q.    And this -- the mortgage served as security

13   for the $185,000 loan --

14         A.    Yes.

15         Q.    -- that was made from Halfpay to Oxbridge?

16         A.    Yes.

17         Q.    Was there a promissory note executed in

18   connection with the transaction?

19         A.    I think so.

20         Q.    Let me show you what I'm going to mark as

21   Number 4.

22               (Thereupon, Exhibit Number 4 was marked for

23   Identification.)

24   BY MR. GARNO:

25         Q.    I'm showing the witness what we've marked as

Page 76

```
 1    Exhibit 4.  It's a balloon promissory note dated
 2    August 10, 2015 in the amount of $185,000.  The maker is
 3    Oxbridge Medical, Inc. and the lender is Halfpay
 4    International, LLC.
 5                   Do you see Exhibit 4, Mr. Douglas?
 6         A.    Yes.
 7         Q.    Is that your signature that appears on the
 8    last page of Exhibit 4?
 9         A.    Yes.
10         Q.    And this was the balloon promissory note
11    that Oxbridge executed in favor of Halfpay?
12         A.    Yes.
13         Q.    It looks like that this is a balloon
14    promissory note?
15         A.    Yes.
16         Q.    And that the balloon payment was due on
17    August 10, 2018?
18         A.    Yes.
19         Q.    And this note required that Oxbridge make
20    monthly interest payments?
21         A.    Yes.
22         Q.    And then I guess it was 36 months later it
23    would pay off the balloon on the note?
24         A.    Yes.
25         Q.    In connection with this August 2015
```

1    transaction, did Oxbridge Medical also pledge its shares

2    to secure this loan obligation to Halfpay?

3            A.    I think there's another agreement that says

4    that, yeah.

5            Q.    Let me see if I can show you the other ---

6            A.    Yeah.

7                  (Thereupon, Exhibit Number 5 was marked for

8    Identification.)

9    BY MR. GARNO:

10           Q.    I'm showing you Exhibit 5.  It's a pledge

11   security agreement.  Do you recognize that document?

12           A.    Yeah.

13           Q.    This was additional collateral that was

14   provided to Halfpay in connection with this August 2015

15   loan?

16           A.    Uh-huh.

17           Q.    And is that your signature on the last page?

18           A.    Yes.

19           Q.    And you signed it on behalf of both

20   Chancellor Holdings --

21           A.    Yeah.

22           Q.    -- and Oxford Medical; correct?

23           A.    (Nods head.)

24           Q.    And so under this agreement, Oxbridge

25   pledged a hundred percent of all of its shares to Halfpay

Page 78

1    to secure the loan?

2         A.    I'm sorry, sorry.

3         Q.    That's okay.

4         A.    Say again, please.

5         Q.    Sure.  Under this agreement Oxbridge pledged

6    a hundred percent of its --

7         A.    Yes.

8         Q.    -- shares to Halfpay to secure the loan?

9         A.    Yes.

10        Q.    And who holds those shares?

11        A.    I don't understand who, Jeremy.  You mean

12   who holds them now or who held it or ---

13        Q.    Who holds them now?

14        A.    I guess it will be Halfpay.

15        Q.    Did you physically deliver the shares to

16   Halfpay?

17        A.    There's no -- no, there's no ---

18        Q.    There's no paper shares or anything like

19   that?

20        A.    No.

21        Q.    And I think you said this earlier, what's

22   the status of Oxbridge Medical?

23        A.    Oh, it's been -- it's been defunct for a

24   long time.

25        Q.    Dead for a while.

```
 1                    Okay.  I'll show you what we're going to
 2    mark as Exhibit Number 6.
 3                    (Thereupon, Exhibit Number 6 was marked for
 4    Identification.)
 5    BY MR. GARNO:
 6         Q.    And isn't it also true that in connection
 7    with this August 2015 transaction regarding the
 8    Embassy Drive property, that you personally guaranteed
 9    performance and payment of Oxbridge's note obligation to
10    Halfpay?
11         A.    Yes.
12         Q.    And I'm showing you Exhibit 6 -- yeah,
13    Exhibit 6.
14         A.    Uh-huh, 6.
15         Q.    It's a guaranty of payment and performance,
16    and it reflects that Denton Douglas is the guarantor and
17    that Halfpay International is the lender; correct?
18         A.    Yes.
19         Q.    And does that signature -- is that your
20    signature that appears on the second to last page of
21    Exhibit 6?
22         A.    Yes.
23         Q.    So at that time in 2015, you guaranteed the
24    payment would be made under the note that we looked at?
25         A.    Yes, yes.
```

Page 80

```
 1           Q.    Ultimately you closed on that property,
 2   Oxbridge Medical became the owner of the property located
 3   on Embassy Drive?
 4           A.    Yes.
 5           Q.    Who is currently the title owner of that
 6   property?
 7           A.    I think it's Halfpay.
 8           Q.    Let me ask you a question.  How did Halfpay
 9   become the title owner to the property?
10           A.    Quitclaimed it back to them.
11           Q.    When did you quitclaim that property?
12           A.    I don't remember the exact time, maybe a
13   couple years ago.  I don't remember.
14           Q.    And why did you quitclaim it back to Halfpay
15   or why did Oxbridge Medical?
16           A.    Well, I was behind is one.  Jeremy did not
17   follow through with the -- the deal was -- that we had
18   with Jeremy was, I'm going to get this lot, I'm going to
19   build my primary home on it.  We're going to do this stuff
20   in Port St. Lucie, and then the profit from that, I will
21   be able to do this.  You know, it was going to be tight to
22   do the lot and the other stuff.
23                 So when I missed a couple payments, made
24   them, a couple payments, made them, so then Jeremy started
25   to -- he hired Craig's wife as his bill collector.  So I
```

Page 81

1    fell back.

2              I talked to Jeremy.  He said to me, look,

3    here's the deal.  He said -- he said I'll stop harassing

4    you -- well, he was calling me at work and telling me he's

5    going to call PNC Bank to say, look, you're a bad person,

6    you didn't pay your bill and you're not qualified to be a

7    business banker.

8              I'm like, you know what, fine, I can't do

9    nothing.  That's fine, you can have it back.  He said,

10   here's the deal, quitclaim it back to me and, you know,

11   when you get caught -- I'll stop all the collection, all

12   the interest and everything else.  When you're ready to

13   pay, we can start again, that is when it was quitclaimed

14   back to him.

15        Q.    Okay, and so let me show you this.  So

16   throughout -- after the note was entered into, would it be

17   fair to say that payments were not consistently made on

18   the note?

19        A.    No, I knew it was going to be tough and I

20   told him.  I said, Jeremy, I need this other stuff to do

21   this.  He said, yeah.  And then Eddie told him, no, and

22   that was like -- so I don't know why.  Said no, we can't

23   do it, Port St. Lucie, out of nowhere he changed his mind.

24        Q.    What was the other stuff that you needed

25   that you just referred to?

```
 1           A.    Well, the deal we had with him, he was -- he
 2     was going to look at buying -- he owns a bunch of lots all
 3     over the place, in Delray Beach, et cetera, and he's
 4     building a couple things in Boca or somewhere, he's
 5     building all these house.
 6           Q.    This is Jeremy?
 7           A.    Jeremy, yeah, Jeremy, to live in.  I said
 8     look, I can -- I can do something cheaper in
 9     Port St. Lucie, the lots are cheaper, 20,000, build a
10     house for about 150, 160, 170, sell it for like 270.  So I
11     wanted to do that, and that will -- cash flow will give me
12     a chance to pay this lot and make some money.
13                 He said, yes, we'll do that.
14           Q.    But how were you going to put money into the
15     Port St. Lucie lots?
16           A.    He was going to fund it.  The deal was he'll
17     fund it.  The deal was I get the builder, I get the
18     drawing, he doesn't have time to go up there, he'll fund
19     it and then he would have his person to close it only, and
20     then he will -- we'll split it or he will finance the new
21     buyer.
22                 He said, look, I'll finance the new buyers.
23     If you get a buyer, I'll finance it, and I'll just, you
24     know, work this out with you and stuff.
25                 I said, perfect, it's good for me, but then
```

1    it's like before we even finished talking, he forgot.

2              Q.    That never got off the ground?

3              A.    No.

4              Q.    Let me show you what we've marked as

5    Exhibit 7.

6                    (Thereupon, Exhibit Number 7 was marked for

7    Identification.)

8                    THE WITNESS:  Yes, this is from Tiffanie.

9    BY MR. GARNO:

10             Q.    Yeah, Tiffanie, I think you referred to.

11   That's Craig Smith's wife Tiffanie Smith?

12             A.    Yeah.

13             Q.    You'll see this is an e-mail exchange in

14   January -- June, excuse me, of 2016, regarding payments on

15   the Embassy Drive property.

16             A.    Yes.

17             Q.    You'll see that she wrote to you that your

18   payment hadn't been made, and you had responded to her

19   that you had made the payment, and that you also requested

20   that you use -- that she use the tripled@ymail.com --

21             A.    Uh-huh.

22             Q.    -- as this is monitored by PNC.

23                   What other e-mail addresses did you utilize

24   during this time period besides tripled@ymail?

25             A.    Tripled, and I'm not -- I think it was --

Page 84

1    I'm not sure of anything else.  I don't think I gave them

2    anything else, I don't remember, honest.

3            Q.    And you didn't want her e-mailing you at PNC

4    for what reason?

5            A.    Because Jeremy threatened to tell PNC that

6    I'm behind on a bill, which would be bad for me.

7            Q.    And why would that be bad for you?

8            A.    Because I'm a banker and I should be able to

9    pay all my bills.

10           Q.    It appears that the loan agreement that we

11   looked at was modified?

12           A.    Yeah.

13           Q.    Take a look at Exhibit 8.

14                 (Thereupon, Exhibit Number 8 was marked for

15   Identification.)

16   BY MR. GARNO:

17           Q.    I'm showing you what we've marked as

18   Exhibit 8, it's an addendum to the loan agreement.

19           A.    Yes, there should be something -- go ahead.

20           Q.    Is that your signature that appears on

21   behalf of Oxbridge?

22           A.    Yes.

23           Q.    It appears -- and the date of this is

24   July 7, 2016?

25           A.    Uh-huh.

1          Q.    It appears there was a modification to the

2     total payoff that was due on the loan?

3          A.    Yes.

4          Q.    And what was -- what were the circumstances

5     around this modification?

6          A.    Jeremy, he said he -- there's something

7     missing.  There is something missing.  That he had spent

8     10,000 in legal fees for consulting and he was going to

9     tell PNC if I don't come in and do this right away, so I'm

10    like, fine.

11         Q.    So this document basically agreed to

12    increase the monthly payments that were due?

13         A.    Yeah.

14         Q.    And increase the amount of the balloon

15    payment at the end?

16         A.    Yeah.

17         Q.    Even after this modification, though, you

18    were still having issues making timely payments to Jeremy?

19         A.    Yeah, I mean, he said -- he said, look,

20    Port St. Lucie was too far for him to do the stuff, if I

21    find stuff closer, like West Palm, he'll do it.  I said

22    fine.

23              He didn't do it, so I just -- I didn't think

24    he would, anyway, but, yes, I had trouble paying this,

25    also.

1          Q.     So let me understand, what was your intent

2     or what was Oxbridge's intent when it acquired the

3     Embassy Drive property, was it to ---

4          A.     To live there, to build a house myself.

5          Q.     To build a home?

6          A.     For myself.

7          Q.     There was no business purpose for it?

8          A.     No.

9                 (Thereupon, Exhibit Number 9 was marked for

10    Identification.)

11    BY MR. GARNO:

12         Q.     I'm going to show you what we've marked as

13    Exhibit 9.  I'm going to represent to you that these are

14    various text messages that we were able to secure off of

15    Mr. Marcus' telephone, and the dates on these text

16    messages is October 4th and October 5th of 2016.

17                You'll see at the very top, those are texts

18    from Tiffanie Smith to a number of parties, one of which

19    is Ddd PNC Banker, and it has a phone number of

20    (561)723-3037.

21         A.     Yeah, I see that.

22         Q.     Is that your cell phone number?

23         A.     Uh-huh.

24         Q.     Or was that your cell phone number at the

25    time?

Page 87

1          A.    Yes, yes.

2          Q.    And you can see there that on the 5th that

3     she had told you that there was late payment again?

4          A.    Late payment.

5          Q.    You'll see that two down from that ---

6          A.    Two down?

7          Q.    Yeah, the number 232 appears next to the

8     text.

9          A.    Yeah.

10         Q.    It's a text from Mr. Marcus to you?

11         A.    Uh-huh.

12         Q.    And he asks you, can I change my SS number

13    and name to solve the problems I'm having with banking?

14         A.    Uh-huh.

15         Q.    Do you see where he texted you that?

16         A.    Yes.

17         Q.    And what do you recall about Mr. Marcus'

18    inquiry at that time about changing his Social Security

19    number and his banking problems?

20         A.    Yeah, he was getting his accounts closed.  I

21    think PNC at the time had closed his account -- had closed

22    his account, and I think BOA had closed his account.  He

23    believed that it was because he was on either Check

24    Systems or Early Warning.

25         Q.    What is -- what is Check Systems and Early

Page 88

1    Warning?

2           A.    It's when you have give a bounced check, you

3    go to this credit bureau of checks, and your bank shares

4    your information, so he thought he was on Check Systems.

5                 And Early Warning is when a client has a

6    history of doing something, there's a company that all the

7    banks have this database that we say, hey, this person is

8    not a person that is bankable.

9           Q.    Okay.

10          A.    I said to him that that won't -- I gave him

11   the number of Check Systems and Early Warning.

12          Q.    And you also -- in terms of changing his

13   Social Security number, do you remember any conversations

14   you had with him about doing that?

15          A.    Oh, yeah.

16          Q.    Do you know if he ever changed his Social

17   Security number?

18          A.    I don't know if he did.

19          Q.    Do you recall anything that you told him in

20   connection with his request or his question, excuse me?

21          A.    I told him that I've had clients who have

22   changed Social Security number, but I don't -- it's -- I

23   said the issue -- his issue was something else.

24                He thought the issue was something else.  He

25   said he has no fraud, he has good credit, he has an

```
 1    American Express card, et cetera.  So I thought it was

 2    just Check Systems or Early Warning.

 3              But he asked me for -- I said to him, look,

 4    I've heard it's been done before.  I don't know how they

 5    do it.  He said he had a lawyer in Vegas or somewhere.  I

 6    know it was done, I had a client who did it.  I don't know

 7    how they do it.

 8         Q.    I don't either.

 9              Okay.  I can tell from the e-mail, these

10    text messages, that Mr. Marcus became increasingly upset

11    with you about payments that were due on this note; is

12    that fair?

13         A.    He cursed, he called ---

14         Q.    We'll get there.

15         A.    Okay.

16         Q.    There's ---

17         A.    You don't have that.

18         Q.    Unfortunately, I've seen some of it.

19              (Thereupon, Exhibit Number 10 was marked for

20    Identification.)

21    BY MR. GARNO:

22         Q.    Let me show you what we've marked as Exhibit

23    10.

24         A.    Yeah.

25         Q.    Again, this is a series of text exchanges
```

Page 90

1   between you and Mr. Marcus; correct?

2           A.    Yes.

3           Q.    And these texts are in the early part of

4   November 2016?

5           A.    Yes.

6           Q.    The first one he sent to you on

7   November 7th, that he was just going to send a legal

8   notice and he was tired of this, and you were in default.

9                 Do you recall him telling you these things

10  at that time?

11          A.    Yes.  Jeremy always forget his promises, he

12  always does that.  It's whatever is in his mind is

13  absolutely right.  And I would tell him, Jeremy, that's

14  not what we agreed.  I did it, and I did sign for this,

15  but I told you I can't afford to pay it unless you do

16  these things, the stuff.  It's -- yeah.

17          Q.    And during this time period he threatened to

18  send you to legal or file a lawsuit against you?

19          A.    He threatened to go to legal, to call my

20  boss, what's my boss' number, which I gave it to him, and,

21  yeah, he got worse, he called me -- he called me

22  constantly.

23                I would block his number.  He'd call me from

24  a different phone number.  He got different numbers to

25  call me from, so I didn't know it was him.

Page 91

1          Q.     Ultimately ---

2          A.     So I just quitclaimed the property you

3    showed me.

4          Q.     Let me show you what we're going to mark as

5    11.

6                 (Thereupon, Exhibit Number 11 was marked for

7    Identification.)

8    BY MR. GARNO:

9          Q.     Exhibit 11 is an e-mail with an attachment

10   from December 15, 2016, from halfpayproperties@gmail.com

11   to tripled@gmail.com.

12                Was that -- was that your e-mail address at

13   the time?

14         A.     Ymail, not gmail, but yeah.

15         Q.     You'll see again, this is an official -- a

16   somewhat official looking notice of default that was

17   served upon you?

18         A.     Yeah.

19         Q.     So by December 15, 2016, he had said you

20   were in default on ---

21         A.     Well, you're missing something, another --

22   go ahead, maybe you have it here.

23         Q.     So by December of 2016, he had declared you

24   in default --

25         A.     Yes.

Page 92

1          Q.      -- under the loans?

2                  I have to tell you, I've seen a number of

3     these texts where he feels like you've tricked him or

4     you've conned him.

5          A.      Yeah.

6          Q.      What's that about?

7          A.      It's the balance -- I told Jeremy, Jeremy,

8     I'm buying the lot for this price.  It's his sister got to

9     pay X amount of money, he want that amount of money,

10    here's what it is.  He was fine with it, he got a copy of

11    the HUD.  He had approved the HUD before the funding could

12    happen.  So he got the HUD, he went through it, he called

13    me up, he got it.  After the closing, it came another HUD

14    again showing the difference.

15                 His thing was I wasn't aware that I'm

16    lending more money.  I said, Jeremy, but we went through

17    it a couple of times and you -- the lawyer sent you the

18    HUD for you to approve it at closing.  I mean, we call you

19    a couple times, you get it, you looked at it.

20    Kathleen McGrath, I believe she was, looked at it.

21         Q.      This is that $45,000 difference?

22         A.      Yeah, I think so.  So we did -- we did talk

23    about it before and during.  His issue was, oh, the lot

24    value went down.  I can't sell the lot now.

25                 I'm like, Jeremy, but it wasn't for me to

Page 93

1   flip it.  I wish I had recorded the stuff I said to him,

2   but call the attorney who did the closing.  I mean, it

3   wasn't that we just scammed you, you saw the HUD, you saw

4   the stuff, you saw the money going back.

5           Q.   Now, the $45,000, you're a little bit vague

6   when you told me where that went.

7           A.   Yeah.

8           Q.   So you had to pay the owner and his sister

9   an off -- off closing statement fee to get the deal done?

10          A.   I had to do some -- I did some stuff with

11  it.  I had -- I wanted to do the lot in Port St. Lucie,

12  and I think I had to pay the owner some money.  I don't

13  remember all the details that went with it, but it

14  didn't -- it didn't go towards -- it wasn't -- it didn't

15  go toward the Port St. Lucie lots.

16          Q.   It didn't go to that?

17          A.   No.

18          Q.   And so it was my understanding that the

19  45,000 difference went to make payments on behalf of the

20  owners who were selling the property; is that fair?

21          A.   That's fair, some of it.

22          Q.   Okay, and some of it went to you personally?

23          A.   Yeah.

24          Q.   How much -- how much of it went to you

25  personally?

Page 94

1        A.    I don't remember.

2        Q.    Okay.

3        A.    I can let you know if I can check.

4        Q.    Sure.

5        A.    I can check on it.

6        Q.    I'm just curious, and this is what ticked

7   off Jeremy in terms of feeling like you had tricked him or

8   fooled him?

9        A.    Yeah, but it's -- Jeremy before -- Jeremy

10  even had the lot appraised, and it appraised for a lot

11  more than that.  He's like, okay, I could do the -- in

12  fact, he told me what he could do on the lot.  He said to

13  me, I looked at it, I looked at the comps.  Okay, cool, I

14  could do this.

15       Q.    Okay.

16       A.    And that's why, but Jeremy, as good or bad

17  as he is, he does his due diligence.  He does -- I mean,

18  he does due diligence.  He got the lot, he went to PAPA,

19  he pulled up the stuff, he look at the comps in it, and he

20  did some other stuff.  He sent one of his guys to look at

21  the property.  He did his stuff.

22       Q.    Okay.

23       A.    So there wasn't a trickery onto it.  It was

24  when later on he wanted to sell it, wholesale it, he's

25  like, oh, I can't get it sold now.

1           Jeremy, call the attorney who did the

2    closing, she sent you the stuff, I told you before.  Call

3    Eddie.  Eddie told you what's going to happen.  I mean,

4    it's -- but, I mean, Jeremy -- it's what it is.

5                  (Thereupon, Exhibit Number 12 was marked for

6    Identification.)

7    BY MR. GARNO:

8           Q.    Let me show you Exhibit 12.  Again, it's

9    another text exchange --

10          A.    Yeah, there's ---

11          Q.    -- between you and Jeremy.  It's on -- the

12   text exchange between you and Jeremy is from January 17,

13   2017.  You'll see -- well, we'll edit this for the

14   children at home.  He's very upset with you and he

15   references, if you didn't want to sign the agreement, just

16   say so.

17          A.    Yeah.

18          Q.    What agreement was he referring to when he

19   texted you that in January of 2017?

20          A.    I don't remember.  I don't know if it was

21   the quitclaim deed was in January or after.  I don't know

22   if it was quitclaim deed or it was the extension, I don't

23   remember.

24          Q.    Were there -- were there discussions during

25   this time about you providing a deed in lieu of

Page 96

1    foreclosure on the property?

2          A.    I think it was a quitclaim deed -- it was a

3    quitclaim and a modification.  I don't remember which one

4    this was referring to, I'm sorry.

5          Q.    And then the last text message on

6    Exhibit 12, is your response to him ---

7          A.    Which one?

8          Q.    It's the one at the bottom.

9          A.    Okay.

10          Q.    It's the one that comes from you.  Do you

11   see where you texted Mr. Marcus in January?

12          A.    Yeah.

13                MR. PERLMAN:  Why don't you read what it

14   says.

15                THE WITNESS:  Okay.  I got it, yes.

16   BY MR. GARNO:

17          Q.    And this goes back to something that we had

18   talked about about him making promises to you?

19          A.    (Nods head.)

20          Q.    Okay.  Let me go back to the text and I want

21   to kind of break it down a little bit.

22                On January 17th you texted him.  You have

23   called me names and completely taken this to the gutter

24   and I have been respectful in all my communications with

25   you.

1            Do you see where you texted Jeremy that?

2        A.    Yes, yes.

3        Q.    I helped your company in so many cases.

4   What were you referring to when you texted him that?

5        A.    Oh, his -- his advanced TM.  I didn't have

6   it, and I literally spent a lot of time finding this

7   product, which the firm had, and getting the people on it

8   to make an exception for this.

9            It was -- it's -- it was a Cash 21 advanced

10  TM stuff.  It was -- I mean, he told me that with the --

11  with the lockbox and the company in Kentucky getting his

12  stuff below two percent, whatever it is, I mean, it was a

13  lot of work, and I didn't get paid on this because

14  advanced TM belongs to commercial banking, they don't pay

15  the business banker on it.

16       Q.    Okay.

17       A.    But I -- it was a lot of work, back and

18  forth, getting his people stuff, getting the paperwork

19  done that I was completely not familiar with.  I had to do

20  a class on it just because I thought that this is a good

21  business, it makes sense, you know stuff like that.

22       Q.    Any other ways that you helped his company

23  besides that?

24       A.    He wanted -- when PNC -- yes, I help him on

25  two other occasions.  His company or him, either one.

Page 98

1          Q.    It doesn't matter for purposes of my

2    question.

3          A.    Yeah.

4          Q.    Either Jeremy or his companies.

5          A.    He wanted to buy a bank, and he had promised

6    me to pay me for it and whatever it is, but -- and I did

7    research on banks, banks for sale, thrifts, banks that are

8    small, and he had his partners, some multi-millionaire

9    partners that want to do this, give them the report.

10               And the other one was he wanted a bank that

11   was more intimate that he can sit down with, et cetera,

12   and talk to, and do I know of a good TM person to work

13   with.

14               I said, look, the TM person who is really

15   good is Gil, and I set up the meeting, give him the

16   number, set up the meeting with him.  It was like either

17   Florida First, First Florida, I know where the branch is,

18   but one of those other banks.

19               But I went out of my way just to help him,

20   say, look, you know, it's -- it seemed like a good

21   business.  I met his wife at the time, his fiance at the

22   time.

23         Q.    Any other ways -- any other ways you helped

24   him that you're referring to in the text?

25         A.    The letter for the bank in Puerto Rico or

1    Panama.  Introduced him to Titan to do his lending and his

2    servicing, et cetera.  I can't think of anything else

3    right now.

4            Q.    Okay, and the promises that he made that he

5    never kept that you referenced in your text, what were you

6    referring to?

7            A.    He -- the promise he made was, if you want

8    to do the stuff for yourself, real estate stuff, I'll fund

9    it for you and we'll split it.

10           Q.    This is the Port St. Lucie deal?

11           A.    Yeah, Port St. Lucie.  I mean, that was --

12   he said he'll do it.  He had to -- he called Titan to see

13   how he can protect himself.  He was going to buy it in his

14   name and give me a contract to give to the title company

15   that settlement is split, X, Y, Z, split this way and he

16   didn't do it.

17           Q.    Anything -- any other promises that he made

18   to you that you felt like he didn't keep?

19           A.    If I help him with the other stuff, he says

20   he'll credit -- first he said to me I'll -- I'll give

21   you -- if I find another bank that is small, I can sit

22   down and work with, I'll give you one year salary.  I

23   said, Jeremy, I made 120 last year.  He's like, oh.  I'll

24   give you a hundred thousand, then.  That's fine.  He did

25   that twice, for that and also for the stuff.  He said I'll

1    do it, you know, swear on whatever it is you want to swear

2    on and he didn't do it.

3          Q.    Okay.  Let me -- let me ask you a question

4    about what you just said.

5                What was he looking for you to do in

6    connection with the small bank that he wanted to sit down

7    and talk to?

8          A.    He said that the big banks are too

9    automated, they don't understand his business, and so if

10   he can get a small bank to say, look, here's the -- here's

11   how we do business.

12               One of his things was that the reason why --

13   and I didn't know why the accounts were being closed out,

14   there was more stuff to it, but I know that one -- one of

15   the things that he told me was that when he was in college

16   he was accused of battery or rape or something like that,

17   and he believed that banks are Googling him and finding

18   that assault, and that's why it's happening.

19               I said, well, it's simple.  Get a small

20   bank, sit with them and he -- so I gave him -- the first

21   name I gave him was Gil and Gil was a -- a TM officer or a

22   big TM guy at another bank.  So he could sit with him,

23   tell him -- explain to him how you do your thing because I

24   never even understood how money goes from a customer, to

25   one bank, to us.  I never got that Kentucky -- how they

1   could clean it up.

2        Q.   Was this after PNC kicked him out for the

3   second time?

4        A.   I don't remember, but it was probably close

5   around that time.

6        Q.   Okay.  So before this conversation where he

7   felt like the banks were persecuting him because of

8   whatever happened in college --

9        A.   He thinks it was that, and that ---

10       Q.   -- he had been banking at PNC, Chase, Bank

11  of America?

12       A.   I think it's after this.  I don't know the

13  date of this text, that's why I can't tell you, but PNC

14  closed the account because of the transactions were not

15  what he said it was going to be.  It was way higher, and

16  he doesn't think it's a big deal because everybody has

17  returns.

18       Q.   Okay.  So when he -- when he made this

19  promise to you that he would give you a year's worth of

20  salary if you did what, what were you supposed to do?

21       A.   It was two things, it was two different

22  deals.

23       Q.   Okay.

24       A.   One was he wanted to buy a bank.

25       Q.   Understood.

1          A.     And he wanted me to find out for him what

2     banks are undercapitalized, and he had -- he and his

3     partners had lot of money.  One of the partners he had

4     does ATM machines, ATM machines --

5          Q.     Okay.

6          A.     -- all over -- all over Florida, and they

7     want to buy a bank, and I gave him a list of banks that

8     are in trouble or you know.

9          Q.     Do you recall the name of any of these

10    partners that he was looking to buy the bank with?

11         A.     I know that -- no, I know one of the guys --

12    one of the guys is the ATM machine, remote ATM, remote.

13    So he had ATM machines at a fair or somewhere else that he

14    does.

15         Q.     Okay.

16         A.     So that was -- so I did a lot of research, I

17    called a couple of friends of mine, went online, did a

18    bunch of research, I mean, and I gave him a couple of

19    banks he was going to buy it, he offered me a job.  I

20    said, no, no, no, I'm not going to work for a small bank

21    in Tennessee or Georgia.

22               The other one was he -- I guess, I mean, I

23    can imagine because he was desperate, introduction to a TM

24    officer who he can talk to about his business, he and

25    Otto.

1          And the third time was to -- he was at

2    Landmark bank for his personal account, but he wanted to

3    meet a business banker at Landmark to talk to, and I gave

4    him the number for somebody at Landmark bank to talk to.

5          Q.    For business accounts?

6          A.    For business accounts.  Because he said that

7    he was told that the big banks have a higher threshold for

8    stuff, and his other friends who are in the same business

9    don't have this problem because they were with small

10   banks.  But, again, he thought it was personal stuff

11   because PNC caught his college thing.

12         Q.    And I think you referenced -- you referenced

13   in your statements that it was a time of desperation for

14   him?

15         A.    Yeah.

16         Q.    What did you mean by that?

17         A.    Whenever a bank closed his accounts, he gets

18   desperate and he makes promises and stuff like that.

19         Q.    And just from a timing perspective, are the

20   promises we've talked about in terms of the bank, and the

21   introduction to the TM officer, the Landmark introduction,

22   this occurred after the phase two relationship at PNC?

23         A.    I'm sorry.

24         Q.    That's okay.

25         A.    I'm sorry, can you say that again?

Page 104

```
 1          Q.    Sure.  I'm just looking for the timing of
 2   these promises.  Were these promises occurring after --
 3          A.    After PNC.
 4          Q.    -- after PNC kicked him out for the second
 5   time?
 6          A.    After PNC, yes.  He was with other banks
 7   and he was flying to Panama and doing well.
 8                (Thereupon, Exhibit Number 13 was marked for
 9   Identification.)
10   BY MR. GARNO:
11          Q.    I'm showing you what we've marked as
12   Exhibit 13.
13          A.    Another one that you must be missing.
14                MR. PERLMAN:  Which one is 13?
15                MR. GARNO:  13 is the quitclaim deed dated
16   January 24, 2017, that was recorded in Palm Beach County
17   on February 22, 2017.
18                THE WITNESS:  Did you say 13?
19                MR. GARNO:  13.
20                (Thereupon, Exhibit Number 14 was marked for
21   Identification.)
22   BY MR. GARNO:
23          Q.    Exhibit 14 is a second addendum to mortgage
24   and balloon promissory note dated the same date,
25   January 24, 2017.
```

Page 105

```
 1                Take a look at Exhibit 14 first, which I
 2    think you're doing.  This is the second addendum to
 3    mortgage and balloon promissory note.
 4          A.    There's another one, but that's fine.  Okay.
 5          Q.    Take a look at the last page of Exhibit 14.
 6          A.    Yeah.
 7          Q.    Is that your signature on behalf of --
 8          A.    Yes.
 9          Q.    -- Oxbridge?
10                And what was the purpose of Exhibit 14, the
11    second addendum to the mortgage and balloon promissory
12    note?
13          A.    The purpose of this?
14          Q.    Sure.
15          A.    I think it was to add -- to add some money
16    to the balance I think it was.  I don't remember.  I mean,
17    I signed it.
18          Q.    Sure.  It looks like the pay out now is
19    $200,000?
20          A.    Yeah, because he had legal fees out there.
21          Q.    And there's also a reference that there's a
22    default --
23          A.    Yes.
24          Q.    -- and that the maturity date for the
25    balloon payment had been extended to January 31, 2020?
```

Page 106

1          A.     Yeah.

2          Q.     And on that same day you -- the same day

3    that you execute this addendum to the mortgage and balloon

4    promissory note, you also executed a quitclaim deed for

5    the property to Halfpay International --

6          A.     Uh-huh.

7          Q.     -- which is Exhibit 13; correct?

8          A.     Yeah.

9          Q.     And that's your signature that appears --

10         A.     Yeah.

11         Q.     -- on the second page of Exhibit 13?

12                Why did you quitclaim the property the same

13   day that you modified the note?

14         A.     So he -- that's a good question.  So he said

15   to me that if you sign a quitclaim deed, we're going to

16   put everything -- we're going to freeze everything and

17   then when you're ready to start -- do another one, then,

18   you know, we can do it.

19                He said, well that will give me some

20   guarantee.  I said, fine.  At this point I was just -- I

21   was just -- I didn't want to do it, because at this time

22   Oxbridge had expired.  He was like you've got to renew

23   Oxbridge.  I said, Jeremy, it's expired.

24         Q.     So at this point in time Oxbridge Medical

25   was an inactive company?

1          A.    Oh, yeah, it was inactive.

2          Q.    It was dissolved by the Secretary of State

3    of Florida?

4          A.    Yeah, I never did the annual stuff.

5          Q.    Was Jeremy supposed to hold this quitclaim

6    deed until something happened or didn't happen?

7          A.    He was supposed to hold the quitclaim deed.

8    I said, Jeremy, I'm going through some stuff right now.

9    What date was this, January 2017?

10         Q.    Yeah, it's the same date as the -- as the

11   addendum to the mortgage.

12         A.    He was supposed to hold it.  I said, Jeremy,

13   I'm going through stuff right now.  I think it was my

14   divorce had started or some events with my ex-wife at the

15   time.  He said, don't worry about it, it's not going to

16   happen, I'm going to hold onto it.  Yeah, I'm going to

17   hold onto it and when you're ready, you know, we can do

18   some stuff.

19              I said, Jeremy, I don't agree with the 5,000

20   in legal fees.  It doesn't take $5,000 in legal fees.  He

21   said, yes, my attorney did it.  I spoke to Otto, he said

22   he didn't do it.  At the time I was just --

23         Q.    You agreed to it anyway?

24         A.    -- tired.  I was just tired.  Jeremy, you

25   know, you made promises, you don't keep it.  You make

1    promises, you don't keep it.  You make promises, you don't

2    keep it, and you don't remember the promises you make

3    because you believe whatever is in your mind today.

4              He said, no, I'll hold onto it.  Couple days

5    later I checked and it was filed.

6         Q.   It was filed almost a month later.

7         A.   Yeah.

8         Q.   Was there -- was there something that you

9    were supposed to do in that time period between

10   January 24th and February 22nd that you didn't do that

11   caused Jeremy to file the quitclaim deed?

12        A.   I give him a check, I told Jeremy to hold

13   onto the check until my bonus comes in.  My bonus came in

14   January, February, the third -- I think it's March,

15   February or March my bonus came in.  Jeremy, my bonus is

16   coming in at this time, so, you know, I'll give you a

17   check to do this.  I didn't agree with the 5,000, he got

18   mad.  I brought the check to Jeremy.  It shouldn't have

19   been deposited, we talk about it.

20        Q.   And then so ultimately he -- Jeremy did

21   cause to be filed the quitclaim deed in February of 2017?

22        A.   Yeah.

23        Q.   And Halfpay is currently the record owner --

24        A.   Yeah.

25        Q.   -- owner of the property?

1          There's a number of text messages between

2    January 24th and February 22nd that we have where he again

3    talks about you scamming him, tricking him.  So in

4    February, what did he think -- what did he think you were

5    scamming him or tricking him about?

6          A.   I -- I really don't know, because this is --

7    this was the earlier -- he said this earlier.  We went

8    back to this.  I think Jeremy was trying to sell the

9    property for -- for his wife -- his wife now wanted to

10   sell the property and I didn't let them in the property,

11   and he got mad or something like that, but it's ---

12         Q.   I'm going to show you what we're going to

13   mark as Exhibit 15.

14              (Thereupon, Exhibit Number 15 was marked for

15   Identification.)

16              MR. PERLMAN:  This is Exhibit 15?

17              THE WITNESS:  It's Exhibit 15.

18   BY MR. GARNO:

19         Q.   Exhibit 15 is a series of ---

20         A.   Okay.  So here's the stuff with PNC

21   complaints.

22         Q.   Yeah, this is -- I mean, I spared you the

23   lead up to this, which is full of a lot of curse words and

24   unpleasant things, but you lived it.

25         A.   He would call me from another number at

1   2:00, 3:00 in the morning, it must be his wife's phone and

2   explicit.

3           Q.    Yes, the text messages are not child

4   friendly.

5           A.    And -- and explicit, and -- yeah.

6           Q.    So you'll see that, you know, this is now

7   February -- this is Valentine's Day of 2017, and again,

8   he's talking about -- well, he's texted you at this time

9   that you scammed him, do you see that?

10          A.    Yeah.

11          Q.    He thought that you were trying to get away

12  with something and pull something over on him, correct,

13  and he threatened to call your boss and file complaints

14  with PNC?

15          A.    Yeah.

16          Q.    And what -- what complaints, did he ever

17  get -- be specific with you --

18          A.    Yeah.

19          Q.    -- as to what you ---

20          A.    That I didn't pay him his money.

21          Q.    Okay.

22          A.    And that a banker shouldn't be there without

23  paying his money.

24          Q.    And did he -- did he hang that over your

25  head --