UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 17-60907-CIV-MORENO

FEDERAL TRADE COMMISSION, *et al.*,

      Plaintiffs,

v.

JEREMY LEE MARCUS, *et al.*,

      Defendants.

_____/

## EXPEDITED MOTION FOR IMPOSITION OF EQUITABLE LIEN BASED ON SEPARATELY CONTRIBUTED FUNDS FOR THE PURCHASE OF THE REAL PROPERTY LOCATED AT 300 ROYAL PLAZA DR. FORT LAUDERDALE, FL 33301

Non-party, Amanda Finley ("Ms. Finley") files this Motion for Imposition of Equitable Lien Based on the Separately Contributed Funds for the Purchase of the Real Property (the "Motion") Located at 300 Royal Plaza Dr. Fort Lauderdale, Florida 33301 (the "Property"). Ms. Finley is seeking expedited relief on the Motion in order to have the issue resolved prior to the sale of the Property, which counsel for Jonathan Perlman (the "Receiver") represented was due to close in ten (10) days. In support, Ms. Finley states as follows:

## INTRODUCTION

Ms. Finley is an innocent non-party in this case. She acted as the real estate agent for the purchase of the Property, which she subsequently resided in as her homestead. In order to contribute to the purchase of her homestead Property and for her proportional ownership of the Property, she contributed $107,500.00 of her commission for the purchase of the Property. *See* attached as **Exhibit A** the Property Closing HUD-1, Line 209, 703. Ms. Finley's commission was paid by the homebuilder and seller of the Property, Estate Homes, LLC (the "Seller"), so it was not traceable at all to the Defendants' funds. *See* Exhibit A, Line 703. She made this

contribution based on the reasonable expectation that she would own that portion of the Property. Importantly, Ms. Finley is not claiming any percentage ownership or claim to the Property over and beyond her actual monetary contribution for the Property. The only equitable right that Ms. Finley is seeking for this Court to enforce is regarding her proportional ownership right in the Property for her separate and independent contribution to the Property in the amount of $107,500.00.

Ms. Finley was married to Defendant Marcus for approximately three (3) months prior to the Plaintiffs filing the instant case.[1] Regardless of whether the Defendant's contribution to the Property was predicated on improperly earned funds, Ms. Finley's contribution was not. Her contribution was based on her legitimate work as a real estate agent to facilitate the purchase and closing of the Property, which was fully paid by the Seller, and thus not traceable to any of the Defendants' funds or alleged wrongdoing. No facts in this case support the Receiver's requested forfeiture of Ms. Finley's purchased ownership interest in the Property. Likewise, there are no facts that could negate that Ms. Finley used her properly and independently earned commission to contribute to the purchase of the Property.

If the Receiver is permitted to reap the full value of the Property, including retaining Ms. Finley's ownership right in the Property, then the Receivership estate would receive an unquestionable windfall, while Ms. Finley would have received nothing in exchange for her purchased interest in the Property. That result is wholly inequitable and Florida law prohibits such unjust enrichment.  Therefore, Ms. Finley is seeking for this Court to impose an equitable lien on the Property or the proceeds thereof in favor of Ms. Finley based on her $107,500.00 monetary contribution for the Property, which should be paid to her upon closing of the Property.

---

[1] Ms. Finley has since divorced the Defendant.

## RELEVANT FACTS

In 2017, Ms. Finley served as the real estate agent for the purchase of the Property.  *See* attached as **Exhibit B** the executed contract for purchase of the Property (the "Contract").  Based on Ms. Finley's work to facilitate the purchase and closing of the Property as well as the work of her broker, Florida Coastal Realty Group ("Broker"), the Seller was obligated to pay her Broker a 3% commission on the total sales price of the Property, or $5,250,000.00. *See* Ex. B at 12 (noting her Broker's 3% commission earned upon closing of the Property); *see also* Ex. A, Line 701, 703 (noting the Seller's payment of the commission). The  total commission the Seller owed to her Broker totaled $157,500.00 (the "Full Commission"). *See* Ex. A, Line 701.

Since this was intended to be Ms. Finley's homestead and permanent residence, in order to contribute to the purchase of the Property Ms. Finley rebated to the Buyer $107,500.00 from the portion of the Full Commission that was otherwise directly payable to her as payment for her portion of the commission paid by the Seller, with the permission of her Broker. Ms. Finley's $107,500.00 monetary contribution was fully disclosed on the HUD-1. *See* Ex. A, Line 209.[2]

Ms. Finley's monetary contribution to the Property was always intended to be for her partial ownership in the Property.[3] Her monetary contribution came from funds that she properly earned, which were completely separate and independent of anything related to the Plaintiffs' lawsuit against the Defendants, which is clear given that it was paid by the Seller – not the Buyer. She only contributed the $107,500.00 based on the expectation that she would own that portion of the Property.

In 2017, this was fully disclosed to the Receiver, who specifically acknowledged Ms.

---

[2] The remainder of the commission was used to pay her Broker its contractual fee of 10% of the Full Commission, or $15,750.00. Ms. Finley received $34,250 at closing.

[3] Ms. Finley and the Defendant's prenuptial agreement stated that Ms. Finley would only own any joint property up to the amount of funds that she separately contributed for the property.

Finley's claim of ownership and equitable lien based on her contributed commission.  *See* attached as **Exhibit C** the reservation of rights acknowledgement letter from the Receiver.  Ms. Finley advised the Receiver that she retained her purchased interest in the Property, even despite her executing a quitclaim deed in the Property to the Defendant at the Receiver and the Plaintiffs' insistence.[4] Ms. Finley immediately cooperated with executing the deed to the Defendant, as requested, but insisted that she maintained her $107,500.00 purchased interest in the Property. The Receiver executed a confirmation letter to Ms. Finley acknowledging that she was not waiving her claim to the $107,500.00 that she paid for the Property, upon my executing the quitclaim deed of the Property. *See id.*

Ms. Finley believed that the Receiver would, in compliance with his duty to objectively and fairly administer the receivership assets, pay Ms. Finley for her monetary contribution to the Property. Instead, the Receiver recently asked Ms. Finley to execute another deed for the Property, and while not disclaiming that Ms. Finley contributed $107,500.00 to the purchase of the Property through her commission rebate, refused to pay her commensurate with her contribution.

## ARGUMENT

**I.   This Court Should Impose an Equitable Lien on the Property in the Amount of Ms. Finley's Monetary Contribution in the Property.**

In Florida, an equitable lien may be granted upon a declaration by a court out of general considerations of right or justice as applied to the particular circumstances of a case. *See Jones v. Carpenter,* 90 Fla. 407, 413–14, 106 So. 127 (1925); *Ross v. Gerung,* 69 So.2d 650, 652 (Fla.

---

[4] At the time this case was filed, Ms. Finley owned the Property as tenants by the entireties with the Defendant. After Plaintiffs threatened to make Ms. Finley a receivership defendant if she did not execute the quitclaim deed to the Defendant, Ms. Finley agreed with the understanding that Plaintiffs and Receiver knew that Ms. Finley retained her equitable interest in the Property.

1954). Another circumstance "justifying the imposition of an equitable lien exists 'when the claimant has furnished funds for the improvement of land with the knowledge and consent of the owner." *Della Ratta v. Della Ratta*, 927 So. 2d 1055, 1059 (Fla. 4th DCA 2006) (citing *Frambach v. Dunihue,* 419 So.2d 1115 (Fla. 5th DCA 1982)). Furthermore, prevention of unjust enrichment is a proper basis for imposing an equitable lien on a homestead. *See e.g., Palm Beach Savings & Loan Assoc. v. Fishbein,* 619 So.2d 267 (Fla.1993); *Spridgeon v. Spridgeon*, 779 So. 2d 501, 502 (Fla. 2d DCA 2000); *Della Ratta,* 927 So.2d at 1059. The elements of unjust enrichment are satisfied when a person voluntarily accepts and retains a benefit from another under circumstances, which would equitably require either disgorgement or the equivalent payment of value. *Zambrana v. Geminis Envios Corp.*, 2008 WL 2397624 *5 (S.D. Fla. 2008).

Ms. Finley conferred a benefit of $107,500.00 that the Receivership estate knowingly (with written acknowledgement) accepted and is attempting permanently retain the full value thereof without paying Ms. Finley anything at all. It would be wholly inequitable and a clear example of unjust enrichment for Ms. Finley to lose her entire monetary contribution paid for the purchase of the Property in exchange for nothing – while the Receivership estate retains the full value of the Property, including Ms. Finley's purchased interest with properly earned funds.

A grantor's lien or vendor's lien is "a creature of equity, a lien implied … for the unpaid purchase price of land, where he has not taken any other lien or security beyond the personal obligation of the purchaser." *Golden v. Woodward*, 15 So. 3d 664, 669 (Fla. 1st DCA 2009) (citing *Special Tax Sch. Dist. No. 1 of Orange County v. Hillman,* 131 Fla. 725, 179 So. 805, 809 (1938); *Bowen v. Grace,* 64 Fla. 28, 59 So. 563, 564 (1912); *McKinnon v. Johnson,* 54 Fla. 538, 45 So. 451, 452 (1907); *Rewis v. Williamson,* 51 Fla. 529, 41 So. 449, 450–51 (1906)). "The lien does not result from agreement, but is given by implication of law, as an incident to the debt, and

is enforceable in equity where the vendor is entitled to it." *Id.* (citing *Hillman,* 179 So. at 809). "Florida courts have recognized that 'a vendor's lien is merely a particular form of equitable lien which has long been recognized.'" *Id.* (citing *Hillman,* 179 So. at 809; *Lake Placid Holding Co. v. Paparone,* 508 So.2d 372, 377 (Fla. 2d DCA 1987); *Oliver v. Mercaldi,* 103 So.2d 665, 668 (Fla. 2d DCA 1958). "A third party who advances the purchase price is entitled to an equitable vendor's lien." *Spikes v. OneWest Bank FSB*, 106 So. 3d 475, 478 (Fla. 4th DCA 2012) (citing *Craven v. Hartley,* 102 Fla. 282, 135 So. 899 (1931)).

Ms. Finley is entitled to a grantor's or vendor's lien based on portion of the purchase price of the Property that she contributed, in which she has no other lien or security interest, yet she should be entitled to her purchased interest based on equity. Importantly, Ms. Finley is not seeking anything beyond the funds that she clearly contributed for the purchase of the Property, as demonstrated through documentary evidence. *See e.g., La Mar v. Lechlider*, 135 Fla. 703, 708, 185 So. 833, 835 (1939) (concluding that plaintiff was entitled to an equitable lien on defendant's real property for money plaintiff had advanced to defendant and for her labor and services performed); *Sonneman v. Tuszynski*, 139 Fla. 824, 828, 191 So. 18, 19 (1939) (imposing an equitable lien on homestead for the amount of funds actually used to improve the homestead and based an additional amount based on other domestic work performed). Ms. Finley is not seeking compensation for her work performed to improve the Property, which is also recoverable under Florida law through an equitable lien. Ms. Finley is seeking to be compensated for her proportional ownership right in the Property for her separate and independent contribution in the amount of $107,500.00, which was paid from the Seller (not traceable to the Defendants).

The attached Contract and corresponding HUD-1 shows that she contributed $107,500.00 of her own properly earned funds to the Property (not merely for improvement but for the actual

purchase of the Property). Ms. Finley was never paid back for this contribution to the Property. Certainly, general considerations of right and justice should demand that Ms. Finley is repaid for her monetary contribution to the Property upon the sale of the Property. Equity cannot permit anyone, even a fiduciary like the Receiver, to reap such a windfall.

It is Ms. Finley's understanding that the Receiver does not dispute the fact that she rebated the commission properly payable to her in order for her to contribute to the purchase of the Property. Indeed, such an argument is contrary to the facts. Instead, the Receiver argues that somehow it would result in unjust enrichment for Ms. Finley to be paid commensurate with the value that she contributed to the Property. This argument is belied by the facts, documents, and simple logic. Rather, it is the Receivership estate that would be unjustly enriched if it was able to retain the full value of the Property, including the amount that Ms. Finley contributed to the purchase of the Property, while giving Ms. Finley nothing in exchange. That is the most classic example of unjust enrichment and a prohibited double recovery.

Based on the Receiver and Plaintiffs insisting on Ms. Finley deeding her interest in the Property to the Defendant, although acknowledging that she was not waiving her claim to the Property, and specifically her equitable lien, Ms. Finley is left with no adequate remedy at law to recover her purchased interest in the Property, other than seeking imposition of the requested equitable lien.  Therefore, this Court should impose an equitable lien in favor of Ms. Finley in the amount of $107,500.00 over the Property or to attach to the sales proceeds of the Property and to be paid at the closing of the Property.

## II. <u>No Circumstances Justify Ms. Finley Forfeiting Her Purchased Ownership Interest in the Property.</u>

"Forfeitures are not favored in the law." *United States v. $ 38,000.00 in U.S. Currency*, 816 F.2d 1538, 1547 (11th Cir. 1987).  The government "cannot deem entireties property forfeit

because of the unlawful conduct of one spouse acting alone." *United States v. One Single Family Residence With Out Buildings Located at 15621 S.W. 209th Ave., Miami, Fla.*, 894 F.2d 1511, 1515 (11th Cir. 1990) (refusing to require property forfeiture by innocent spouse). The Receiver makes many unavailing arguments why Ms. Finley should not be paid commensurate with her contribution in the Property, but none warrant the forfeiture that the Receiver seeks.

First, the Receiver takes the position that Ms. Finley received value for her purchased interest in the Property by virtue of her living in the Property "rent-free." It is uncertain how the Receiver can argue that, as tenants by the entireties property owner at the time, Ms. Finley should be required to pay rent. Certainly, it is unclear how this would be required for the approximate one (1) year period before this case was even filed and since this was before the Receiver was even entitled to possession of the Property. The Receiver uses this skewed logic to conjure some sort of "value" given to Ms. Finley for her purchased interest in the Property. However, the only way for Ms. Finley to truly obtain any value for her purchased interest in the Property is by her being paid back the $107,500.00 that she contributed towards the purchase of the Property.

Second, the Receiver argued that the Property was purchased with stolen funds. However, the Receiver confusing the issues and conflating Ms. Finley, an innocent third party, with the Defendant. Ms. Finley's purchased interest in the Property was based solely on her independent work as a real estate agent, which commission was paid by the Seller to her Broker and then would be paid to her upon closing. There is nothing inappropriate about Ms. Finley's separate contribution from her properly earned funds that were payable to the Broker and her directly from the Seller. No conceivable facts could make her monetary contribution traceable to

any stolen funds as the Contract and HUD-1 show that payment of the commission was due by the Seller upon closing of the Property. *See* Ex. A and B.

In fact, Ms. Finley was in the process of selling two (2) other pieces of real property owned by the Defendant at the time of this lawsuit.  The Receiver allowed her to complete both sales and paid her Broker, and thus Ms. Finley, the full commission for her work as a real estate agent for the seller in both transactions, as contractually required.  The Receiver's own actions in this case regarding Ms. Finley's work as a real estate agent undermines his current position in denying Ms. Finley the amount of money that she contributed to the Property, especially given that the commission in this circumstance was paid by a source other than the Defendants.

Third, the Receiver avers that Ms. Finley's relationship to the Defendant should somehow result in her forfeiting her purchased interest in the Property. There is nothing equitable about an innocent third party forfeiting a purchased ownership right. Ms. Finley was in no way involved in the Defendants' debt businesses or the subject of the Plaintiffs' lawsuit. Her short-term marriage to someone that she has since realized that she never truly knew should not serve as a basis for her to forfeit her ownership interest in the Property. All principals of equity and fairness contradict the Receiver's desired result.

Finally, the Receiver wrongfully threatens that Ms. Finley will be in violation of the preliminary injunction order by virtue of attempting to enforce her purchased interest in the Property that preceded the issuance of that Order – and the filing of this case. The Receiver attempts to equate Ms. Finley's request for payment based on her contribution as somehow inexplicably encumbering the Property or interfering with the Receiver. However, the Receiver's threats of purported violation of the Court's Order are contrary to the facts. Ms. Finley's purchased interest in the Property, and thus any corresponding encumbrance, preceded the May

2017 Order and the filing of this case by nearly one (1) year. This was fully disclosed to the Receiver as expressed in the Receiver's own correspondence. *See* Ex. C. Further, Ms. Finley in no way interfered with the Receiver and, in fact, cooperated with deeding the Property, as requested, and later vacating the Property, as agreed. Ms. Finley is merely seeking to be paid commensurate with her monetary contribution in the Property. After the Receiver refused to honor her purchased interest, Ms. Finley was forced to seek the requested equitable lien from this Court. No stretch of the imagination could support anyone viewing Ms. Finley's actions as violating this Court's Order.[5]

## **CONCLUSION**

Ms. Finley is an innocent non-party. She contributed $107,500 of money payable directly to her from her professional work as a real estate agent for the purchase of the Property. She did this to contribute to the purchase of her homestead and based on the expectation that she would own that percentage of the Property. It is logical that the Defendant would have to forfeit his interest in the Property based on the facts of this case. However, nothing in this case warrants Ms. Finley forfeiting her purchased interest in the Property. Indeed, such a draconian result would be contrary to the law and all principals of equity and fairness. Therefore, this Court should enter an equitable lien in the Property in favor of Ms. Finley or over the sale proceeds of the Property to be paid at the closing.

---

[5] The Receiver also threatened legal action for any "lost sale" due to Ms. Finley seeking payment for her monetary contribution to the Property. Ms. Finley agreed to sign any documents necessary to effectuate the sale of the Property if the Receiver agreed to pay Ms. Finley for her separate contribution to the Property. The Receiver refused. If any sale is lost, it is based on the Receiver's actions in wrongfully refusing to honor Ms. Finley's purchased ownership interest in the Property that he has been on notice of since 2017.

WHERFORE, Ms. Finley respectfully requests that this Honorable Court enter an Order:

(i)     Granting this Motion;

(ii)    Imposing an equitable lien in the amount of $107.500.00 over the Property located at 300 Royal Plaza Dr. Fort Lauderdale, FL 33301 in favor of Ms. Finley;

(iii)   Directing that the $107,500.00 equitable lien be paid at the closing of any sale of the Property or to attach to the proceeds of the sale of the Property; and

(iv)    For any further relief that this Court deems just and proper.

## CERTIFICATE OF COMPLIANCE LOCAL RULE 7.1(A)(3)

I HEREBY CERTIFY that, pursuant to Local Rule 7.1(a)(3), Amanda Finley conferred with the Receiver on this matter prior to filing the Motion in a good faith attempt to resolve the issue without Court intervention. The Receiver opposes the relief requested.

Dated: August 29, 2019                          Respectfully Submitted,

                                                */s/ Amanda E. Finley*
                                                Amanda Finley, Esq. (*pro se*)
                                                Florida Bar No. 100225
                                                1001 Brickell Bay Dr., 9th Floor
                                                Miami, Florida 33131

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case on August 29, 2019.

                                                */s/ Amanda E. Finley*
                                                Amanda E. Finley

# *EXHIBIT A*

HUD-1

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

B. Type of Loan

| 1. FHA | 2. FmHA | 3. Conv. Unins | 6. File Number | 7. Loan Number | 8. Mortg. Ins. Case Num. |
|--------|---------|----------------|----------------|----------------|--------------------------|
| 4. V.A. | 5. Conv. Ins | | T300EstateHomes | | |
| | | | ID. | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER: Douglas E. Nicholson, Trustee of the Jean Pierre Trust #1
   Address of Borrower: 1410 SW 3rd Street  Pompano Beach, Florida 33069

E. NAME OF SELLER: Estate Homes, LLC, a Florida limited liability company
   Address of Seller: 3409 Flagstaff Rd, Baltimore, Maryland 21215          TIN: 90-0960942

F. NAME OF LENDER:
   Address of Lender:

G. PROPERTY LOCATION: 300 Royal Plaza Drive, Fort Lauderdale, Florida 33301          TIN: 27-4614121

H. SETTLEMENT AGENT: Michele M Lewis PA          Phone: 561-315-7549
   Place of Settlement: 250 S. Central Blvd., Suite 101, Jupiter, Florida 33458

I. SETTLEMENT DATE: 7/7/16          DISBURSEMENT DATE: 7/7/16

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | 5,250,000.00 | 401. Contract sales price | 5,250,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 8,135.53 | 403. | |
| 104 | | 404. | |
| 105 | | 405. | |
| **Adjustments for items paid by seller in advance:** | | **Adjustments for items paid by seller in advance:** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109 | | 409. | |
| 110 | | 410. | |
| 111 | | 411. | |
| 112 | | 412. | |
| **120. Gross amount due from borrower:** | 5,258,135.53 | **420. Gross amount due to seller:** | 5,250,000.00 |
| **200. Amounts paid or in behalf of borrower:** | | **500. Reductions in amount due seller:** | |
| 201. Deposit or earnest money | 400,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 313,114.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | | 504. Payoff of first mortgage loan | 2,260,060.00 |
| 205 | | 505. Payoff of second mortgage loan | |
| 206 | | 506. Deposits held by seller | |
| 207. Principal amt of mortgage held by seller | | 507. Principal amt of mortgage held by seller | |
| 208 | | 508. | |
| 209. Credit from Florida Coastal Realty Group | 107,500.00 | 509. | |
| **Adjustments for items unpaid by seller:** | | **Adjustments for items unpaid by seller:** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes from 01/01/16 to 07/07/16 | 9,192.09 | 511. County taxes from 01/01/16 to 07/07/16 | 9,192.09 |
| 212. Assessments | | 512. Assessments | |
| 213 | | 513. | |
| 214 | | 514. | |
| 215 | | 515. | |
| 216 | | 516. | |
| 217 | | 517. | |
| 218 | | 518. | |
| 219 | | 519. | |
| **220. Total paid by/for borrower:** | 516,692.09 | **520. Total reductions in amount due seller:** | 2,582,366.09 |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower (line 120) | 5,258,135.53 | 601. Gross amount due to seller (line 420) | 5,250,000.00 |
| 302. Less amount paid by/for the borrower (line 220) | (516,692.09) | 602. Less total reductions in amount due seller (line 520) | (2,582,366.09) |
| 303. Cash ( ✓ From   To ) Borrower: | 4,741,443.44 | 603. Cash ( ✓ To   From ) Seller | 2,667,633.91 |

Substitute Form 1099 Seller Statement:     The information contained in blocks E, G, H, and I and on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

Seller Instructions:     If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return; for other transactions, complete the applicable parts of Form 4797, Form 6262 and/or Schedule D (Form 1040)

DoubleTime®

| L. Settlement charges: | | | | Borrower's Funds at Settlement | Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700 | Total Sales/Brokers Com. based on price | $5,250,000.00 @ | 5.0000 % = 262,500.00 | | |
| 701 | 157,500.00 | 3.0000 % to Florida Coastal Realty Group | | | |
| 702 | 105,000.00 | 2.0000 % to Coldwell Banker | | | 262,500.00 |
| 703 | Commission paid at settlement | | | | |
| 704 | Bonus Commission | to Coldwell Banker | | | 12,500.00 |
| 800. Items payable in connection with loan: | | | Borrower POC Seller POC | | |
| 801 | Loan origination fee | % to | | | |
| 802 | Loan discount | % to | | | |
| 803 | Appraisal fee | to | | | |
| 804 | Credit report | to | | | |
| 805 | Lender's inspection fee | to | | | |
| 806 | Mortgage insurance application fee | to | | | |
| 807 | Assumption Fee | to | | | |
| 808 | | to | | | |
| 809 | | to | | | |
| 810 | | to | | | |
| 811 | | to | | | |
| 900. Items required by lender to be paid in advance: | | | Borrower POC Seller POC | | |
| 901 | Interest from | to | @ | /day | |
| 902 | Mortgage insurance premium for | months to | | | |
| 903 | Hazard insurance premium for | years to | | | |
| 904 | Flood insurance premium for | years to | | | |
| 905 | | years to | | | |
| 1000. Reserves deposited with lender: | | | Borrower POC Seller POC | | |
| 1001 | Hazard insurance | months @ | per month | | |
| 1002 | Mortgage insurance | months @ | per month | | |
| 1003 | City property taxes | months @ | per month | | |
| 1004 | County property taxes | months @ | per month | | |
| 1005 | Annual assessments | months @ | per month | | |
| 1006 | Flood insurance | months @ | per month | | |
| 1007 | | months @ | per month | | |
| 1008 | | months @ | per month | | |
| 1009 | Aggregate accounting adjustment | | | | |
| 1100. Title charges: | | | Borrower POC Seller POC | | |
| 1101 | Settlement or closing fee | to Michele M Lewis PA | | 295.00 | 125.00 |
| 1102 | Abstract or title search | to Old Republic National Title Insurance Company | | | |
| 1103 | Title examination | to | | | |
| 1104 | Title insurance binder | to | | | |
| 1105 | Document preparation | to | | | |
| 1106 | Notary fees | to | | | |
| 1107 | Attorney's Fees | to | | | |
| | (includes above item numbers: | ) | | | |
| 1108 | Title Insurance | to Old Republic Nat. Title/Michele M Lewis | | 15,637.50 | |
| | (includes above item numbers: | ) | | | |
| 1109 | Lender's coverage (Premium): | | | | |
| 1110 | Owner's coverage (Premium): | $5,250,000.00 ($15,637.50) | | | |
| 1111 | Endorse: | | | -7,818.75 | |
| 1112 | Courtesy Discount for Title Insurance | to Michele M Lewis PA | | 3.28 | |
| 1113 | FL Statutory Surcharge | to Old Republic National Title Insurance Company | | | |
| 1200. Government recording and transfer charges: | | | | | |
| 1201 | Recording fees | Deed | $18.50 Mortgage(s) | Releases | 18.50 |
| 1202 | City/county tax/stamps | Deed | Mortgage(s) | | 36,750.00 |
| 1203 | State tax/stamps | Deed | $36,750.00 Mortgage(s) | | |
| 1204 | | to | | | |
| 1205 | | to | | | |
| 1300. Additional settlement charges: | | | Borrower POC Seller POC | | |
| 1301 | Survey | to | | | |
| 1302 | Pest Inspection | to | | | 219.00 |
| 1303 | Municipal Lien Search | to Clear Choice Tax & Lien Service | | | 1,020.00 |
| 1304 | Home Warranty | to American Home Shield | | | |
| 1305 | | to | | | |
| 1306 | | to | | | |
| 1307 | | to | | | |
| 1308 | | to | | | |
| 1309 | | | | | |
| 1400. Total settlement charges: | | | | 8,135.53 | 313,114.00 |
| ( Enter on lines 103, Section J and 502, Section K.) | | | | | |

# HUD-1 SETTLEMENT STATEMENT ADDENDUM

File Number:   T300EstateHomes

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

## Borrower(s)

_____
Douglas E. Nicholson
Trustee

## Seller(s)

Estate Homes, LLC a Florida limited liability company
a partnership

By:   The Caden Group, Inc., a Florida corporation
      its Managing Member

      By: _____
          Elliott Sharaby
          President

      (Corporate Seal)

## Settlement Agent

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Michele M Lewis PA

By: _____         Date: _____

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

DoubleTime®

# HUD-1 SETTLEMENT STATEMENT ADDENDUM

File Number:   T300EstateHomes

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

## Borrower(s)

_____
Douglas E. Nicholson
Trustee

## Seller(s)

Estate Homes, LLC a Florida limited liability company

By:   The Cades Group, Inc., a Florida corporation
       its Managing Member

By: _____
       Elliott Sharaby
       President

       (Corporate Seal)

## Settlement Agent

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Michele M Lewis PA

By: _____        Date: _____

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

# *EXHIBIT B*

## "AS IS" Residential Contract For Sale And Purchase

**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**



1* **PARTIES:** _____ ESTATE HOMES LLC _____ ("Seller"),
2* and _____ JLM Land Trust _____ ("Buyer"),
3  agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4  (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And
5  Purchase and any riders and addenda ("Contract"):
6  **1. PROPERTY DESCRIPTION:**
7*   (a) Street address, city, zip: _____ 300 Royal Plaza Drive Fort Lauderdale, FL 33301 _____
8*   (b) Property is located in: ___ Broward ___ County, Florida. Real Property Tax ID No.: ___ 5042 12 14 0010 ___
9*   (c) Real Property: The legal description is Lot 1, Plus the North 10.58 feet of Lot 2, Block 2, of STILLWELL
10      ISLES, according to the Plat thereof, recorded in Plat Book 15, Page 26, of the Public Records of Broward
11      County, Florida.
12      together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13      attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14      by other terms of this Contract.
15   (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16      which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17      purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18      drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security
19      gate and other access devices, and storm shutters/panels ("Personal Property").
20*     Other Personal Property items included in this purchase are: All appliances
21      _____
22      Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23*   (e) The following items are excluded from the purchase: NA
24      _____

**PURCHASE PRICE AND CLOSING**

26* **2. PURCHASE PRICE** (U.S. currency):.............................................................$ ___ 5,250,000.00 ___
27*   (a) Initial deposit to be held in escrow in the amount of **(checks subject to COLLECTION)** .......$ ___ 150,000.00 ___
28      The initial deposit made payable and delivered to "Escrow Agent" named below
29*     **(CHECK ONE):** (i) ☐ accompanies offer or (ii) ☒ is to be made within ___ 3 ___ (if left
30      blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31      OPTION (ii) SHALL BE DEEMED SELECTED.
32*     Escrow Agent Information: Name: ___ Florida Coastal Realty Group ___
33*     Address: ___ 3900 E. Indiantown Rd. Ste. 607-179 Jupiter, FL 33477 ___
34*     Phone: 561-277-8490 E-mail: ___ peggy@flcoastalrealty.com ___ Fax: 866-890-2458
35*   (b) Additional deposit to be delivered to Escrow Agent within ___ 16 ___ (if left blank, then 10)
36*     days after Effective Date ...........................................................................$ ___ 250,000.00 ___
37      (All deposits paid or to be paid, are collectively referred to as the "Deposit")
38*   (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8 .........____
39*   (d) Other:_____ ...............$____
40    (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41*     transfer or other **COLLECTED** funds ........................................................$ ___ 4,850,000.00 ___
42      **NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.**
43  **3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44    (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45*     _____ June 17, 2016 _____, this offer shall be deemed withdrawn and the Deposit, if any, shall be returned
46      to Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the
47      day the counter-offer is delivered.
48    (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49      initialed and delivered this offer or final counter-offer ("Effective Date").
50  **4. CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51      and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52*     ("Closing") on _____ or before July 15, 2016 _____ ("Closing Date"), at the time established by the Closing Agent.

---

Buyer's Initials _JM_ _____    Page **1** of **12**    Seller's Initials _Gp_ _____

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.

Jun 17, 2016

Serial#: 010850-000146-6176684

*formsimplicity*

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

**5. EXTENSION OF CLOSING DATE:**

(a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.

(b) If extreme weather or other condition or event constituting "Force Majeure" (see STANDARD G) causes: (i) disruption of utilities or other services essential for Closing or (ii) Hazard, Wind, Flood or Homeowners' insurance, to become unavailable prior to Closing, Closing shall be extended a reasonable time up to 3 days after restoration of utilities and other services essential to Closing and availability of applicable Hazard, Wind, Flood or Homeowners' insurance. If restoration of such utilities or services and availability of insurance has not occurred within _____ (if left blank, then 14) days after Closing Date, then either party may terminate this Contract by delivering written notice to the other party, and Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract.

**6. OCCUPANCY AND POSSESSION:**

(a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.

(b) ☐ **CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING.** If Property is subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

**7. ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☒ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

<div align="center">

**FINANCING**

</div>

**8. FINANCING:**

☒ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.

☐ (b) This Contract is contingent upon Buyer obtaining a written loan commitment for a ☐ conventional ☐ FHA ☐ VA or ☐ other _____ (describe) loan on the following terms within _____ (if left blank, then 45) days after Effective Date ("Loan Commitment Date") for **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate loan in the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _____ % (if left blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____(if left blank, then 30) years ("Financing").

Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective Date and use good faith and diligent effort to obtain a written loan commitment for the Financing ("Loan Commitment") and thereafter to close this Contract. Buyer shall keep Seller and Broker fully informed about the status of mortgage loan application and Loan Commitment and authorizes Buyer's mortgage broker and Buyer's lender to disclose such status and progress to Seller and Broker.

Upon Buyer's receipt of Loan Commitment, Buyer shall provide written notice of same to Seller. If Buyer does not receive Loan Commitment by Loan Commitment Date, then thereafter either party may cancel this Contract **up to the earlier of:**

Buyer's Initials _JM_ _____    Page **2** of **12**    Seller's Initials _Ejs_ _____
                                                                                           Jun 17, 2016

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.

Serial#: **010850-000146-6176684**

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

formsimplicity

107         (i.)  Buyer's delivery of written notice to Seller that Buyer has either received Loan Commitment or elected
108            to waive the financing contingency of this Contract; or
109         (ii.) 7 days prior to the Closing Date specified in Paragraph 4, which date, for purposes of this Paragraph
110            8(b) (ii), shall not be modified by Paragraph 5(a).

111    If either party timely cancels this Contract pursuant to this Paragraph 8 and Buyer is not in default under the terms
112    of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
113    obligations under this Contract. If neither party has timely canceled this Contract pursuant to this Paragraph 8,
114    then this financing contingency shall be deemed waived by Buyer.

115    If Buyer delivers written notice of receipt of Loan Commitment to Seller and this Contract does not thereafter
116    close, the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's default; (2) Property related
117    conditions of the Loan Commitment have not been met (except when such conditions are waived by other
118    provisions of this Contract); (3) appraisal of the Property obtained by Buyer's lender is insufficient to meet terms
119    of the Loan Commitment; or (4) the loan is not funded due to financial failure of Buyer's lender, in which event(s)
120    the Deposit shall be returned to Buyer, thereby releasing Buyer and Seller from all further obligations under this
121    Contract.
122*   ☐ (c) Assumption of existing mortgage (see rider for terms).
123*   ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

124    **CLOSING COSTS, FEES AND CHARGES**

125    **9.  CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
126    (a) **COSTS TO BE PAID BY SELLER:**
127    • Documentary stamp taxes and surtax on deed, if any      • HOA/Condominium Association estoppel fees
128    • Owner's Policy and Charges (if Paragraph 9(c) (i) is checked)   • Recording and other fees needed to cure title
129    • Title search charges (if Paragraph 9(c) (iii) is checked)      • Seller's attorneys' fees
130*   • Municipal lien search (if Paragraph 9(c) (i) or (iii) is checked)  • Other:_____
131        If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
132        a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
133        Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall
134        pay such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
135    (b) **COSTS TO BE PAID BY BUYER:**
136    • Taxes and recording fees on notes and mortgages      • Loan expenses
137    • Recording fees for deed and financing statements      • Appraisal fees
138    • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)  • Buyer's Inspections
139    • Survey (and elevation certification, if required)       • Buyer's attorneys' fees
140    • Lender's title policy and endorsements         • All property related insurance
141    • HOA/Condominium Association application/transfer fees   • Owner's Policy Premium (if Paragraph
142    • Municipal lien search (if Paragraph 9(c) (ii) is checked)    9 (c) (iii) is checked.)
143*   • Other: _____
144*   (c) **TITLE EVIDENCE AND INSURANCE:** At least _____ (if left blank, then 15, or if Paragraph 8(a) is checked,
145        then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a
146        Florida licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
147        Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
148        obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property,
149        a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title
150        policy premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as
151        set forth below. The title insurance premium charges for the owner's policy and any lender's policy will be
152        calculated and allocated in accordance with Florida law, but may be reported differently on certain federally
153        mandated closing disclosures and other closing documents.
154    **(CHECK ONE):**
155*   ☐ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
156        premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
157        endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
158        provider(s) as Buyer may select; or
159*   ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
160        services related to Buyer's lender's policy, endorsements and loan closing; or
161*   ☒ (iii) **[MIAMI-DADE/BROWARD REGIONAL PROVISION]:** Seller shall furnish a copy of a prior owner's
162        policy of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title

Buyer's Initials _JM_____        Page 3 of 12        Seller's Initials _EJS_
                                                                       Jun 17, 2016

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar. All rights reserved.

Serial#: **010850-000146-6176684**

formsimplicity

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

163      evidence, which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search;
164      and (C) municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for
165      Buyer's owner's policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more
166*    than $ __400.00__ (if left blank, then $200.00) for abstract continuation or title search ordered or
167      performed by Closing Agent.

168   (d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
169      surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
170      Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.

171*  (e) **HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☒ N/A shall pay for a home warranty plan issued by
172*      _____ at a cost not to exceed $_____. A home
173      warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
174      appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.

175   (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
176      ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
177      ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
178      improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
179      imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
180      be paid in installments **(CHECK ONE):**
181*     ☐ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
182      Installments prepaid or due for the year of Closing shall be prorated.
183*     ☒ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
184      IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
185      This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
186      (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

187                  **DISCLOSURES**

188 **10. DISCLOSURES:**

189   (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
190      sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
191      exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
192      radon and radon testing may be obtained from your county health department.

193   (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure,
194      Seller does not know of any improvements made to the Property which were made without required permits
195      or made pursuant to permits which have not been properly closed.

196   (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned
197      or desires additional information regarding mold, Buyer should contact an appropriate professional.

198   (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
199      zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
200      improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
201      or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish
202      and Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s)
203      and /or flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance
204      coverage through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C.
205      §4012a, Buyer may terminate this Contract by delivering written notice to Seller within _____ (if left blank,
206*     then 20) days after Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and
207      Seller from all further obligations under this Contract, failing which Buyer accepts existing elevation of
208      buildings and flood zone designation of Property. The National Flood Insurance Program may assess
209      additional fees or adjust premiums for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures
210      (residential structures in which the insured or spouse does not reside for at least 50% of the year) and an
211      elevation certificate may be required for actuarial rating.

212   (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information
213      Brochure required by Section 553.996, F.S.

214   (f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is
215      mandatory.

216   (g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS
217      CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS'
218      ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

Buyer's Initials _JM_ _____         Page **4** of **12**         Seller's Initials _Ejs_ _____

Serial#: **010850-000146-6176684**

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

formsimplicity

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **FIRPTA TAX WITHHOLDING:** Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

**PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS**

**11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

**12. PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have __15__ (if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations, consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to expend, any money.

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

(d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties to Buyer.

### ESCROW AGENT AND BROKER

**13. ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow within the State of Florida and, subject to **COLLECTION**, disburse them in accordance with terms and conditions of this Contract. Failure of funds to become **COLLECTED** shall not excuse Buyer's performance. When conflicting demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through mediation, arbitration, interpleader or an escrow disbursement order.
Any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or termination of this Contract.

**14. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition, square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL, WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral, recommendation or retention of any vendor for, or on behalf of Indemnifying Party; (iv) products or services provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor. Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

### DEFAULT AND DISPUTE RESOLUTION

**15. DEFAULT:**

(a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract, including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.

Serial#: 010850-000146-6176684

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

formsimplicity

326     default by Buyer, shall be split equally between Listing Broker and Cooperating Broker; provided however,
327     Cooperating Broker's share shall not be greater than the commission amount Listing Broker had agreed to
328     pay to Cooperating Broker.
329   (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
330     reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
331     Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
332     from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
333     performance.
334 This Paragraph 15 shall survive Closing or termination of this Contract.
335 **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
336     Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be
337     settled as follows:
338   (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
339     resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
340     16(b).
341   (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
342     Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
343     The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
344     sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
345     may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
346     16 shall survive Closing or termination of this Contract.
347 **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
348     by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
349     conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to
350     recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting
351     the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

352 <center>**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**</center>

353 **18. STANDARDS:**
354   **A. TITLE:**
355   (i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
356     Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto,
357     shall be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by
358     Seller at or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title
359     insurance in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the
360     Real Property, subject only to the following matters: (a) comprehensive land use plans, zoning, and other land
361     use restrictions, prohibitions and requirements imposed by governmental authority; (b) restrictions and matters
362     appearing on the Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of
363     record without right of entry; (d) unplatted public utility easements of record (located contiguous to real property
364     lines and not more than 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes
365     for year of Closing and subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if
366     additional items, attach addendum); provided, that, none prevent use of Property for **RESIDENTIAL PURPOSES**.
367     If there exists at Closing any violation of items identified in (b) – (f) above, then the same shall be deemed a title
368     defect. Marketable title shall be determined according to applicable Title Standards adopted by authority of The
369     Florida Bar and in accordance with law.
370   (ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify
371     Seller in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and
372     it is delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after
373     date of receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period")
374     after receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify
375     Seller, Buyer shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller
376     will deliver written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties
377     will close this Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of
378     Seller's notice). If Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after
379     expiration of Cure Period, deliver written notice to Seller: (a) extending Cure Period for a specified period not to
380     exceed 120 days within which Seller shall continue to use reasonable diligent effort to remove or cure the defects
381     ("Extended Cure Period"); or (b) electing to accept title with existing defects and close this Contract on Closing

---

Buyer's Initials _JM_ _____     Page **7** of **12**      Seller's Initials _Ejs_ _____

FloridaRealtors/FloridaBar-ASIS-4x    Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.

Jun 17, 2016

Serial#: **010850-000146-6176684**

formsimplicity

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aaa49bfe ]

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

382 Date (or if Closing Date has passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's
383 receipt of Seller's notice), or (c) electing to terminate this Contract and receive a refund of the Deposit, thereby
384 releasing Buyer and Seller from all further obligations under this Contract. If after reasonable diligent effort, Seller
385 is unable to timely cure defects, and Buyer does not waive the defects, this Contract shall terminate, and Buyer
386 shall receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under this
387 Contract.
388 **B.  SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
389 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
390 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
391 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
392 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
393 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
394 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
395 preparation of such prior survey, to the extent the affirmations therein are true and correct.
396 **C.  INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
397 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of
398 access.
399 **D.  LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
400 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
401 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
402 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
403 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
404 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to
405 Paragraph 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice
406 to Seller within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating
407 this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations
408 under this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's
409 obligations thereunder.
410 **E.  LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
411 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
412 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
413 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
414 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
415 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all
416 charges for improvements or repairs which could serve as a basis for a construction lien or a claim for damages
417 have been paid or will be paid at Closing.
418 **F.  TIME:** Calendar days shall be used in computing time periods. **Time is of the essence in this Contract.**
419 Other than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or
420 dates specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or
421 occur on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the
422 Property is located) of the next business day.
423 **G.  FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
424 liable to each other for damages so long as performance or non-performance of the obligation is delayed, caused
425 or prevented by Force Majeure. "Force Majeure" means: hurricanes, earthquakes, floods, fire, acts of God,
426 unusual transportation delays, wars, insurrections, and acts of terrorism, and which, by exercise of reasonable diligent
427 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
428 Closing Date, will be extended for the period that the Force Majeure prevents performance under this Contract,
429 provided, however, if such Force Majeure continues to prevent performance under this Contract more than 14
430 days beyond Closing Date, then either party may terminate this Contract by delivering written notice to the other
431 and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under
432 this Contract.
433 **H.  CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
434 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
435 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be
436 transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in
437 this Contract.
438 **I.   CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**

*E's*

Buyer's Initials *JM* _____          Page **8** of **12**          Seller's Initials _____ Jun 17, 2016

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.

Serial#: 010850-000146-6176684

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

formsimplicity

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

439  (i)  **LOCATION:** Closing will take place in the county where the Real Property is located at the office of the
440  attorney or other closing agent ("Closing Agent") designated by the party paying for the owner's policy of title
441  insurance, or, if no title insurance, designated by Seller. Closing may be conducted by mail or electronic means.
442  (ii)  **CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
443  sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien  affidavit
444  (s), owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer  with paid
445  receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as  applicable
446  the survey, flood elevation certification, and documents required by Buyer's lender.
447  (iii)  **PROCEDURE:** The deed shall be recorded upon **COLLECTION** of all closing funds. If the Title Commitment
448  provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
449  procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to COLLECTION of all**
450  **closing funds**, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.
451  **J.  ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
452  for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
453  escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
454  for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault
455  of Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days
456  from date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit
457  and all Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
458  simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
459  convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely
460  demand for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening
461  defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
462  **K.  PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as
463  of the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
464  (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
465  and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if
466  assumable, in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may
467  be required by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will
468  be credited to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated
469  based on current year's tax with due allowance made for maximum allowable discount, homestead and other
470  exemptions. If Closing occurs on a date when current year's millage is not fixed but current year's assessment is
471  available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
472  assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
473  on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
474  of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
475  agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
476  informal assessment taking into account available exemptions. A tax proration based on an estimate shall, at
477  either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K shall survive
478  Closing.
479  **L.  ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
480  shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
481  including a walk-through (or follow-up walk-through if necessary) prior to Closing.
482  **M. RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
483  ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does
484  not exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
485  pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated
486  cost to complete restoration (not to exceed 1.5% of Purchase Price), will be escrowed at Closing. If actual cost of
487  restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
488  Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
489  Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
490  Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
491  with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
492  **N.  1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
493  Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall
494  cooperate in all reasonable respects to effectuate the Exchange, including execution of documents; provided,

Buyer's Initials **JM** _____                    Page **9** of **12**                    Seller's Initials *Ejs* _____

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aaa49bfe ]

formsimplicity

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

however, cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent upon, nor extended or delayed by, such Exchange.

**O. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures, as determined by Florida's Electronic Signature Act and other applicable laws.

**P. INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended to be bound by it.

**Q. WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or rights.

**R. RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten or handwritten provisions shall control all printed provisions of this Contract in conflict with them.

**S. COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or received, including Deposits, have become actually and finally collected and deposited in the account of Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.**

**T. LOAN COMMITMENT:** "Loan Commitment" means a statement by the lender setting forth the terms and conditions upon which the lender is willing to make a particular mortgage loan to a particular borrower. Neither a pre-approval letter nor a prequalification letter shall be deemed a Loan Commitment for purposes of this Contract.

**U. APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the county where the Real Property is located.

**V. FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA, Section 1445 of the Internal Revenue Code requires the buyer of the real property to withhold up to 15% of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate from the IRS authorizing a reduced amount of withholding. Due to the complexity and potential risks of FIRPTA, Buyer and Seller should seek legal and tax advice regarding compliance, particularly if an "exemption" is claimed on the sale of residential property for $300,000 or less.

(i) No withholding is required under Section 1445 if the Seller is not a "foreign person," provided Buyer accepts proof of same from Seller, which may include Buyer's receipt of certification of non-foreign status from Seller, signed under penalties of perjury, stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds to the IRS.

(ii) If Seller has received a Withholding Certificate from the IRS which provides for reduced or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the reduced sum, if any required, and timely remit said funds to the IRS.

(iii) If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.

(iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aaa49bfe ]

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

552  applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
553  disbursement in accordance with the final determination of the IRS, as applicable.
554  (v)  Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
555  8288 and 8288-A, as filed.
556  **W.  RESERVED**
557  **X.  BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller*
558  *and against any real estate licensee involved in the negotiation of this Contract for any damage or*
559  *defects pertaining to the physical condition of the Property that may exist at Closing of this Contract and*
560  *be subsequently discovered by the Buyer or anyone claiming* by, through, under or against the Buyer.
561  *This provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall*
562  *survive Closing.*
563                    **ADDENDA AND ADDITIONAL TERMS**

564* **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into
565  this Contract (**Check if applicable**):

☐ A.  Condominium Rider
☐ B.  Homeowners' Assn.
☐ C.  Seller Financing
☐ D.  Mortgage Assumption
☐ E.  FHA/VA Financing
☐ F.  Appraisal Contingency
☐ G.  Short Sale
☐ H.  Homeowners'/Flood In
☐ J.  Interest-Bearing Acct.

☐ K.  RESERVED
☐ L.  RESERVED
☐ M.  Defective Drywall
☐ N.  Coastal Construction Control Line
☐ O.  Insulation Disclosure
☐ P.  Lead Paint Disclosure (Pre-1978)
☐ Q.  Housing for Older Persons
☐ R.  Rezoning
☐ S.  Lease Purchase/ Lease Option

☐ T.  Pre-Closing Occupancy
☐ U.  Post-Closing Occupancy
☐ V.  Sale of Buyer's Property
☐ W.  Back-up Contract
☐ X.  Kick-out Clause
☐ Y.  Seller's Attorney Approval
☐ Z.  Buyer's Attorney Approval
☐ AA.  Licensee Property Interest
☐ BB.  Binding Arbitration

566* **20. ADDITIONAL TERMS:** The Buyer and Seller agree to split closing costs 50/50. The Buyer will select the closing
567  agent.
568
569
570
571
572
573
574
575
576
577
578
579
580
581
582

583                    **COUNTER-OFFER/REJECTION**

584* ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
585  deliver a copy of the acceptance to Seller).
586* ☐ Seller rejects Buyer's offer.

587  **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
588  **ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**

589  **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

590  *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the terms*
591  *and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and conditions*

Buyer's Initials _JM_ _____                    Page **11** of **12**                    Seller's Initials _Ejs_ _____
                                                                                                    Jun 17, 2016
Serial#: **010850-000146-6176684**

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

592   *should be negotiated based upon the respective interests, objectives and bargaining positions of all interested*
593   *persons.*

594   AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO
595   BE COMPLETED.

596
597*  Buyer: *Jeremy Marcus* _____   Date: 6/17/2016 _____
598
599*  Buyer: _____   Date: _____
600
601*  Seller: *Elliott Sharaby* _____   Date:  June 17, 2016 _____
602
603*  Seller: Jun 17, 2016 _____   Date: _____
604
605   Buyer's address for purposes of notice             Seller's address for purposes of notice
606*  1410 SW 3rd St. _____             3409 FALLSTAFF RD _____
607*  Pompano Beach, FL 33069 _____           BALTIMORE MD 21215 _____
608*  _____             _____

609   **BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers entitled
610   to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct Closing Agent
611   to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage agreements with the
612   parties and cooperative agreements between the Brokers, except to the extent Broker has retained such fees from the
613   escrowed funds. This Contract shall not modify any MLS or other offer of compensation made by Seller or Listing
614   Broker to Cooperating Brokers.

615*  _____ Amanda Finley _____     _____ Timothy Elmes _____
616   **Cooperating Sales Associate, if any**             **Listing Sales Associate**

617*  _____ Florida Coastal Realty Group 3% _____     _____ Coldwell Banker _____
618   **Cooperating Broker, if any**                      **Listing Broker**

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

# *EXHIBIT C*



GENOVESE

JOBLOVE &

BATTISTA
— P.A. —
ATTORNEYS AT LAW

Heather L. Harmon
Telephone: (305) 349-2300
Email: hharmon@gjb-law.com

September 6, 2017

**Via Hand Delivery:**

Amanda Elizabeth Finley
300 Royal Plaza Drive
Fort Lauderdale, FL 33301

Re:     **Federal Trade Commission and State of Florida v. Jeremy Lee Marcus, et al.**
        **USDC SD FL Case No. 17-60907-CIV-MORENO**

Dear Ms. Finley,

As you are aware, this firm represents Jonathan E. Perlman, as Receiver for the Receivership Defendants[1] (the "Receiver") in the above-referenced case.

By quit claiming your interest in your home to Jeremy Marcus, the Receiver agrees that you are not waiving any potential right you may have to assert an equitable lien in the property based solely on a brokerage fee you claim to have earned in its purchase, which you agree will in no event exceed $107,500.

Should you have any questions or wish to discuss this matter further, please do not hesitate to contact the undersigned. Thank you in advance for your cooperation in this matter.

---

[1] The "Receivership Defendants" means Financial Freedom National, Inc. f/k/a Institute for Financial Freedom, Inc. and Marine Career Institute Sea Frontiers, Inc. also d/b/a 321 Loans, Instahelp America, Inc., Helping America Group, United Financial Support, Breeze Financial Solutions 321Financial Education, Credit Health Plan, Credit Specialists of America, American Advocacy Alliance, and Associated Administrative Services; 321Loans, Inc., f/k/a 321 Loans, Inc. also d/b/a 321Financial, Inc.; Instahelp America, Inc. f/k/a Helping America Team, Inc. also d/b/a Helping America Group; Breeze Financial Solutions, Inc. also d/b/a Credit Health Plan and Credit Maximizing Program; US Legal Club, LLC; Active Debt Solutions, LLC f/k/a Active Debt Solutions, Inc. also d/b/a Guardian Legal Center; Guardian LG, LLC also d/b/a Guardian Legal Group; American Credit Security, LLC f/k/a America Credit Shield, LLC; Paralegal Support Group LLC f/k/a Paralegal Support LLC; and Associated Administrative Services, LLC also d/b/a Jobfax, and their divisions, subsidiaries, affiliates, predecessors, successors, assigns, and any fictitious business entities or business names created or used by these entities, or any of them.   The Receivership Defendants were expanded to include Viking Management Services, LLC, Cockburn & Associate LLC, Omni Management Partners LLC, Discount Marketing USA, S.A., JLMJP Pompano, LLC, Nantucket Cove of Illinois, LLC, Halfpay International, LLC, Halfpay NV, LLC, HP Properties Group, Inc., HP Media, Inc., White Light Media LLC, Blue42, LLC as Additional Receivership Entities. ("Expansion Order") [ECF No. 102]. The Receiver understands that Plaintiffs will be filing an amended complaint that includes the additional Receivership Entities as additional "Receivership Defendants."

2 | Page

Very truly yours,

Heather L. Harmon
For the firm

Enclosure


Cc:     Rachel Hirsch, Esq.
        Ifrah PLLC
        1717 Pennsylvania Avenue
        Suite 650
        Washington, D.C. 20006
        rhirsch@ifrahlaw.com

        Valerie M. Verduce, Esq.
        Southeast Region
        Bureau of Consumer Protection
        225 Peachtree Street N.E., Suite 1500
        Atlanta, GA  30303
        vverduce@ftc.gov

[10675-006/2771061/1]

GENOVESE JOBLOVE & BATTISTA, P.A. • 100 Southeast Second Street, 44th Floor • Miami, Florida 33131 • Telephone: 305.349.2300 • Facsimile 305.349.2310