UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 17-60907-CIV-MORENO/SELTZER

FEDERAL TRADE COMMISSION, *et al.*,

      Plaintiffs,

v.

JEREMY LEE MARCUS, *et al.*,

      Defendants.

_____/

**EXPEDITED MOTION TO REQUIRE THE RECEIVER TO CONTINUE
TO HOLD IN TRUST $107,500 OF THE PROPERTY SALES PROCEEDS
THAT ARE THE *RES* OF MS. FINLEY'S EQUITABLE LIEN CLAIM
THROUGH ADJUDICATION OF THE MOTION FOR RECONSIDERATION,
OR ALTERNATIVELY, MOTION FOR A STAY PENDING APPEAL**

**Basis for Expedited Relief:**

**This request is made on an expedited basis in order to prevent transfer
of the *res* of Ms. Finley's equitable lien claim to avoid it potentially being
unrecoverable if Ms. Finley prevails on the Motion to Reconsider or, if
necessary, on appeal to the Eleventh Circuit. Eliminating the *res* of Ms.
Finley's equitable lien would cause irreparable harm to Ms. Finley and
continuing to hold the funds in trust, as the Receiver previously agreed,
does not harm or prejudice the Plaintiffs or Receiver.**

Non-party, claimant Amanda Finley ("Ms. Finley") files this Expedited Motion to Require the Receiver to Continue to Hold in Trust $107,500 of the Property Sales Proceeds that are the *Res* of Ms. Finley's Equitable Lien Claim through Adjudication of the Motion for Reconsideration [D.E. 454], or Alternatively, Motion for Stay Pending Appeal (the "Motion") of this Court's Order Denying Ms. Finley's Motion for Imposition of Equitable Lien Based on the Separately Contributed Funds for the Purchase of the Real Property [D.E. 404] (the "Motion for Equitable Lien") located at 300 Royal Plaza Dr. Fort Lauderdale, Florida 33301 (the "Property") [D.E. 451] (the "Order"), which rejected the Report and Recommendation of the Honorable Barry S. Seltzer [D.E. 419] (the "Report and Recommendation") attached as **Exhibit A**, and in support, states as follows:

## BACKGROUND

Ms. Finley is an innocent non-party claimant in this case. She acted as the real estate agent for the purchase of the Property, which she subsequently resided in as her homestead. In order to contribute to the purchase of her homestead Property and for her proportional ownership of the Property, she contributed $107,500 of the commission for the purchase of the Property that was unequivocally contractually payable to Ms. Finley. *See* attached as **Exhibit B** the Independent Contractor Agreement between Florida Coastal Realty Group (the "Broker") and Ms. Finley (the "Broker Agreement") at 2 ¶ 3(c)(1) (explicitly entitling Ms. Finley to 90% of the fee as commission for sales); *see also* attached as **Exhibit C** the Property Closing HUD-1, Lines 209, 703. With her Broker's express permission, Ms. Finley chose to contribute $107,500 to the purchase of the Property. Ms. Finley's properly earned income was paid by the homebuilder and seller of the Property, Estate Homes, LLC (the "Seller"), so it was not traceable at all to the Defendants' funds or fraud. *See* Exhibit A, Line 703. Ms. Finley made this contribution based on the reasonable

1

expectation and contractually required result that she would own that portion of the Property and she did, in fact, own the Property as a tenancy-by-the-entireties owner. Ms. Finley is seeking her equitable interest and proportional ownership right in the Property for her separate and independent contribution to the Property that the Receiver expressly agreed that she maintained the right to assert.  *See* attached as **Exhibit D** the Receiver's September 2017 letter to Ms. Finley confirming her reservation of rights as to the $107,500.

On August 29, 2019, Ms. Finley filed the Motion for Equitable Lien.  On September 13, 2019, the Receiver filed a Corrected Response to the Motion for Equitable Lien [D.E. 413]. On September 18, 2019, Ms. Finley filed a Reply to the Receiver's Corrected Response [D.E. 415]. On September 27, 2019, the Judge Seltzer entered the Report and Recommendation to grant the Motion for Equitable Lien.   The Plaintiffs and Receiver Objected to the Report and Recommendation [D.E. 425, 426].   On October 25, 2019, Ms. Finley filed a Response to the Objections [D.E. 429].  On January 31, 2020, this Court entered the Order.  On February 13, 2020, Ms. Finley filed a Motion for Reconsideration of the Order [D.E. 454] and this Motion.

## **ARGUMENT**

I.    **THE COURT SHOULD REQUIRE THE RECEIVER TO HOLD THE $107,500 *RES* OF MS. FINLEY'S EQUITABLE LIEN IN TRUST PENDING ADJUDICATION OF THE MOTION FOR RECONSIDERATION AND THROUGH CONCLUSION OF ANY APPEAL.**

On an expedited basis, the Court should require the Receiver to continue to hold the $107,500 in his trust account because if he is permitted to transfer the funds it would result in dissipation (whether intended or not) of the *res* of Ms. Finley's equitable lien claim, which would cause irreparable harm to Ms. Finley by potentially extinguishing her ability to obtain the funds to which she is entitled.

## A. Legal Standard

The Court should consider fours factors in determining whether to grant a motion for stay:

(i)      the likelihood the moving party will prevail on the merits;

(ii)     the prospect of irreparable injury to the moving party if relief is withheld;

(iii)    the possibility of substantial harm to other parties if relief is granted; and

(iv)    the public interest.

*See LabMD, Inc. v. Federal Trade Commission*, 678 Fed. Appx. 816, 819 (11th Cir. 2016) (granting motion for stay pending appeal) (citing *Nken v. Holder*, 556 U.S. 418, 425–26, (2009). In order for Ms. Finley to prevail on her Motion, she "must demonstrate that the equities lie strongly in [her] favor." *Freeman v. Cavazos*, 923 F.2d 1434, 1437 (11th Cir. 1991). "The first two factors ... are the most critical." *See LabMD, Inc.,* 678 Fed. Appx. at 819.   However, Ms. Finley may have her "motion granted upon a lesser showing of a 'substantial case on the merits' when 'the balance of the equities [identified in factors 2, 3, and 4] weighs heavily in favor of granting the stay.'" *Id.* (citing *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (per curiam)).

## B. Ms. Finley is Likely to Succeed in the Motion for Reconsideration, or Alternatively on Appeal to the Eleventh Circuit Court of Appeals.

Ms. Finley has a substantial likelihood of success on the Motion for Reconsideration, or alternatively on appeal to the Eleventh Circuit based on: (i) the strong Report and Recommendation decisively in Ms. Finley's favor; (ii) the facts underlying her request for equitable lien; (iii) the critical, new evidence demonstrating her unequivocal entitlement to the $107,500 contribution, which support her representations to the Court as an officer of the Court during this entire proceeding; (iv) binding Eleventh Circuit case law supporting an innocent spouse having a claim to their contribution to a property in similar cases; and (v) the unjust enrichment and forfeiture that results absent the equitable lien.

i.   <u>The New Evidence, Ms. Finley's Independent Contractor Agreement with the Broker, Evidences Her Entitlement to the $107,500 Contribution for the Purchase of the Property and Warrants the Court Reconsidering the Order.</u>

On February 11, 2020 (eleven days after the Court entered the Order), Ms. Finley obtained from the Broker critical new evidence that this Court ruled was lacking when ruling on Ms. Finley's equitable lien claim.  *See* Order at 5.  The Broker Agreement between Ms. Finley and the Broker evidences her clear contractual entitlement to 90% of all commission earned as a real estate agent in any sales transaction.  *See* Ex. B at 2 ¶ 3(c)(1). The Broker Agreement clarifies and confirms what Ms. Finley stated to the Court throughout all of the briefing on the Motion for Equitable Lien – that she was contractually and legally entitled to the $107,500 that she chose to contribute to the purchase of the Property.  *See* Ex. B at 2 ¶ 3(c)(1).

Ms. Finley believed that by submitting the HUD, the contract for the purchase of the Property listing Ms. Finley as the real estate agent, and making statements as an officer of the Court to this effect that she submitted sufficient evidence of her claim.  *See* Ex. C at lines 209, 703; *see also* attached as **Exhibit D** the Contract for the purchase of the Property at 12.  The Report and Recommendation agreed stating "Finley's statements … are both unrefuted and presumptively credible … Finley is a member of the Bar in good standing.  *See Holloway v. Arkansas*, 435 U.S. 475, 486 (1978) (accepting the tenet that "attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.").  Report and Recommendation at 4.  Since Judge Seltzer found that Ms. Finley submitted sufficient evidence that she was entitled to an equitable lien, Ms. Finley did not believe that she needed to obtain and submit additional evidence to support her entitlement in responding to the Objections.  *Id.*

The Court found in contrast that Ms. Finley did not provide "evidence of the transaction, i.e. that she was contractually entitled to the $107,500 … Put differently, she did not produce a

4

contract evincing that Florida Coastal agreed to pay her this money and that she was the real party crediting the commission towards the purchase price of the home." Order at 5. After the Court made this ruling, which for the first time questioned Ms. Finley's contractual entitlement to these funds, Ms. Finley contacted her former Broker and the Broker sent her the Broker Agreement on February 11, 2020. Ms. Finley did not have a copy of the Broker Agreement until the eleventh day after the Court's ruling. *See* Ex. B. Therefore, Ms. Finley's new, critical evidence demonstrating Ms. Finley's entitlement to the $107,500 contribution, which was not traceable to fraud or the facts underlying this case, should prompt the Court to reconsider the Order and grant the Motion for Equitable Lien, or alternatively, will serve as a basis for success on appeal.

ii.    The Broker Agreement Demonstrates that Ms. Finley's Contribution to the Property Was Separately Earned, Which was Ultimately Paid by the Seller's Clean Funds.

The Court determined that Ms. Finley's contribution was not separately earned. Order at 8. The new evidence supporting that the rebate was her separately earned income pursuant to the Broker Agreement, supports Ms. Finley prevailing on reconsideration of this issue or success on appeal. The rebate that Ms. Finley elected to provide from her income as a real estate professional as separately earned and a monetary contribution to the Property of clean funds that are not traceable to fraud. Every dollar of the $107,500 contribution for the purchase of the Property was unequivocally contractually payable to Ms. Finley from her Broker on or about the closing of the Property. *See* Ex. B. Now Ms. Finley has obtained the Broker Agreement that this Court viewed as necessary to determine that she was entitled to these funds and her separate contribution should be viewed as separately earned and subject to recovery through the requested equitable lien.

Furthermore, Ms. Finley's separately earned contribution to the Property came directly from the Seller's clean funds. The Court referenced that "the HUD shows that the property was purchased with all cash from the buyer and reflects that no cash was provided by the seller at

closing." Order at 8. In fact, Ms. Finley's properly earned income and commission was specifically paid by the homebuilder and seller of the Property, Estate Homes, LLC (the "Seller"), as shown in the documentary evidence before the Court, so it was not traceable at all to the Defendants' funds or fraud. *See* Ex. C, Line 703; *see also* Report and Recommendation at 6 ("in fact, the commission was **paid by the seller**, as it usually is. (*See* DE 404: Ex. A, ln. 703).").

Under Florida law, there is a presumption that the seller pays the commission on listed properties even in the absence of an agreement. *See R.C. Hilton Assocs., Inc. v. Stan Musial & Biggie's Inc.*, 702 F.2d 907, 908 (11th Cir. 1983) ("[i]n the absence of any special agreement, when a seller places property with a broker for sale, he impliedly agrees to pay a customary commission to the broker.") (citing *Kerdyk v. Hammock Oaks Estates, Inc.*, 342 So.2d 833, 835 (Fla. 3d DCA 1977)). Here, the commission from the Seller's clean funds is even stronger than the customary presumption that the seller pays the commission because the documentary evidence (the HUD) shows that the Seller paid all commission. *See* Ex. C, ln. 703.

This scenario is as if at the closing table the Broker earned $157,500; the Broker retained its 10% fee ($15,750); the Broker paid Ms. Finley 90% of the fee ($141,750); and Ms. Finley chose to retain $34,250 and pay $107,500 for the purchase of the Property in which she intended to and did reside with her young child for years. Ms. Finley made this contribution based on the reasonable expectation and contractually required result that she would own that portion of the Property, which she did, in fact, own the Property as a tenancy-by-the-entireties owner. The Broker Agreement proves that Ms. Finley's contribution was not functionally, legally, or practically any different from her paying money from "her clean bank account towards the purchase of the home," which this Court stated would have changed the analysis in favor of Ms. Finley. Order at 8.

6

"[T]he commission Finley earned as a real estate sales associate is independent of the underlying fraud scheme that was the genesis of the receivership."  Report and Recommendation at 5.  Ms. Finley's earnings from her services as a real estate agent had nothing to do with the Defendants' debt business or any of the facts and allegations underlying this receivership case, so there is no record support to find that it would be tainted or that it was any different from the money coming directly from her clean bank account.  Therefore, Ms. Finley will prevail on the Motion for Reconsideration, or alternatively on appeal, because her separately earned contribution to the Property stemmed from her independent contractor relationship with her Broker, which entitles her to an equitable interest commensurate with her proportional ownership right in the Property.

### iii. Eleventh Circuit Case Law Supports Ms. Finley Recovering Her Full Contribution to the Property that is Not Traceable to Fraud.

Binding Eleventh Circuit case law requires the imposition of an equitable lien under these circumstances when not all of the funds used to purchase a property are traceable to fraud.  *See e.g., Fin. Federated Title & Trust,* 347 F.3d at 892 (limiting the interest a receiver may obtain in a property to the amount traceable to fraudulent funds); *In re Hecker*, 316 B.R. 375, 390 (Bankr. S.D. Fla. 2004), *aff'd,* 264 F. App'x at 791 (an innocent spouse "may be entitled to assert a claim to a portion of the proceeds prospectively to be derived from a sale of the [Property] based on the amount of her contributions to the purchase price.").

Ms. Finley submits that it is reversible error for the Court to not acknowledge Ms. Finley's contribution to the Property equivalent to clean funds paid at closing from her income for her services as a real estate agent under the Broker Agreement, which was not traceable to fraud, and to allow her claim to those funds as the (now) undisputedly innocent spouse.  Notably, the Receiver and Plaintiffs do not assert that any of Ms. Finley's other real estate commissions earned were

tainted or traceable to fraud, nor could they since there are absolutely no facts or legal authority to support such a notion.

In the Order, the Court analyzed the Defendant's cash contribution to the Property and found (without the Receiver filing another separate motion for equitable lien) that the Court would *sua sponte* grant the Receiver an equitable lien in the Property that could take priority over Ms. Finley's earlier-acquired interest resulting from her untainted contribution to purchase the Property.  Order at 6.  The Court ignored the precedent that the Receiver did not establish an equitable lien through his prior motion because the Property was turned over by stipulation.  *See* Agreed Order [D.E. 212]; *see also In re All Star Mortg. Fin. Corp.*, 411 B.R. 774, 782 (Bankr. S.D. Fla. 2009) (discussing the effect of unperfected equitable liens).

The Court also overlooked that the Receiver could never claim to be a bona fide purchaser without knowledge or notice since he expressly agreed to Ms. Finley's right to assert an equitable lien for $107,500 in writing prior to Ms. Finley's quit claiming her interest at his request.  *See* Report and Recommendation at 5 n.3; *see also* attached as **Exhibit E** the Receiver's 2017 letter confirming Ms. Finley's reservation of rights as to her $107,500 contribution to the Property. Notably, the Receiver did not object to this finding in the Report and Recommendation.

Even if the Receiver be granted an equitable lien without filing a separate motion based on a ruling on Ms. Finley's Motion for Equitable Lien (not the Receiver's motion), it should not bar Ms. Finley from obtaining an equitable lien for her separate contribution to purchase the Property, which was deducted from the amount of cash the Defendant had to contribute and was the equivalent of Ms. Finley paying $107,500 clean cash at the closing.

Next, the Court found that *Hudgins* would allow the Receiver's previously undetermined equitable interest to essentially negate or supersede Ms. Finley's equitable claim because the

Property depreciated.  Order at 7-8 (citing *Commodity Futures Trading Comm'n v. Hudgins*, 620 F. Supp. 2d 790, 792 (E.D. Tex. 2009).  The Eleventh Circuit was clear in allowing an innocent spouse to claim their contribution to a property and prohibiting a Receiver from obtaining more than the amount paid with proceeds of fraudulent funds.  *See e.g.*, *Fin. Fed. Title & Trust,* 347 F.3d at 892; *Hecker*, 316 B.R. at 390, *aff'd,* 264 F. App'x at 791.  Since Ms. Finley's contribution was not traceable to fraud, she should be able to equitably retain it and any depreciation of the Property is irrelevant to defeat the innocent spouse's contribution to the Property from her clean funds.  The *Hudgins* case from the Eastern District of Texas is, at most, persuasive and importantly only addresses funds directly traceable to fraud.  *Hudgins*, 620 F. Supp. 2d at 792.  This highly distinguishable case does not sufficiently support the Court's ruling that is contrary to Eleventh Circuit precedent.  *See e.g.*, *Fin. Fed. Title & Trust,* 347 F.3d at 892; *Hecker*, 316 B.R. at 390, *aff'd,* 264 F. App'x at 791.

The Receiver induced Ms. Finley to transfer the Property at his and the Plaintiffs' insistence (under a clear reservation of rights).  Ex. E.  Then, years after the transaction, claimed that any equitable right was extinguished by that transaction or should be a nullity by subordination to the interest.  That is not equitable and results in unjust enrichment to the receivership, which can only be remedied by the requested equitable lien.  Therefore, Ms. Finley will prevail on the Motion for Reconsideration or on appeal to the Eleventh Circuit, which will likely follow its own precedent.

    iv.    <u>The Court Erred in Ruling that Fla. Stat. § 475.42(1)(d) Bars Ms. Finley's Motion for Equitable Lien.</u>

The Court conducted an analysis of Fla. Stat. § 475.42(1)(d) and determined that the Motion for Equitable Lien was an action to recover a sales commission.  Ms. Finley asserts that the Court's statutory analysis was not in line with any Florida case law interpreting Fla. Stat. § 475.42.  Initially, the statute is inapplicable because Ms. Finley never sought a brokerage lien or

direct payment of unpaid commission.  Instead, she was seeking reimbursement of her contribution to the Property, which funds are no longer representative of commission. There is no dispute that the commission in this case was already paid years ago at closing.  Neither Ms. Finley, nor her Broker had to "maintain an action for commission" because the Seller voluntarily paid it.  *See* Fla. Stat. § 475.42(1)(d).  Rather, Ms. Finley is seeking an equitable lien so that she may to collect the clean funds that she earned for her services as a real estate professional that she contributed to the purchase of the Property based on these specific facts in which she was induced to deed the Property away voluntarily to the Receiver under a clear reservation of rights.  *See* Exs. B-D.

There is no authority at all to support the notion that previously paid commission maintains its status as "commission" years later after it was used to purchase a property such that Fla. Stat. § 475.42 would bar future litigation over the contributor's ownership or equitable rights to the property sales proceeds.  Following the Court's reasoning, any real estate agent's commission rebate to purchase a property, which years later resulted in litigation over ownership or equitable rights, could be barred under Fla. Stat. § 475.42 – even if not against the seller or payer of the commission.  This is an improper statutory interpretation.  In fact, none of the parties submitted one case that supported the proposition that Fla. Stat. § 475.42(1)(d) applies to recovery of already paid commission against a party that was not the seller or initial payer of the commission.  The Court also cited none, and after extensive research, it seems that none exists.

There is, however, ample case law supporting a more limited statutory interpretation holding that Fla. Stat. § 475.42(1)(d) bars a real estate sales associate from directly suing for unpaid commission from the seller or owner because the broker must be the one to sue.  *See e.g.*, *Bergin v. Kickliter*, 538 So. 2d 950, 951 (Fla. 2d DCA 1989) (the only case cited by the Court in which a sales associate tried to sue a seller for unpaid commission); *Scachitti v. DMC Real Estate Dev.*,

10

*Inc.*, No. 607-CV-1003-ORL-19DA, 2008 WL 4853617, at *5 (M.D. Fla. Nov. 10, 2008) ("Plaintiff [sales associate] is asserting a claim for **unpaid commissions** in his own name against parties that are not registered as his employer," which was found to be impermissible); *Marks v. M.S.F. Mgmt. Corp.*, 540 So. 2d 138, 140 (Fla. 5th DCA 1989) ("Only Marks's broker at the time he performed the services can **sue the seller directly**.") (emphasis added); *Campbell v. Romfh Bros.*, 132 So. 2d 466, 468 (Fla. 2d DCA 1961) (holding that a sales associate co-plaintiff suing a seller for unpaid commission violated Fla. Stat. § 475.42(1)(d)).

Similarly, no case law exists at all applies Fla. Stat. § 475.42(1)(d) to bar a motion for equitable lien for commission that was paid at closing and then used to contribute to the purchase of the Property many years prior to litigation arising over the contributor's equitable interest from that payment. Respectfully, the Court's ruling runs contrary to all Florida law interpreting Fla. Stat. § 475.42(1)(d). The commission was already paid by the Seller on July 7, 2016. These facts do not support the conclusion that Fla. Stat. § 475.42(1)(d) would bar Ms. Finley's Motion for Equitable Lien. In any event, the Motion for Equitable Lien is seeking an *in rem* claim to the sales proceeds of the Property based on Ms. Finley's clean contribution and cannot be construed as an "action" against anyone for payment of commission. Therefore, Ms. Finley should succeed on reconsideration or on appeal regarding the manifest errors in law in the Order ruling that Fla. Stat. § 475.42 barred Ms. Finley's Motion for Equitable Lien.

> v. <u>Ms. Finley's Divorce Affidavit that Was Filed After She Was Divested of Her Ownership and After the Receiver Obtained Sole Control of the Property Does Not Warrant Denial of the Motion for Equitable Lien.</u>

The Court twice referenced that Ms. Finley did not list the Property on her divorce affidavit or "request that the state court award her any interest in the home." Order at 3; *see also* Order at 6. Importantly, when the affidavit was filed on April 4, 2018, Ms. Finley had already deeded the Property over at the Plaintiffs' and Receiver's insistence nearly over seven months prior on

11

September 6, 2017.  In addition, on January 30, 2018, ***months prior to the filing of the affidavit***, this Court already ruled that the Defendant was required to vacate the Property and immediately ***"turnover the title and possession of the property … to the Receiver … [and] ordering the Receiver to take exclusive possession."*** *See* Agreed Order [D.E. 212].  The Defendant was permitted to reside in the Property, but did not even maintain a tenancy interest.  *Id*.  In March 2018, again a month before Ms. Finley filed the affidavit, the Defendant had already vacated the Property, per this Court's Order, and the Receiver took exclusive possession.

By the time of filing the affidavit, at most, Ms. Finley maintained a contingent, unliquidated equitable claim to the Property that had not yet been sought or adjudicated by the only forum with jurisdiction to determine ownership of the Property – this Court.  Since the Defendant had already vacated the Property and relinquished all rights to the Property to the Receiver months prior, the Property was no longer a dispute that could be properly decided in the divorce case or by the state court.  Only this Court maintained jurisdiction over the Property as property of the receivership.  The Court stated that Ms. Finley should have "requested that the state court in her divorce safeguard that interest" in the Property.  Order at 6.  However, if Ms. Finley had sought to assert her interest in the Property state court, undoubtedly the Receiver would have objected or intervened to prevent the state court from ruling on issues that were in the sole purview of this Court.  Ms. Finley should not be penalized for seeking adjudication of her *in rem* claim to the Property before the only Court that has jurisdiction over the Property and in the case involving the party that maintained exclusive control of the asset - the Receiver and not the Defendant.  Therefore, the Court's reliance on Ms. Finley's divorce affidavit twice in the Order was erroneous, which will allow her to succeed on reconsideration or appeal.

vi.   Equitable Lien Claims Do Not Need to be Based on a Loan and are Well-Supported to Combat Unjust Enrichment.

The Court ruled that because Ms. Finley's contribution to the purchase of the Property was not a loan and "Finley had no reasonable expectation based on the terms of the deal that she would be repaid the money" that the Court then found "difficult … to find that equity requires that she now be compensated."  Order at 5.  There is no such requirement that an equitable lien stem from a loan.  In fact, an equitable lien to combat unjust enrichment is overwhelmingly supported under Florida law.  *See e.g., Palm Beach Savings & Loan Assoc. v. Fishbein,* 619 So.2d 267 (Fla. 1993); *Spridgeon v. Spridgeon*, 779 So. 2d 501, 502 (Fla. 2d DCA 2000); *Della Ratta v. Della Ratta*, 927 So. 2d 1055, 1059 (Fla. 4th DCA 2006) (allowing an equitable lien for expenses and improvements to a property based on unjust enrichment); *Frambach v. Dunihue*, 419 So. 2d 1115, 1117 (Fla. 5th DCA 1982) (allowing an equitable lien to prevent unjust enrichment and indicating that a claim is even stronger when "part of the purchase price" is paid, which may allow for a claim of a constructive or resulting trust); *Johnson v. Craig*, 158 Fla. 254, 255, 28 So. 2d 696, 697 (1946); *Sonneman v. Tuszynski*, 139 Fla. 824, 831, 191 So. 18, 21 (1939) (allowing an equitable lien on real property for "money advanced" and labor and services performed).

In this case, Ms. Finley is seeking exactly what is allowed - an equitable lien for the money that she actually advanced to purchase the Property.  Respectfully, the Court disregarded this line of case law and the unjust enrichment that would result absent the equitable lien.  The right to an equitable lien is even stronger in this case where a monetary contribution to the Property was for ownership (rather than a loan) and the ownership was unilaterally taken due to no fault of the co-owner and separate contributor, particularly when that co-owner obtained a reservation of rights agreement from the one taking the Property.  *See* Ex. E.  Ms. Finley will prevail on the Motion for

13

Reconsideration or on appeal because refusing to grant an equitable lien would undoubtedly lead to unjust enrichment, which is a clearly defined basis for an equitable lien.

Finally, this Court states without analysis that 'Finley obtained the benefit of that bargain when the purchase price was rebated" and that her collecting her contribution would be "akin to giving her a windfall." Order at 5. However, the Court does not explain at all how she received any benefit of her bargain. The only way that she would have received the benefit of her bargain would be by her having a proportional ownership in the Property for that amount of money. However, this interest was taken, due to no fault of Ms. Finley, and was only relinquished with the explicit understanding that she maintained her right to assert her equitable claim to the Property. *See* Ex. E. The only way Ms. Finley would get a windfall would be if she was able to retain that proportional ownership ***and*** receive $107,500 on top of that. In this case, if the Order is not reconsidered, Ms. Finley would have lost her proportional equitable ownership and she would have lost her entire contribution that created that ownership. She would have gotten nothing in exchange for $107,500 she contributed while the Receiver would have kept the full value of the Property, including Ms. Finley's $107,500 contribution. Equity and basic fairness contradict this result, which would result an unquestionable windfall for the Receiver at Ms. Finley's sole expense. Therefore, considering the new evidence, Ms. Finley will prevail on her Motion for Reconsideration, or alternatively on appeal to the Eleventh Circuit.

## C. Ms. Finley Will be Irreparably Harmed Absent the Requested Relief.

Ms. Finley will be irreparable harmed if this Court does not grant this expedited request to require the Receiver to continue to hold the $107,500 in his trust account during the Court's adjudication of the Motion for Reconsideration, and alternatively, during any subsequent appeal to the Eleventh Circuit. There must be an "identifiable res for an equitable lien to attach." *In re*

*21st Century Satellite Commc'ns, Inc.*, 278 B.R. 577, 585 (Bankr. M.D. Fla. 2002). These funds constitute the *res* of Ms. Finley's equitable lien claim and will likely be transferred, paid, and possibly no longer recoverable if the Court does not require that the Receiver hold the funds in trust through final resolution on the merits. If the Receiver is permitted to transfer the funds during the pendency of the Court's consideration of this Motion or any appeal, it would result in dissipation (even if not intended) of the *res* of Ms. Finley's equitable lien claim, which would cause irreparable harm to Ms. Finley by potentially extinguishing her ability to obtain the funds that she is entitled to if she ultimately prevails. The law supports maintaining the status quo during an appeal and that is all that Ms. Finley is requesting. Therefore, this factor militates towards granting the Motion.

### D. **The Plaintiffs and Receiver Will Not be Harmed if the Court Grants the Motion.**

Ms. Finley is only seeking for the Receiver to continue to hold the $107,500 proceeds of the sale in trust pending the decision by the Eleventh Circuit, which in no way harms the Receiver or the Plaintiffs. The Receiver previously agreed to hold these funds in trust pending the adjudication by this Court. The circumstances have not materially changed after the Receiver initially agreed to hold the funds in trust such that continuing to do so would prejudice the Receiver or the Plaintiffs in any way. Ms. Finley is merely asking for opportunity for a fair review by this Court, and if necessary, by the appellate court, and for the *res* of her equitable lien to be intact if she prevails. The Receiver continues to request that this case remain open for him to prosecute and investigate claims, so this request does not elongate administration of the estate or unduly prevent closure of this case. There is no burden to the Plaintiffs or the Receiver in holding these funds for a short time longer until this Court rules on the Motion and, if applicable, any appeal to the Eleventh Circuit concludes. Therefore, this weighs heavily in Ms. Finley's favor.

### E.  **The Public Interest Supports the Motion.**

Numerous public interests support this Motion.  First, there is a public interest in a party recovering property that is unequivocally owed to them.  *See* Ex. B-E.  Second, no "consumer is currently at risk" by the Court requiring these funds to be held in the Receiver's trust account pending a final adjudication on the merits.  *LabMD, Inc.*, 678 F. App'x at 822.  Third, the law supports maintaining the status quo in order to facilitate a resolution on the merits through appeal because the "ability to appeal … is a 'substantial and important right.'"  *See CW Capital Asset Management, LLC v. Burcam Capital II, LLC*, 2013 WL 3288092, *9 (E.D.N.C. June 28, 2013) (stating the public interest favors a stay because "denying a stay in this case will likely moot appellate review.").  As explained above, the Motion for Reconsideration and any appeal could be rendered meaningless if the requested stay is denied because the *res* of her equitable lien could be transferred or hopelessly commingled if the Court does not grant this Motion.  Finally, "[f]orfeitures are not favored in the law."  *United States v. $ 38,000.00 in U.S. Currency*, 816 F.2d 1538, 1547 (11th Cir. 1987)).  The Court's ruling results in Ms. Finley forfeiting her $107,500 contribution to the Property of funds that are not traceable to fraud.  Granting this Motion would help potentially mitigate such forfeiture.  Therefore, the public interests support the Motion.

### CONCLUSION

WHERFORE, Ms. Finley respectfully requests that this Honorable Court enter an Order granting the Motion to Require the Receiver to Continue to Hold in Trust $107,500 of the Property Sales Proceeds that are the *Res* of Ms. Finley's Equitable Lien Claim through Adjudication of the Motion for Reconsideration, or Alternatively, Motion for Stay Pending Appeal, and any further relief that this Court deems just and proper.

## CERTIFICATE OF COMPLIANCE LOCAL RULE 7.1(A)(3)

I HEREBY CERTIFY that, pursuant to Local Rule 7.1(a)(3), Amanda Finley conferred with the Receiver and Plaintiffs on this matter prior to filing the Motion in a good faith attempt to resolve the issue without Court intervention.  The Plaintiffs and Receiver did not give a position on the Motion because they requested to review the Motion before commenting.  Ms. Finley will attempt to meet and confer again in a good faith attempt to resolve the issue without Court intervention after they review the filing.


Dated: February 13, 2020                    Respectfully Submitted,

                                            SEQUOR LAW, P.A.
                                            1111 Brickell Ave., Suite 1250
                                            Miami, Florida 33131
                                            Telephone: (305) 372-8282
                                            Facsimile: (305) 372-8202
                                            Email: afinley@sequorlaw.com

                                            */s/ Amanda E. Finley*
                                            Amanda Finley, Esq.
                                            Florida Bar No. 100225




## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case on February 13, 2020.


                                            */s/ Amanda E. Finley*

                                            Amanda E. Finley

**SERVICE LIST**

Amanda Elizabeth Finley afinley@sequorlaw.com

Angeleque P. Linville alinville@ftc.gov

Barry Seth Turner bturner@joneswalker.com, aminor@joneswalker.com,

miamiservice@joneswalker.com, mvelapoldi@joneswalker.com

Diana M. Joskowicz JoskowiczD@ballardspahr.com

Gregory Matthew Garno ggarno@gjb-law.com, chopkins@gjb-law.com,

gjbecf@ecf.courtdrive.com, gjbecf@gjb-law.com, vlambdin@gjb-law.com

Irina R. Sadovnic Isadovnic@gjb-law.com

Jonathan Perlman jperlman@gjb-law.com, cmonzon@gjb-law.com, eserres@gjb-law.com,

gjbecf@ecf.courtdrive.com

Mariaelena Gayo-Guitian mguitian@gjb-law.com, chopkins@gjb-law.com,

gjbecf@ecf.courtdrive.com, vlambdin@gjb-law.com

Mark S. Kokanovich KokanovichM@ballardspahr.com

Maurice Belmont VerStandig mac@mbvesq.com, molly@mbvesq.com

Melanie J. Vartabedian VartabedianM@ballardspahr.com

Michael Bild mbild@gjb-law.com, cmonzon@gjb-law.com, lpiotrowski@gjb-law.com

Michael A Friedman mfriedman@gjb-law.com, cmonzon@gjb-law.com,

gjbecf@ecf.courtdrive.com, jsardina@gjb-law.com, mchang@gjb-law.com

Nicholas Steven Agnello nagnello@burr.com, flservice@burr.com, rzamora@burr.com

Peter D. Hardy HardyP@ballardspahr.com

Peter W. Homer phomer@homerbonner.com, jgarcia@homerbonner.com

Ronnie Adili ronnie.adili@myfloridalegal.com

Ryann H. Flack ryann.flack@myfloridalegal.com, laura.gomez@myfloridalegal.com

Terence M. Grugan Grugant@ballardspahr.com

Valerie M. Verduce vverduce@ftc.gov

# *EXHIBIT A*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-60907-CIV-MORENO/SELTZER

FEDERAL TRADE COMMISSION, et al.,

     Plaintiffs,

v.

JEREMY LEE MARCUS, et al.,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Amanda Finley's Expedited Motion for Imposition of Equitable Lien on Real Property Located at 300 Royal Plaza Drive, Fort Lauderdale, Florida 33301 ("Motion") (DE 404). This matter was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida (DE 407). The undersigned has carefully considered the motion and the record, and is otherwise fully advised. For the reasons stated below, it is **RECOMMENDED** that Finley's Motion (DE 404) be **GRANTED**.

## I.   BACKGROUND

This dispute invokes the Court's equitable authority to distribute assets in a receivership, namely, the proceeds of a home sale. The receivership was created to benefit victims of Defendants' fraudulent debt-relief scheme. (DE 6, 21). The particulars of the scheme are not relevant for present purposes, and the bulk of the underlying litigation between the plaintiffs and the individual defendants was concluded in April 2008

based on a series of stipulated orders (DE 212, 231, 232). Among other things, the stipulations provided for the turnover of certain assets belonging to Defendant Jeremy Marcus, as well as injunctive relief and damages (Id.).

At the time this litigation was initiated, non-party Claimant Amanda Finley ("Finley") was Marcus's spouse, as well as a co-owner and tenant-by-the-entirety of real property located at 300 Royal Plaza Drive, Fort Lauderdale, Florida 33301 ("Property").   It is undisputed that in exchange for Finley's cooperation in marshalling receivership assets, and to eliminate the need to join her as a defendant in the underlying lawsuit, the Receiver recognized her potential right to assert an equitable lien in the Property based on her financial contributions to its purchase price. That contribution, $107,500, was rebated by Finley from a commission she earned as the buyer's sales associate on the purchase.

Because the Property was purchased in part by Marcus based on the proceeds of the fraud, this asset, or at least a portion of it, was subject to eventual turnover. Accordingly, the Receiver wrote Finley a letter inviting Finley to quitclaim her interest in the Property by "agree[ing] that [Finley] [was] not waiving any potential right [she] may have to assert an equitable lien in the property based solely on a brokerage fee [she] claim[ed] to have earned in its purchase . . . ." (DE 415, Ex. A). Finley assented and provided the Receiver a quitclaim deed (DE 406: 7-8).  At some point thereafter, however, the Receiver adopted the inconsistent position that the quitclaim deed extinguished her equitable interest.  (See DE 411: 10-11).

Ultimately, the Receiver arranged a sale of the Property. At the insistence of the title insurance company, the Receiver further requested that Finley execute a special warranty deed disavowing any homestead interest in the property. In principle, Finley did

not object to executing the deed, but before doing so, sought reassurance from the Receiver that she would not be waiving her entitlement to seek an equitable lien on the sale proceeds. Unwilling to agree, the Receiver moved to compel Finley on an expedited basis to execute the special warranty deed. (DE 406). The Receiver ultimately agreed to hold $107,500 in trust pending the resolution of Finley's equitable lien claim. While maintaining that Finley was not entitled to the equitable lien, the Receiver argued that "it can be addressed on a different day." (Id.). Finley subsequently executed the special warranty deed (DE 409), and the day to resolve her equitable lien claim has now arrived.

## II.  DISCUSSION

Courts must look to applicable state law when determining whether an equitable lien should be imposed. See, e.g., In re Fin. Federated Title & Tr., Inc., 347 F.3d 880, 886 (11th Cir. 2003). In Florida, an equitable lien may be granted upon "general considerations of right or justice" as applied to the particular circumstances of a case. See Jones v. Carpenter, 106 So. 127, 129 (1925); Ross v. Gerung, 69 So.2d 650, 652 (Fla. 1954). In Palm Beach Savings & Loan Assoc., F.S.A., et al. v. Fishbein, 619 So.2d 267, 271 (Fla. 1993), the Florida Supreme Court further recognized that the imposition of an equitable lien may be appropriate, even on a homestead property, "in order to prevent unjust enrichment" and "where equity demands." Id.  Whether to impose an equitable lien in the receivership context is a matter of court discretion.  Cox Enterprises, Inc. v. Pension Ben. Guar. Corp., 666 F.3d 697, 701 (11th Cir. 2012).

Given the particular circumstances of this case, the undersigned concludes that the imposition of an equitable lien on the sale proceeds is appropriate. Several considerations compel this conclusion.

Initially, the Receiver does not dispute that Finley rebated $107,500 towards the purchase of the Property.[1]  Indeed, Finley has provided the Court with a HUD-1 settlement statement confirming the rebated amount, as well as a contract identifying Finley as the sales associate entitled to a commission on the purchase transaction (DE 404, Exhs. A-B).  The Receiver did not object to these exhibits. Accordingly, the undersigned will credit the exhibits, as well as Finley's statements (which are both unrefuted and presumptively credible[2]), as sufficient to establish the fact that Finley's personal funds, earned in the course of legitimate employment, were used to pay down a portion of the Property's purchase price.

The Receiver then expressly agreed, as a condition of Finley quitclaiming her interests in the Property, that Finley **did not** "waiv[e] any potential right . . . to assert an equitable lien in the property based solely on a brokerage fee [she] claim[ed] to have earned in its purchase . . . ." (DE 415, Ex. A).

But after receiving the benefit of his bargain, the Receiver is now arguing the opposite: that the very quitclaim deed he expressly induced by recognizing Finley's ability to litigate her equitable claim at a later time, in fact, extinguished her equitable claim. This is a prototypical example of a "gotcha" argument, and the undersigned is unmoved by it.

---

[1]     Rather, the Receiver disputes that Finley is a "broker." (DE 411: 11). Finley, however, does not claim to be a "broker," nor does she seek the imposition of a "broker's lien," as confusingly argued by the Receiver.

[2]     Finley is a member of the Bar in good standing. See Holloway v. Arkansas, 435 U.S. 475, 486 (1978) (accepting the tenet that "attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.") (quotations omitted).

Had the Receiver taken this position at the outset, Finley would have had her day in Court as a party to the underlying lawsuit and could have asserted her equitable claim at an earlier stage in these proceedings.

Accepting the Receiver's argument would require the undersigned to conclude that the Receiver's agreement was a mere ruse or trick. Applying the principles of equity, the undersigned declines to endorse this result and concludes that an equitable lien should be imposed in Finley's favor on the basis of her financial contributions to the purchase of the Property. See, e.g., In re Hecker, 316 B.R. 375, 390 (Bankr. S.D. Fla. 2004), aff'd, 264 Fed. Appx. 786 (11th Cir. 2008) (recognizing that an innocent spouse may be entitled to assert a claim to a portion of the proceeds prospectively to be derived from a sale of a property based on the amount of her contributions to the purchase price). [3]

The undersigned further concludes that if the Receiver were permitted to retain Finley's contribution, it would amount to an improper windfall for the Receiver because the commission Finley earned as a real estate sales associate is independent of the underlying fraud scheme that was the genesis of the receivership. The Receiver has not explained how it would be entitled to this sum. Indeed, the Eleventh Circuit has instructed that a trustee's interests over fraudulently acquired real estate can be no greater than the

---

[3]     The Receiver alternatively argues that even if Finley were entitled to an equitable lien, it would be subordinate to the Receiver's equitable lien. The undersigned disagrees.

First, the Receiver did not establish an equitable lien because the Property was turned over by stipulation of the parties. See In re All Star Mortg. Fin. Corp., 411 B.R. 774, 782 (Bankr. S.D. Fla. 2009) (unperfected equitable interest is subordinate to the interest of a judicial lien creditor under Florida law) (citing In re Mabbott, 255 B.R. 787 (Bankr. M.D. Fla. 2000)). Nor was the Receiver a bona fide purchaser without notice since he expressly agreed to Finley's reservation of rights prior to the transfer.

Second, Finley's contributions to the property are akin to a purchase-money security interest, which would take priority over the Receiver's lien, even if he had one. See generally Fla. Stat. § 679.324.

amount fraudulently obtained and used to benefit the land. In re: Fin. Federated Title &

Trust, Inc., 347 F.3d 880, 892 (11th Cir. 2003). Applying that maxim here, the Receiver's

equitable interest in the Property does not extend to Finley's sales commission.

Finally, the undersigned addresses the doctrine of "unclean hands." Despite his

various statements appearing to conflate Finley's conduct with those of her ex-husband,

the Receiver has provided no evidence to support its assertion that Finley was complicit

in the fraud or that her sales commission was tainted in any way. Contrary to the

Receiver's repeated assertions that the commission was "comprised entirely of stolen

funds," (DE 411: 13, 14), in fact, the commission was **paid by the seller**, as it usually is.

(See DE 404: Ex. A, ln. 703).[4]  Although the Receiver accuses Finley of enjoying an

"extravagant lifestyle" and failing to "pay rent" for living in her own house, these remarks,

even if true, are wholly insufficient to establish unclean hands. See generally Calloway

---

[4]     The undersigned is troubled by the Receiver's repeated accusations—and subsequent failure to produce evidence of—fraudulent misconduct by Finley. In particular, the Receiver makes the following unsupported assertions: (1) "Amanda [Finley] was a participant . . . of the debt relief scheme." (DE 411: 3); (2) "Immediately after Amanda [Finley] had notice of this Court's asset freeze, she violated the freeze . . . ." (Id.: 12); (3) "[Amanda Finley] utilized her real estate commission, comprised entirely of stolen consumer funds, in the acquisition of the Property . . . ." (Id.: 14); (4) "[Amanda Finley] and Jeremy [Marcus] ended up getting back over $158,000 in overages after closing." (Id.), and; (5) "The Receiver has undisputably [sic] traced the monies Defendant Jeremy [Marcus] and Amanda [Finley] used to purchase the Royal Plaza Property as coming from the Receivership Defendants . . . ." (Id.: 17).

The undersigned notes that previously, the Receiver strongly implied in his First Interim Report that Finley fraudulently utilized a federal judge's judicial stamp to approve a payment to herself in an unconnected litigation. (DE 19: 37-38). That document has since been restricted and amended after the Receiver revealed that it had not conducted an adequate investigation prior to making the false accusation. (DE 70: 37). Although the undersigned will presume the good faith of the parties, the Receiver's mistake was egregious and reckless at best.

The undersigned is further displeased with the Receiver's unprofessional and disparaging references to Amanda Finley—a member in good standing of the Florida Bar—as "Amanda." The Receiver shall address litigants appropriately in future filings.

v. Partners Nat. Health Plans, 986 F.2d 446, 450 (11th Cir. 1993). The undersigned has considered the Receiver's remaining arguments and finds them to be without merit.

## III. <u>CONCLUSION</u>

For the foregoing reasons, therefore, the undersigned respectfully **RECOMMENDS** that the Motion for Imposition of Equitable Lien (DE 404) be **GRANTED**. The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. Failure to file objections timely shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. <u>See</u> 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Henley v. Johnson</u>, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers, Fort Lauderdale, Florida, this 27th day of September 2019.

BARRY S. SELTZER
United States Magistrate Judge

Copies furnished via CM/ECF to:

The Honorable Federico A. Moreno
United States District Judge

Counsel of record

# *EXHIBIT B*

## Independent Contractor Agreement between Broker and Associate  FloridaRealtors®

_____ Margaret Greene _____ ("Broker")
is licensed as a real estate broker in the State of Florida and performs acts designated within Chapter 475, Florida Statutes, enjoys goodwill and a reputation for dealing with the public, and maintains an office for the purpose of serving the public as a real estate broker.

_____ Amanda Finley _____ ("Associate")
is licensed as a [X] sales associate (license number SL ___ 3316277 ___ ) [ ] broker associate (license number
BK/BL _____) in the State of Florida and is properly qualified to deal with the public as such.

Effective _____ 2/3/2015 _____ ("effective date"), Broker and Associate agree to associate pursuant to the following terms and conditions.

1. **Employment Status:** Broker retains Associate as an independent contractor to assist Broker in the performance of real estate-related activities. With respect to the clients and customers for whom service is performed within the scope of this Agreement, Associate will be construed to be an agent of Broker; otherwise, Associate will not be deemed a servant, employee, joint venturer, or partner of Broker for any purpose. Associate will not be treated as an employee for federal tax purposes with respect to the services performed for Broker under this Agreement. Associate is responsible for paying her/his own estimated income tax payments, self-employment taxes, occupational taxes, and other taxes, if any, to the appropriate governmental entities. Broker will not withhold any taxes from compensation due to Associate, nor will Broker provide worker's compensation insurance for Associate.

2. **Associate Responsibilities:** Associate will use her/his best efforts to procure real estate-related business for Broker and will conduct her/his business in a reputable manner and in conformance with all laws, rules, regulations, and codes of ethics that are binding upon or applicable to real estate licensees, and with Broker's office policy manual, if any.
   (a) **Compliance:** Associate recognizes and acknowledges the obligation to keep abreast of all legal and other issues that affect the real estate industry as they may change from time to time. Associate will not commit any act that violates Florida real estate license law.
      (1) **Fair Housing:** Broker and Broker's company support and practice Fair Housing principles. Associate has been advised that failure to comply with Fair Housing principles will result in appropriate disciplinary action and possible termination of this Agreement. Associate warrants and represents that it is Associate's intent to attend Fair Housing instructional programs, keep current on developments in Fair Housing as it affects real estate marketing and sales, and comply with the Fair Housing laws and regulations. Associate understands this acknowledgment, warranty, and representation and agrees to it voluntarily.
      (2) **Office Policy Manual:** Broker [X] maintains [ ] does not maintain an office policy manual. Associate has received a copy and agrees to comply with the manual and such modifications, addenda, and changes as may be incorporated therein from time to time.
   (b) **License Renewal; Continuing Education; Dues:** Associate will be responsible for timely renewing Associate's real estate license and for completing all legally required continuing education in a timely manner and maintaining the records that evidence such completion as required by the Florida Real Estate Commission. Associate will be responsible for paying all license fees, membership dues, and fines.
   (c) **Broker Supervision:** Associate will be deemed to be working under Broker's supervision only to the extent required by Chapter 475, Florida Statutes. Associate will perform all activities, including those activities Broker requires Associate to perform, independently without Broker's supervision or control.
   (d) **Broker Property:** Associate acknowledges that all pending sales and listings taken during the term of this Agreement are Broker's property. All programs, forms, data, keys, manuals, signs, and other paraphernalia relative to the business of Broker are Broker's property, as are all documents and other items pertaining to transactions.
   (e) **Property of Others:** In accordance with Florida law, Associate will deliver to Broker, by the end of the next business day following receipt, any funds or other items that a consumer has entrusted to Associate in connection with a real estate transaction.
   (f) **Responsibility:** Broker will not be liable to Associate for any expenses incurred by Associate nor for any of Associate's acts. Associate will have no authority to bind Broker by any promise or representation, oral or otherwise, unless specifically authorized in writing in a particular transaction. Suits, whether for fees or otherwise, against clients, customers, and others in the real estate business will be maintained only in Broker's name. Associate is responsible for providing all tools necessary to perform the duties outlined. Associate will also be

Broker (____) and Associate (____) acknowledge receipt of a copy of this page, which is Page 1 of 3.
ICA-6 Rev. 6/13 ©2013 Florida Association of REALTORS®

Serial#: 001623-600142-2968966 formsimplicity

responsible for providing **Associate's** own automobile and is responsible for transportation expenses, including insurance in the minimum coverage amount of $ 100,000 for personal injury protection liability and insurance in the minimum coverage amount of $ 300,000 for bodily injury liability and insurance in the minimum coverage amount of $ 10,000 for property damage liability and other expenses incidental to performing **Associate's** duties without receiving any reimbursement from **Broker**. **Broker** will be named as an additional insured in all such policies.

(g) **Indemnification:** **Associate** will indemnify and hold **Broker**, its officers, directors, and employees harmless from all claims, demands, suits, costs, and expenses, including reasonable attorneys' fees at all levels, of whatever nature and description to the extent based on **Associate's** representations, acts, omissions, negligence, willful misconduct, or violation of laws, rules, regulations, codes of ethics, this Agreement, or office policy manual.

3. **Broker Responsibilities:**

(a) **Access to Listings:** **Broker** will provide **Associate** with access to all current listings of **Broker** and listings made available to **Broker** through offers of cooperation, except those listings that **Broker**, in her/his/its discretion places exclusively in the possession of another associate.

(b) **Access to Facilities:** **Associate** may use **Broker's** then existing office facilities for the performance of **Associate's** duties as described above.

(c) **Compensation:** **Broker** will negotiate all terms and conditions of fees charged clients, including but not limited to the amount and payment date. **Broker** will compensate **Associate** in proportion to **Associate's** output with regard to real estate-related activities and not to hours worked by **Associate**. Such compensation will be solely through commissions as described below or in **Broker's** office policy manual, if any. In the event of conflict between **Broker's** office policy manual and this Agreement, the terms of the office policy manual will prevail. **Broker** may deduct from **Associate's** compensation any amounts due from **Associate** to **Broker**.

(1) **Amount; Payment:** When **Associate** performs any brokerage service for **Broker** and **Broker** earns and collects a fee for such service, **Broker** will pay **Associate** within 3 days after the funds are collected and have cleared:

| | | |
|---|---|---|
| 90 | % of the fee as commission for | Sales |
| 90 | % of the fee as commission for | Rentals |
| 90 | % of the fee as commission for | Options |

(2) **Dividing Compensation with Other Licensees:** If two or more associates participate in rendering a brokerage service to the public, or claim to have done so, **Broker** will determine, in **Broker's** sole and absolute discretion, the amount of the fee due **Associate**.

(3) **Incentives:** If a seller or listing office offers a premium, bonus, or other incentive, if such premium, incentive, or bonus is in the form of money, then 100% of the incentive as commission for associate.

If such incentive is other than money (i.e., a cruise, trip, or other matter having economic value but not delivered in money), then such premium, bonus, or incentive will go to ☐**Broker** ☒**Associate**. If a nonmonetary incentive goes to **Associate**, **Broker** will report the fair market value of the incentive as income to **Associate**, as **Broker** must collect and deliver the incentive to **Associate** to preserve the respective legal positions of the parties.

(4) **Benefits:** **Associate** will be provided no minimum salary, vacation pay, sick leave, or any other fringe benefit.

(5) **Collection of Fees:** **Broker** will not be required to prosecute or sue any party in order to collect any fee for services performed by **Associate**. However, if **Broker** incurs attorney's fees and costs in the collection of or attempt to collect a fee, such amounts will be deducted from **Associate's** commission in the same proportion as provided for herein in the division of the fee.

(6) **Compensation after Termination of Agreement:** After termination of this Agreement, **Broker** will pay **Associate** any amount earned before termination less amounts owed to **Broker** and amounts **Broker** must pay another licensee to complete pending transactions for which **Associate** was responsible before termination.

4. **Errors and Omissions Insurance:** ☒**Broker** maintains Errors and Omissions insurance which coverage includes **Associate**. ☐**Associate** will pay a portion of Errors and Omissions coverage as follows: _____

**Broker** ( ) and **Associate** ( ) acknowledge receipt of a copy of this page, which is Page 2 of 3.
ICA-6  Rev. 3/13                                                    ©2013 Florida Association of REALTORS®
Serial#: 001623-800142-2968956                                     formsimplicity

5. **Term; Termination:** This Agreement will be in effect for ___1___ year(s) from the effective date. Either party may terminate this Agreement by ___1___ days' advance written notice to the other party. **Broker** may terminate this Agreement without notice for wrongful conduct by **Associate.** Failure by either party to maintain active licensure status pursuant to Chapter 475, Florida Statutes, will be deemed automatic termination. **Associate** will not, after termination of this Agreement, use to her/his own advantage, or to the advantage of any other person or entity, any information gained from the business of the **Broker** relating to property for sale, lease, or rental, or **Broker's** customers or clients. Upon termination of this Agreement, **Associate** will return all **Broker's** property to **Broker** with no copies made or retained by **Associate.**

6. **Confidentiality: Associate** acknowledges that **Broker** may disclose confidential information to **Associate** during the course of this Agreement. Any such information that is or should be reasonably understood to be confidential or proprietary to **Broker,** including mailing lists, customer and client lists, sales, costs, unpublished financial information, product and business plans, projections, marketing data, computer data, computer programs and supporting documentation, and **Broker's** office policy manual, if any, are considered confidential property of **Broker. Associate** will take reasonable steps and use due care during the term of this Agreement and after its termination to prevent the duplication or disclosure of confidential information, other than by or to **Broker's** employees or agents who must have access to the information to perform their duties for **Broker.**

7. **Dispute Resolution:** This Agreement will be construed under Florida law. All disputes between **Associate** and another associate in **Broker's** firm will be resolved by **Broker.** All disputes between **Broker** and **Associate** will be mediated under the rules of the American Arbitration Association or other mediator agreed upon by the parties. The parties will equally divide the mediation fee, if any. In any litigation between **Broker** and **Associate,** the prevailing party will be entitled to recover reasonable attorneys' fees and costs at all levels, unless the following box is checked: ☐ **Arbitration:** Any dispute not resolved by mediation will be settled by neutral binding arbitration in accordance with the rules of the American Arbitration Association or other arbitrator agreed upon by the parties. Each party to any arbitration or litigation (including appeals and interpleaders) will pay its own fees, costs, and expenses, including attorneys' fees at all levels, and will equally split the arbitrators' fees and administrative fees of arbitration.

8. **Additional Terms:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Florida Coastal Realty Group
_____
Brokerage Name

_____  __2/3/15__     _____  __2/3/15__
**Broker**                Date          **Associate**            Date

Margaret Greene                        Amanda Finley
_____                  _____
Print name                             Print name

Broker _____ and Associate _____ acknowledge receipt of a copy of this page, which is Page 3 of 3.

ICA-6   Rev. 4/13                                    ©2013 Florida Association of REALTORS®

Serial#: 001523-800142-2868966

formsimplicity

# *EXHIBIT C*

HUD-1

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

A. Settlement Statement

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1. FHA | 2. FmHA | 3. Conv Unins | 6. File Number<br>T300EstateHomes | 7. Loan Number | 8. Mortg. Ins. Case Num. |
| 4. V.A. | 5. Conv Ins | | ID. | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER: Douglas E. Nicholson, Trustee of the Jean Pierre Trust #1
Address of Borrower: 1410 SW 3rd Street, Pompano Beach, Florida 33069

E. NAME OF SELLER: Estate Homes, LLC, a Florida limited liability company
Address of Seller: 3409 Flagstaff Rd, Baltimore, Maryland 21215  TIN: 90-0960942

F. NAME OF LENDER:
Address of Lender:

G. PROPERTY LOCATION: 300 Royal Plaza Drive, Fort Lauderdale, Florida 33301  TIN: 27-4614121

H. SETTLEMENT AGENT: Michele M Lewis PA
Place of Settlement: 250 S Central Blvd., Suite 101, Jupiter, Florida 33458  Phone: 561-315-7549

I. SETTLEMENT DATE: 7/7/16  DISBURSEMENT DATE: 7/7/16

| J. Summary of borrower's transaction | | K. Summary of seller's transaction | |
|---|---|---|---|
| **100. Gross amount due from borrower:** | | **400. Gross amount due to seller:** | |
| 101. Contract sales price | 5,250,000.00 | 401. Contract sales price | 5,250,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (Line 1400) | 8,135.53 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance:** | | **Adjustments for items paid by seller in advance:** | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross amount due from borrower:** | 5,258,135.53 | **420. Gross amount due to seller:** | 5,250,000.00 |
| **200. Amounts paid or in behalf of borrower:** | | **500. Reductions in amount due seller:** | |
| 201. Deposit or earnest money | 400,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 313,114.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Principal amount of second mortgage | | 504. Payoff of first mortgage loan | 2,260,060.00 |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Deposits held by seller | |
| 207. Principal amt of mortgage held by seller | | 507. Principal amt of mortgage held by seller | |
| 208. | | 508. | |
| 209. Credit from Florida Coastal Realty Group | 107,500.00 | 509. | |
| **Adjustments for items unpaid by seller:** | | **Adjustments for items unpaid by seller:** | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes from 01/01/16 to 07/07/16 | 9,192.09 | 511. County taxes from 01/01/16 to 07/07/16 | 9,192.09 |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total paid by/for borrower:** | 516,692.09 | **520. Total reductions in amount due seller:** | 2,582,366.09 |
| **300. Cash at settlement from/to borrower:** | | **600. Cash at settlement to/from seller:** | |
| 301. Gross amount due from borrower<br>(line 120) | 5,258,135.53 | 601. Gross amount due to seller<br>(line 420) | 5,250,000.00 |
| 302. Less amount paid by/for the borrower<br>(line 220) | (516,692.09) | 602. Less total reductions in amount due seller<br>(line 520) | (2,582,366.09) |
| 303. Cash ( ✓ From  To ) Borrower: | 4,741,443.44 | 603. Cash ( ✓ To  From ) Seller | 2,667,633.91 |

**Substitute Form 1099 Seller Statement:** The information contained in blocks E, G, H, and I and on line 401 is important tax information and is being furnished to the IRS. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

**Seller Instructions:** If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your tax return, for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

DoubleTime®

| L. Settlement charges: | | | | | Borrower's POC/Seller POC | Borrower's Funds at Settlement | Seller's Funds at Settlement |
|---|---|---|---|---|---|---|---|
| 700 | Total Sales/Brokers Com. based on price | | $5,250,000.00 @ | 5.0000 % = | 262,500.00 | | |
| 701 | 157,500.00 | 3.0000 % to | Florida Coastal Realty Group | | | | |
| 702 | 105,000.00 | 2.0000 % to | Coldwell Banker | | | | |
| 703 | Commission paid at settlement | | | | | | 262,500.00 |
| 704 | Bonus Commission | | to | Coldwell Banker | | | 12,500.00 |
| 800. Items payable in connection with loan: | | | | | Borrower POC/Seller POC | | |
| 801 | Loan origination fee | | % to | | | | |
| 802 | Loan discount | | % to | | | | |
| 803 | Appraisal fee | | to | | | | |
| 804 | Credit report | | to | | | | |
| 805 | Lender's inspection fee | | to | | | | |
| 806 | Mortgage insurance application fee | | to | | | | |
| 807 | Assumption Fee | | to | | | | |
| 808 | | | to | | | | |
| 809 | | | to | | | | |
| 810 | | | to | | | | |
| 811 | | | to | | | | |
| 900. Items required by lender to be paid in advance: | | | | | Borrower POC/Seller POC | | |
| 901 | Interest from | | to | @ | /day | | |
| 902 | Mortgage insurance premium for | | months to | | | | |
| 903 | Hazard insurance premium for | | years to | | | | |
| 904 | Flood insurance premium for | | years to | | | | |
| 905 | | | years to | | | | |
| 1000. Reserves deposited with lender: | | | | | Borrower POC/Seller POC | | |
| 1001 | Hazard insurance | | months @ | per month | | | |
| 1002 | Mortgage insurance | | months @ | per month | | | |
| 1003 | City property taxes | | months @ | per month | | | |
| 1004 | County property taxes | | months @ | per month | | | |
| 1005 | Annual assessments | | months @ | per month | | | |
| 1006 | Flood insurance | | months @ | per month | | | |
| 1007 | | | months @ | per month | | | |
| 1008 | | | months @ | per month | | | |
| 1009 | Aggregate accounting adjustment | | | | | | |
| 1100. Title charges: | | | | | Borrower POC/Seller POC | | |
| 1101 | Settlement or closing fee | | to | Michele M Lewis PA | | 295.00 | 125.00 |
| 1102 | Abstract or title search: | | to | Old Republic National Title Insurance Company | | | |
| 1103 | Title examination | | to | | | | |
| 1104 | Title insurance binder | | to | | | | |
| 1105 | Document preparation | | to | | | | |
| 1106 | Notary fees | | to | | | | |
| 1107 | Attorney's Fees | | to | | | | |
| | (includes above item numbers: | | | ) | | 15,637.50 | |
| 1108 | Title Insurance | to Old Republic Nat. Title/Michele M Lewis | | | ) | | |
| | (includes above item numbers: | | | ) | | | |
| 1109 | Lender's coverage (Premium): | | | | | | |
| 1110 | Owner's coverage (Premium): | $5,250,000.00 ($15,637.50) | | | | | |
| 1111 | Endorse: | | | | | -7,818.75 | |
| 1112 | Courtesy Discount for Title Insurance | | to Michele M Lewis PA | | | 3.28 | |
| 1113 | FL Statutory Surcharge | | to Old Republic National Title Insurance Company | | | | |
| 1200. Government recording and transfer charges: | | | | | | | |
| 1201 | Recording fees | Deed | $18.50 Mortgage(s) | Releases | | 18.50 | |
| 1202 | City/county tax/stamps | Deed | Mortgage(s) | | | | 36,750.00 |
| 1203 | State tax/stamps | Deed | $36,750.00 Mortgage(s) | | | | |
| 1204 | | | to | | | | |
| 1205 | | | to | | Borrower POC/Seller POC | | |
| 1300. Additional settlement charges: | | | | | | | |
| 1301 | Survey | | to | | | | |
| 1302 | Pest Inspection | | to | | | | 219.00 |
| 1303 | Municipal Lien Search | | to | Clear Choice Tax & Lien Service | | | 1,020.00 |
| 1304 | Home Warranty | | to | American Home Shield | | | |
| 1305 | | | to | | | | |
| 1306 | | | to | | | | |
| 1307 | | | to | | | | |
| 1308 | | | to | | | | |
| 1309 | | | | | | | |
| 1400. Total settlement charges: | | | | | | 8,135.53 | 313,114.00 |
| ( Enter on lines 103, Section J and 502, Section K.) | | | | | | | |

DoubleTime®

# HUD-1 SETTLEMENT STATEMENT ADDENDUM

**File Number:**   T300EstateHomes

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

## Borrower(s)

_____

Douglas E. Nicholson
Trustee

## Seller(s)

Estate Homes, LLC a Florida limited liability company
a partnership

By:   The Caden Group, Inc., a Florida corporation
      its Managing Member

      By: _____
          Elliott Sharaby
          President

      (Corporate Seal)

## Settlement Agent

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Michele M Lewis PA

By: _____   Date: _____

**WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.**

DoubleTime®

# HUD-1 SETTLEMENT STATEMENT ADDENDUM

File Number:    T300EstateHomes

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a copy of the HUD-1 Settlement Statement.

## Borrower(s)

_____
Douglas E. Nicholson
Trustee

## Seller(s)

Estate Homes, LLC a Florida limited liability company

By:   The Caden Group, Inc., a Florida corporation
      its Managing Member

By: _____
    Elliott Sharaby
    President

      (Corporate Seal)

## Settlement Agent

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have caused or will cause the funds to be disbursed in accordance with this statement.

Michele M Lewis PA

By: _____          Date: _____

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment.  For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

# *EXHIBIT D*

# "AS IS" Residential Contract For Sale And Purchase
**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**

 **Florida**Realtors®

1\* **PARTIES:** _____ ESTATE HOMES LLC _____ ("Seller"),
2\* and _____ JLM Land Trust _____ ("Buyer"),
3 agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4 (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And
5 Purchase and any riders and addenda ("Contract"):
6 **1. PROPERTY DESCRIPTION:**
7\*   (a) Street address, city, zip: _____ 300 Royal Plaza Drive Fort Lauderdale, FL 33301 _____
8\*   (b) Property is located in: __ Broward __ County, Florida. Real Property Tax ID No.: _ 5042 12 14 0010 _
9\*   (c) Real Property: The legal description is Lot 1, Plus the North 10.58 feet of Lot 2, Block 2, of STILLWELL
10      ISLES, according to the Plat thereof, recorded in Plat Book 15, Page 26, of the Public Records of Broward
11      County, Florida.
12      together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13      attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14      by other terms of this Contract.
15   (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16      which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17      purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18      drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security
19      gate and other access devices, and storm shutters/panels ("Personal Property").
20\*     Other Personal Property items included in this purchase are: All appliances _____
21      _____
22      Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23\*   (e) The following items are excluded from the purchase: NA _____
24      _____

25                              **PURCHASE PRICE AND CLOSING**

26\* **2. PURCHASE PRICE** (U.S. currency): ........................................................................... $ _ 5,250,000.00 _
27\*   (a) Initial deposit to be held in escrow in the amount of **(checks subject to COLLECTION)** ....... $ _ 150,000.00 _
28      The initial deposit made payable and delivered to "Escrow Agent" named below
29\*     **(CHECK ONE):** (i) ☐ accompanies offer or (ii) ☒ is to be made within __3__ (if left
30      blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31      OPTION (ii) SHALL BE DEEMED SELECTED.
32\*     Escrow Agent Information: Name: _____ Florida Coastal Realty Group _____
33\*     Address: _____ 3900 E. Indiantown Rd. Ste. 607-179 Jupiter, FL 33477 _____
34\*     Phone: 561-277-8490 E-mail: _ peggy@flcoastalrealty.com _ Fax: 866-890-2458
35\*   (b) Additional deposit to be delivered to Escrow Agent within ___16___ (if left blank, then 10)
36\*     days after Effective Date .................................................................................... $ _ 250,000.00 _
37      (All deposits paid or to be paid, are collectively referred to as the "Deposit")
38\*   (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8 ......... _____
39\*   (d) Other: _____ ................ $ _____
40   (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41\*     transfer or other **COLLECTED** funds ................................................................. $ _ 4,850,000.00 _
42      **NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.**
43 **3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44   (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45\*     _____ June 17, 2016 _____, this offer shall be deemed withdrawn and the Deposit, if any, shall be returned
46      to Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the
47      day the counter-offer is delivered.
48   (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49      initialed and delivered this offer or final counter-offer ("Effective Date").
50 **4. CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51      and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52\*     ("Closing") on _____ or before July 15, 2016 _____ ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials _JM_ _____        Page 1 of 12        Seller's Initials _____ _____
Jun 17, 2016
formsimplicity

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

**5. EXTENSION OF CLOSING DATE:**

(a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.

(b) If extreme weather or other condition or event constituting "Force Majeure" (see STANDARD G) causes: (i) disruption of utilities or other services essential for Closing or (ii) Hazard, Wind, Flood or Homeowners' insurance, to become unavailable prior to Closing, Closing shall be extended a reasonable time up to 3 days after restoration of utilities and other services essential to Closing and availability of applicable Hazard, Wind, Flood or Homeowners' insurance. If restoration of such utilities or services and availability of insurance has not occurred within _____ (if left blank, then 14) days after Closing Date, then either party may terminate this Contract by delivering written notice to the other party, and Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract.

**6. OCCUPANCY AND POSSESSION:**

(a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.

(b) ☐ **CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING.** If Property is subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

**7. ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☒ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

<strong>FINANCING</strong>

**8. FINANCING:**

☒ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.

☐ (b) This Contract is contingent upon Buyer obtaining a written loan commitment for a ☐ conventional ☐ FHA ☐ VA or ☐ other _____ (describe) loan on the following terms within _____ (if left blank, then 45) days after Effective Date ("Loan Commitment Date") for **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate loan in the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _____ % (if left blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____ (if left blank, then 30) years ("Financing").

Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective Date and use good faith and diligent effort to obtain a written loan commitment for the Financing ("Loan Commitment") and thereafter to close this Contract. Buyer shall keep Seller and Broker fully informed about the status of mortgage loan application and Loan Commitment and authorizes Buyer's mortgage broker and Buyer's lender to disclose such status and progress to Seller and Broker.

Upon Buyer's receipt of Loan Commitment, Buyer shall provide written notice of same to Seller. If Buyer does not receive Loan Commitment by Loan Commitment Date, then thereafter either party may cancel this Contract **up to the earlier of:**

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

(i.) Buyer's delivery of written notice to Seller that Buyer has either received Loan Commitment or elected to waive the financing contingency of this Contract; or

(ii.) 7 days prior to the Closing Date specified in Paragraph 4, which date, for purposes of this Paragraph 8(b) (ii), shall not be modified by Paragraph 5(a).

If either party timely cancels this Contract pursuant to this Paragraph 8 and Buyer is not in default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. If neither party has timely canceled this Contract pursuant to this Paragraph 8, then this financing contingency shall be deemed waived by Buyer.

If Buyer delivers written notice of receipt of Loan Commitment to Seller and this Contract does not thereafter close, the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's default; (2) Property related conditions of the Loan Commitment have not been met (except when such conditions are waived by other provisions of this Contract); (3) appraisal of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Commitment; or (4) the loan is not funded due to financial failure of Buyer's lender, in which event(s) the Deposit shall be returned to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

☐ (c) Assumption of existing mortgage (see rider for terms).

☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

### CLOSING COSTS, FEES AND CHARGES

**9.  CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**

(a) **COSTS TO BE PAID BY SELLER:**

- Documentary stamp taxes and surtax on deed, if any
- Owner's Policy and Charges (if Paragraph 9(c) (i) is checked)
- Title search charges (if Paragraph 9(c) (iii) is checked)
- Municipal lien search (if Paragraph 9(c) (i) or (iii) is checked)
- HOA/Condominium Association estoppel fees
- Recording and other fees needed to cure title
- Seller's attorneys' fees
- Other:_____

If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11 a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.

(b) **COSTS TO BE PAID BY BUYER:**

- Taxes and recording fees on notes and mortgages
- Recording fees for deed and financing statements
- Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)
- Survey (and elevation certification, if required)
- Lender's title policy and endorsements
- HOA/Condominium Association application/transfer fees
- Municipal lien search (if Paragraph 9(c) (ii) is checked)
- Other: _____
- Loan expenses
- Appraisal fees
- Buyer's Inspections
- Buyer's attorneys' fees
- All property related insurance
- Owner's Policy Premium (if Paragraph 9 (c) (iii) is checked.)

(c) **TITLE EVIDENCE AND INSURANCE:** At least _____ (if left blank, then 15, or if Paragraph 8(a) is checked, then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated and allocated in accordance with Florida law, but may be reported differently on certain federally mandated closing disclosures and other closing documents.

**(CHECK ONE):**

☐ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the premium for Buyer's lender's policy and charges for closing services related to the lender's policy, endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other provider(s) as Buyer may select; or

☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing services related to Buyer's lender's policy, endorsements and loan closing; or

☒ (iii) **[MIAMI-DADE/BROWARD REGIONAL PROVISION]:** Seller shall furnish a copy of a prior owner's policy of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

163 evidence, which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search;
164 and (C) municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for
165 Buyer's owner's policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more
166* than $ 400.00           (if left blank, then $200.00) for abstract continuation or title search ordered or
167 performed by Closing Agent.

(d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
169 surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
170 Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.

171* (e) **HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☒ N/A shall pay for a home warranty plan issued by
172* _____ at a cost not to exceed $_____. A home
173 warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
174 appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.

175 (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
176 ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
177 ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
178 improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
179 imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
180 be paid in installments **(CHECK ONE):**
181* ☐ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
182 Installments prepaid or due for the year of Closing shall be prorated.
183* ☒ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
184 IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
185 This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
186 (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

187 **DISCLOSURES**

188 **10. DISCLOSURES:**
189 (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
190 sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
191 exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
192 radon and radon testing may be obtained from your county health department.
193 (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure,
194 Seller does not know of any improvements made to the Property which were made without required permits
195 or made pursuant to permits which have not been properly closed.
196 (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned
197 or desires additional information regarding mold, Buyer should contact an appropriate professional.
198 (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
199 zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
200 improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
201 or "Coastal Barrier Resources Act" designated zone or otherwise protected area identified by the U.S. Fish
202 and Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s)
203 and /or flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance
204 coverage through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C.
205 §4012a, Buyer may terminate this Contract by delivering written notice to Seller within _____ (if left blank,
206* then 20) days after Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and
207 Seller from all further obligations under this Contract, failing which Buyer accepts existing elevation of
208 buildings and flood zone designation of Property. The National Flood Insurance Program may assess
209 additional fees or adjust premiums for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures
210 (residential structures in which the insured or spouse does not reside for at least 50% of the year) and an
211 elevation certificate may be required for actuarial rating.
212 (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information
213 Brochure required by Section 553.996, F.S.
214 (f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is
215 mandatory.
216 (g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS**
217 **CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS'**
218 **ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

Buyer's Initials _JM_ _____     Page **4** of **12**     Seller's Initials _Ejs_ _____
Serial#: **010850-000146-6176684**

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

formsimplicity

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **FIRPTA TAX WITHHOLDING:** Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

**PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS**

**11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

**12. PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have __15__ (if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations, consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to expend, any money.

Buyer's Initials _JM_  _____          Page **5** of **12**          Seller's Initials _Ejs_  _____

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.          Jun 17, 2016

Serial#: 010850-000146-6176684

formsimplicity

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

(d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties to Buyer.

### ESCROW AGENT AND BROKER

**13. ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow within the State of Florida and, subject to **COLLECTION**, disburse them in accordance with terms and conditions of this Contract. Failure of funds to become **COLLECTED** shall not excuse Buyer's performance. When conflicting demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through mediation, arbitration, interpleader or an escrow disbursement order.

Any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or termination of this Contract.

**14. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition, square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL, WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral, recommendation or retention of any vendor for, or on behalf of Indemnifying Party; (iv) products or services provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor. Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

### DEFAULT AND DISPUTE RESOLUTION

**15. DEFAULT:**

(a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract, including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon

---

Buyer's Initials _JM_ _____          Page **6** of **12**          Seller's Initials _Ejs_

FloridaRealtors/FloridaBar-ASIS-4x   Rev.2/16 © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.

Serial#: 010850-000146-6176684

Jun 17, 2016

formsimplicity

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

326  default by Buyer, shall be split equally between Listing Broker and Cooperating Broker; provided however,
327  Cooperating Broker's share shall not be greater than the commission amount Listing Broker had agreed to
328  pay to Cooperating Broker.

329  (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
330  reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
331  Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
332  from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
333  performance.

334  This Paragraph 15 shall survive Closing or termination of this Contract.

335  **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
336  Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be
337  settled as follows:

338  (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
339  resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
340  16(b).

341  (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
342  Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
343  The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
344  sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
345  may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
346  16 shall survive Closing or termination of this Contract.

347  **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
348  by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
349  conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to
350  recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting
351  the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

352  **STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**

353  **18. STANDARDS:**

354  **A. TITLE:**

355  (i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
356  Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto,
357  shall be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by
358  Seller at or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title
359  insurance in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the
360  Real Property, subject only to the following matters: (a) comprehensive land use plans, zoning, and other land
361  use restrictions, prohibitions and requirements imposed by governmental authority; (b) restrictions and matters
362  appearing on the Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of
363  record without right of entry; (d) unplatted public utility easements of record (located contiguous to real property
364  lines and not more than 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes
365  for year of Closing and subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if
366  additional items, attach addendum); provided, that, none prevent use of Property for **RESIDENTIAL PURPOSES**.
367  If there exists at Closing any violation of items identified in (b) – (f) above, then the same shall be deemed a title
368  defect. Marketable title shall be determined according to applicable Title Standards adopted by authority of The
369  Florida Bar and in accordance with law.

370  (ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify
371  Seller in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and
372  it is delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after
373  date of receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period")
374  after receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to so notify
375  Seller, Buyer shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller
376  will deliver written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties
377  will close this Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of
378  Seller's notice). If Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after
379  expiration of Cure Period, deliver written notice to Seller: (a) extending Cure Period for a specified period not to
380  exceed 120 days within which Seller shall continue to use reasonable diligent effort to remove or cure the defects
381  ("Extended Cure Period"); or (b) electing to accept title with existing defects and close this Contract on Closing

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aaa49bfe ]

formsimplicity

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

382 Date (or if Closing Date has passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's
383 receipt of Seller's notice), or (c) electing to terminate this Contract and receive a refund of the Deposit, thereby
384 releasing Buyer and Seller from all further obligations under this Contract. If after reasonable diligent effort, Seller
385 is unable to timely cure defects, and Buyer does not waive the defects, this Contract shall terminate, and Buyer
386 shall receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under this
387 Contract.
388 **B.  SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
389 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
390 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
391 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
392 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
393 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
394 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
395 preparation of such prior survey, to the extent the affirmations therein are true and correct.
396 **C.  INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
397 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of
398 access.
399 **D.  LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
400 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
401 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
402 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
403 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
404 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to
405 Paragraph 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice
406 to Seller within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating
407 this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations
408 under this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's
409 obligations thereunder.
410 **E.  LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
411 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
412 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
413 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
414 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
415 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all
416 charges for improvements or repairs which could serve as a basis for a construction lien or a claim for damages
417 have been paid or will be paid at Closing.
418 **F.  TIME:** Calendar days shall be used in computing time periods. **Time is of the essence in this Contract.**
419 Other than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or
420 dates specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or
421 occur on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the
422 Property is located) of the next business day.
423 **G.  FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
424 liable to each other for damages so long as performance or non-performance of the obligation is delayed, caused
425 or prevented by Force Majeure. "Force Majeure" means: hurricanes, earthquakes, floods, fire, acts of God,
426 unusual transportation delays, wars, insurrections, and acts of terrorism, and which, by exercise of reasonable diligent
427 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
428 Closing Date, will be extended for the period that the Force Majeure prevents performance under this Contract,
429 provided, however, if such Force Majeure continues to prevent performance under this Contract more than 14
430 days beyond Closing Date, then either party may terminate this Contract by delivering written notice to the other
431 and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under
432 this Contract.
433 **H.  CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
434 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
435 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be
436 transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in
437 this Contract.
438 **I.  CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**

Buyer's Initials _JM_ _____    Page **8** of **12**    Seller's Initials _____

*Ejs*

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

formsimplicity

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

439 (i) **LOCATION:** Closing will take place in the county where the Real Property is located at the office of the
440 attorney or other closing agent ("Closing Agent") designated by the party paying for the owner's policy of title
441 insurance, or, if no title insurance, designated by Seller. Closing may be conducted by mail or electronic means.
442 (ii) **CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
443 sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien  affidavit
444 (s), owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer  with paid
445 receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as  applicable
446 the survey, flood elevation certification, and documents required by Buyer's lender.
447 (iii) **PROCEDURE:** The deed shall be recorded upon **COLLECTION** of all closing funds. If the Title Commitment
448 provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
449 procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to COLLECTION of all**
450 **closing funds**, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.
451 **J.  ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
452 for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
453 escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
454 for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault
455 of Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days
456 from date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit
457 and all Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
458 simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
459 convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely
460 demand for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening
461 defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
462 **K.  PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as
463 of the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
464 (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
465 and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if
466 assumable, in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may
467 be required by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will
468 be credited to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated
469 based on current year's tax with due allowance made for maximum allowable discount, homestead and other
470 exemptions. If Closing occurs on a date when current year's millage is not fixed but current year's assessment is
471 available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
472 assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
473 on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
474 of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
475 agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
476 informal assessment taking into account available exemptions. A tax proration based on an estimate shall, at
477 either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K shall survive
478 Closing.
479 **L.  ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
480 shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
481 including a walk-through (or follow-up walk-through if necessary) prior to Closing.
482 **M. RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
483 ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does
484 not exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
485 pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated
486 cost to complete restoration (not to exceed 1.5% of Purchase Price), will be escrowed at Closing. If actual cost of
487 restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase
488 Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of
489 Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the
490 Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation
491 with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.
492 **N.  1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with
493 Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall
494 cooperate in all reasonable respects to effectuate the Exchange, including execution of documents; provided,

Buyer's Initials _JM_ _____          Page **9** of **12**          Seller's Initials _EJS_ _____

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aaa49bfe ]

formsimplicity

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

495 however, cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be
496 contingent upon, nor extended or delayed by, such Exchange.
497 **O.  CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT**
498 **EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall
499 be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest.
500 Whenever the context permits, singular shall include plural and one gender shall include all. Notice and delivery
501 given by or to the attorney or broker (including such broker's real estate licensee) representing any party shall be
502 as effective as if given by or to that party. All notices must be in writing and may be made by mail, personal
503 delivery or electronic (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and
504 any signatures hereon shall be considered for all purposes as an original. This Contract may be executed by use
505 of electronic signatures, as determined by Florida's Electronic Signature Act and other applicable laws.
506 **P.  INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement
507 of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or
508 representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or
509 change in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties
510 intended to be bound by it.
511 **Q.  WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this
512 Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or
513 rights.
514 **R.  RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten
515 or handwritten provisions shall control all printed provisions of this Contract in conflict with them.
516 **S.  COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or**
517 **received, including Deposits, have become actually and finally collected and deposited in the account of**
518 **Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents**
519 **may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's**
520 **accounts.**
521 **T.  LOAN COMMITMENT:** "Loan Commitment" means a statement by the lender setting forth the terms and
522 conditions upon which the lender is willing to make a particular mortgage loan to a particular borrower. Neither a
523 pre-approval letter nor a prequalification letter shall be deemed a Loan Commitment for purposes of this Contract.
524 **U.  APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State
525 of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the
526 county where the Real Property is located.
527 **V.  FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** If a seller of U.S. real property is a
528 "foreign person" as defined by FIRPTA, Section 1445 of the Internal Revenue Code requires the buyer of the real
529 property to withhold up to 15% of the amount realized by the seller on the transfer and remit the withheld amount
530 to the  Internal Revenue Service (IRS) unless an exemption to the required withholding applies or the seller has
531 obtained  a Withholding Certificate from the IRS authorizing a reduced amount of withholding. Due to the
532 complexity and  potential risks of FIRPTA, Buyer and Seller should seek legal and tax advice regarding
533 compliance, particularly if  an "exemption" is claimed on the sale of residential property for $300,000 or less.
534 (i)  No withholding is required under Section 1445 if the Seller is not a "foreign person," provided Buyer accepts
535 proof of same from Seller, which may include Buyer's receipt of certification of non-foreign status from Seller,
536 signed under penalties of perjury, stating that Seller is not a foreign person and containing Seller's name, U.S.
537 taxpayer identification number and home address (or office address, in the case of an entity), as provided for in
538 26 CFR 1.1445-2(b). Otherwise, Buyer shall withhold the applicable percentage of the amount realized by Seller
539 on the transfer and  timely remit said funds to the IRS.
540 (ii)  If Seller has received a Withholding Certificate from the IRS which provides for reduced or eliminated
541 withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the reduced
542 sum, if any required, and timely remit said funds to the IRS.
543 (iii) If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and
544 has provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been
545 received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by
546 Seller on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the
547 funds in escrow, at  Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated
548 by the parties, to be  subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or
549 remitted directly to  the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.
550 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
551 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the

Buyer's Initials _JM_ _____     Page **10** of **12**     Seller's Initials _EJS_ _____

**STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED**

552 applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
553 disbursement in accordance with the final determination of the IRS, as applicable.
554 (v)  Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
555 8288 and 8288-A, as filed.
556 **W.  RESERVED**
557 **X.  BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller*
558 *and against any real estate licensee involved in the negotiation of this Contract for any damage or*
559 *defects pertaining to the physical condition of the Property that may exist at Closing of this Contract and*
560 *be subsequently discovered by the Buyer or anyone claiming* by, through, under or against the Buyer.
561 *This provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall*
562 *survive Closing.*
563 **ADDENDA AND ADDITIONAL TERMS**

564* **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into
565 this Contract (**Check if applicable**):

- [ ] A.  Condominium Rider
- [ ] B.  Homeowners' Assn.
- [ ] C.  Seller Financing
- [ ] D.  Mortgage Assumption
- [ ] E.  FHA/VA Financing
- [ ] F.  Appraisal Contingency
- [ ] G.  Short Sale
- [ ] H.  Homeowners'/Flood In
- [ ] J.  Interest-Bearing Acct.

- [ ] K.  RESERVED
- [ ] L.  RESERVED
- [ ] M.  Defective Drywall
- [ ] N.  Coastal Construction Control Line
- [ ] O.  Insulation Disclosure
- [ ] P.  Lead Paint Disclosure (Pre-1978)
- [ ] Q.  Housing for Older Persons
- [ ] R.  Rezoning
- [ ] S.  Lease Purchase/ Lease Option

- [ ] T.  Pre-Closing Occupancy
- [ ] U.  Post-Closing Occupancy
- [ ] V.  Sale of Buyer's Property
- [ ] W.  Back-up Contract
- [ ] X.  Kick-out Clause
- [ ] Y.  Seller's Attorney Approval
- [ ] Z.  Buyer's Attorney Approval
- [ ] AA.  Licensee Property Interest
- [ ] BB.  Binding Arbitration

566* **20. ADDITIONAL TERMS:** The Buyer and Seller agree to split closing costs 50/50. The Buyer will select the closing
567 agent.
568
569
570
571
572
573
574
575
576
577
578
579
580
581
582

583 **COUNTER-OFFER/REJECTION**

584* [ ] Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
585 deliver a copy of the acceptance to Seller).
586* [ ] Seller rejects Buyer's offer.

587 **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE**
588 **ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**

589 **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

590 *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the terms*
591 *and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and conditions*

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

592  *should be negotiated based upon the respective interests, objectives and bargaining positions of all interested*
593  *persons.*

594  AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO
595  BE COMPLETED.

596
597*  Buyer: *Jeremy Marcus* _____     Date: 6/17/2016
598
599*  Buyer: _____     Date: _____
600
601*  Seller: *Elliott Sharaby* _____     Date: June 17, 2016
602
603*  Seller: Jun 17, 2016 _____     Date: _____
604
605   Buyer's address for purposes of notice          Seller's address for purposes of notice
606*  1410 SW 3rd St.                                 3409 FALLSTAFF RD
607*  Pompano Beach, FL 33069                         BALTIMORE MD 21215
608*  _____                     _____

609  **BROKER:** Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers entitled
610  to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct Closing Agent
611  to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage agreements with the
612  parties and cooperative agreements between the Brokers, except to the extent Broker has retained such fees from the
613  escrowed funds. This Contract shall not modify any MLS or other offer of compensation made by Seller or Listing
614  Broker to Cooperating Brokers.

615*  _____Amanda Finley_____          _____Timothy Elmes_____
616  **Cooperating Sales Associate, if any**                **Listing Sales Associate**

617*  _____Florida Coastal Realty Group 3%_____          _____Coldwell Banker_____
618  **Cooperating Broker, if any**                         **Listing Broker**

Electronically Signed using eSignOnline™[ Session ID : 3bf08f55-c4b9-494c-b156-e54e9aa49bfe ]

# *EXHIBIT E*



GENOVESE

JOBLOVE &

BATTISTA
— P.A. —
ATTORNEYS AT LAW

Heather L. Harmon
Telephone: (305) 349-2300
Email: hharmon@gjb-law.com

September 6, 2017

**Via Hand Delivery:**

Amanda Elizabeth Finley
300 Royal Plaza Drive
Fort Lauderdale, FL 33301

Re:  **Federal Trade Commission and State of Florida v. Jeremy Lee Marcus, et al.**
     **USDC SD FL Case No. 17-60907-CIV-MORENO**

Dear Ms. Finley,

As you are aware, this firm represents Jonathan E. Perlman, as Receiver for the Receivership Defendants[1] (the "Receiver") in the above-referenced case.

By quit claiming your interest in your home to Jeremy Marcus, the Receiver agrees that you are not waiving any potential right you may have to assert an equitable lien in the property based solely on a brokerage fee you claim to have earned in its purchase, which you agree will in no event exceed $107,500.

Should you have any questions or wish to discuss this matter further, please do not hesitate to contact the undersigned. Thank you in advance for your cooperation in this matter.

---

[1] The "Receivership Defendants" means Financial Freedom National, Inc. f/k/a Institute for Financial Freedom, Inc. and Marine Career Institute Sea Frontiers, Inc. also d/b/a 321 Loans, Instahelp America, Inc., Helping America Group, United Financial Support, Breeze Financial Solutions 321 Financial Education, Credit Health Plan, Credit Specialists of America, American Advocacy Alliance, and Associated Administrative Services; 321 Loans, Inc., f/k/a 321 Loans, Inc. also d/b/a 321 Financial, Inc.; Instahelp America, Inc. f/k/a Helping America Team, Inc. also d/b/a Helping America Group; Breeze Financial Solutions, Inc. also d/b/a Credit Health Plan and Credit Maximizing Program; US Legal Club, LLC; Active Debt Solutions, LLC f/k/a Active Debt Solutions, Inc. also d/b/a Guardian Legal Center; Guardian LG, LLC also d/b/a Guardian Legal Group; American Credit Security, LLC f/k/a America Credit Shield, LLC; Paralegal Support Group LLC f/k/a Paralegal Support LLC; and Associated Administrative Services, LLC also d/b/a Jobfax, and their divisions, subsidiaries, affiliates, predecessors, successors, assigns, and any fictitious business entities or business names created or used by these entities, or any of them.   The Receivership Defendants were expanded to include Viking Management Services, LLC, Cockburn & Associate LLC, Omni Management Partners LLC, Discount Marketing USA, S.A., JLMJP Pompano, LLC, Nantucket Cove of Illinois, LLC, Halfpay International, LLC, Halfpay NV, LLC, HP Properties Group, Inc., HP Media, Inc., White Light Media LLC, Blue42, LLC as Additional Receivership Entities. ("Expansion Order") [ECF No. 102]. The Receiver understands that Plaintiffs will be filing an amended complaint that includes the additional Receivership Entities as additional "Receivership Defendants."

2 | Page

Very truly yours,

Heather L. Harmon
For the firm

Enclosure

Cc:     Rachel Hirsch, Esq.
        Ifrah PLLC
        1717 Pennsylvania Avenue
        Suite 650
        Washington, D.C. 20006
        rhirsch@ifrahlaw.com

        Valerie M. Verduce, Esq.
        Southeast Region
        Bureau of Consumer Protection
        225 Peachtree Street N.E., Suite 1500
        Atlanta, GA  30303
        vverduce@ftc.gov

[10675-006/2771061/1]

GENOVESE JOBLOVE & BATTISTA, P.A. • 100 Southeast Second Street, 44th Floor • Miami, Florida 33131 • Telephone: 305.349.2300 • Facsimile 305.349.2310